IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **DOUG GREISEN**, an individual, | Case No. 3:14-cv-01399-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **JON HANKEN**, an individual; **JOHN DOES 1-5**; and the **CITY OF SCAPPOOSE**, an Oregon municipality, | |
| Defendants. | |

John D. Ostrander and William A. Drew, ELLIOTT, OSTRANDER & PRESTON, P.C., 707 S.W. Washington Street, Suite 1500, Portland, OR 97205. Of Attorneys for Plaintiff.

Karen M. Vickers and Blake H. Fry, MERSEREAU SHANNON L.L.P., One S.W. Columbia Street, Suite 1600, Portland, OR 97258. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

  Doug Greisen ("Griesen") brings this action against Jon Hanken ("Hanken"), the former City Manager for the City of Scappoose; John Does 1-5, individuals alleged to have acted in concert with Hanken, in their official and personal capacities (the "Doe Defendants"); and the City of Scappoose (the "City"), an Oregon municipality that is Greisen's former employer (collectively, "Defendants"). In response to Defendants' motion for summary judgment, Greisen withdrew his claims for whistleblowing retaliation and wrongful discharge. Greisen's remaining

claims are: (1) First Amendment retaliation in violation of 42 U.S.C. § 1983, against Hanken; (2) intentional infliction of emotional distress, against all Defendants; (3) invasion of privacy by false light, against all Defendants; (4) unpaid wages, against the City; and (5) tortious interference with economic relations, against Hanken. Before the Court is Defendants' motion for summary judgment against all remaining claims. Dkt. 26. For the reasons that follow, the Court GRANTS IN PART AND DENIES IN PART Defendants' motion for summary judgment.

## STANDARD

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

For 13 years Greisen was the Chief of Police of Scappoose, Oregon. The City terminated his employment in May 2014 under a "no-cause" provision in his contract. Dkt. 31-2 at 2; Dkt. 27-4 at 6. Hanken was City Manager of Scappoose until his resignation on November 8,

PAGE 2 – OPINION AND ORDER

2013. Dkt. 31-3 at 32. In 2012, Greisen became concerned about Hanken's budget practices and began to voice concerns. Greisen alleges that Hanken retaliated against Greisen for doing so, resulting in three allegedly sham investigations into Greisen's conduct as Chief of Police, a newspaper article that damaged Greisen's public reputation, and, ultimately, Greisen's termination as Chief of Police.

**A.   Greisen's Concerns About Hanken's Budget Practices**

As Chief of Police, Greisen's job duties included developing and managing the budget for the police department. Dkt. 27-1 at 4. In 2012, Greisen began raising questions about the City's budget and finances with Hanken. Dkt. 30, ¶ 1. In April of that year, Hanken "firmly instructed" Greisen that in the "best interests of [his] career," Greisen should support Hanken's budget. *Id.* Following those directions, on May 14, 2012, Greisen opposed City Councilor Judi Ingham's ("Ingham") request to hire additional police officers even though he "truly agreed" with her proposal. *Id.* Greisen alleges that Hanken perceived Greisen's opposition to Ingham's request as "weak" and became "enraged" and confronted and admonished Greisen. *Id.* In August 2012, Hanken again confronted Greisen and told Greisen that the best thing for his career was to not listen to Ingham, as "she is the one that will ruin [Greisen's] career here with the city." *Id.*

At about the same time, police department vendors contacted Greisen about past due bills. *Id.* at ¶ 2. Greisen asked the City's accounts payable clerk about the unpaid invoices. *Id.* ¶ 2. The clerk stated that Hanken and the City's Finance Director were holding invoices totaling more than $10,000 for the police department. *Id.* Greisen states that he was concerned, both "as a Police Chief *and* as a citizen," that Hanken was manipulating city accounts to hide inappropriate budget expenditures. *Id.* (emphasis in original). After Greisen asked the accounts payable clerk about the unpaid invoices, Hanken told Greisen that Greisen "should not question Mr. Hanken or

anything about finances." *Id.* ¶ 3. Greisen later discovered that Hanken had held invoices for several months, waiting to pay them until the new fiscal year started. Dkt. 27-2 at 6.

Greisen raised these issues with a City finance officer, Jill Herr ("Herr"). *Id.* Herr told Greisen that "she only does what Jon [Hanken] tells her to do" and that Hanken directed her to hold invoices until the new fiscal year. *Id.* Greisen was troubled by this practice because it "was not only damaging to important, long-term vendor relationships, but was contrary to proper budgeting practices and procedures" as he understood them. Dkt. 30 ¶ 4. Greisen "escalated [his] inquiries with City employees other than Mr. Hanken," including the City Finance Director. *Id.* ¶ 4. Greisen began to question Hanken's role in the budget and expenditures for other departments, and talked with City councilors "both as a police chief and as a concerned citizen." *Id.* ¶ 5.

**B. The First Investigation**

Greisen alleges that Hanken retaliated against him for these budget inquiries by initiating three investigations into Greisen's conduct as Chief of Police. The first investigation concerned Greisen's involvement in a February 4, 2013 high-speed car chase. During the car chase, Greisen authorized another officer to perform a "PIT" maneuver designed to cause the suspect vehicle to spin out. Dkt. 27-1 at 33-34. On March 4, 2013, one of Greisen's sergeants, Doug Carpenter ("Carpenter"), complained about the use of the PIT maneuver in a memorandum to Carpenter's superior, then-Lieutenant Norman Miller ("Miller"). *Id.* at 33-39. On May 30, 2013, Miller recommended to Hanken that the Oregon State Police conduct an internal investigation into the incident. *Id.* at 31.

On July 17, 2013, Hanken discussed Carpenter's complaint with the City Attorney. Dkt. 31-3 at 2. Hanken then hired the Local Government Personnel Institute ("LGPI") to investigate the complaint. *Id.* On August 12, 2013, LGPI submitted an investigative report

PAGE 4 – OPINION AND ORDER

regarding the PIT maneuver that was unfavorable to Greisen. Dkt. 27-3 at 29-34. On August 23, 2013, Hanken wrote a letter to Greisen notifying Greisen of the results of the investigative report, stating: "As I draft this letter, I cannot help but wonder if you would be able to maintain your position if this report was known by or reported to the news media." *Id.* at 35-36. Hanken suspended Greisen for two weeks without pay. *Id.* at 36.

On August 26, 2013, Greisen appealed the disciplinary action to then-City Mayor Scott Burge ("Burge"). *Id.* at 37-42. Burge appointed a Personnel Review Committee ("PRC"), composed of City councilors and the City Attorney, to consider Greisen's appeal. Dkt. 31-3 at 26. On October 14, 2013, the PRC found that the degree of discipline was "entirely out of proportion based on the totality of the circumstances" surrounding the incident. *Id.* at 27. The PRC additionally found that the LGPI report was "an erroneous mischaracterization of the events" and that the report "purposely omitted pertinent and material facts." *Id.* at 29. The PRC concluded that the LGPI report was "null and void." *Id.*

### C. The Second Investigation

In early September 2013, Greisen received a letter advising him that he would remain on paid administrative leave because of another complaint made by Carpenter. Dkt. 27-1 at 6. In this second complaint, Carpenter claimed that Greisen harassed him in retaliation for complaining about the PIT maneuver. *Id.* LGPI conducted an investigation into the harassment allegation against Greisen. *Id.* at 7.

Greisen was ultimately exonerated in the harassment investigation. Dkt. 31-2 at 8. Greisen states that the City "held on" to the harassment investigation report that cleared his name until June 2015, though the report was completed on November 13, 2013. Dkt. 30 ¶ 7.

PAGE 5 – OPINION AND ORDER

### D. The Third Investigation

In the fall of 2013, while Greisen was still on administrative leave, Miller discovered cash in a locked desk drawer in Greisen's office and brought it to Hanken. *Id.* at 10. Hanken called the Columbia County Sheriff to get advice on how to handle the situation and also talked to the Mayor and the Columbia County District Attorney. *Id.* at 32. The Columbia County District Attorney recommended that Hanken arrange for a forensic audit. *Id.* Hanken again hired LGPI to perform the investigation. *Id.* Hanken ordered Greisen not to discuss the matter publicly. Dkt. 31-2 at 20. On September 9, 2013, the City Attorney also ordered Greisen not to speak with the press or media. Dkt. 30 ¶ 8.

Greisen testified during his deposition that the cash came from police department bank accounts. In the 1980s, a former police chief established the bank accounts to hold donations and other funds, and the accounts were later moved from bank to bank. Dkt. 27-1 at 8. Greisen closed the accounts because of a monthly finance fee and intended to open a credit union account with the money. *Id.* at 9. He stated that he was keeping the money in his desk drawer, which "was well known and understood," because he thought it was a safe place. *Id.*

### E. The *South County Spotlight* Article

On November 15, 2013, the *South County Spotlight*, a local newspaper, published an article about the financial investigation. Dkt. 31-3 at 30-33. The article asserted that the "[d]iscovery of the bank deposit bag and its contents is significant as it raises questions about whether the chief was maintaining an unauthorized account for revenue deposits and withdrawals." *Id.* The article also discussed the prior two investigations and stated that Greisen was "currently on paid leave following allegations he retaliated against a Scappoose Police Department sergeant who had brought to light concerns Greisen negligently managed a police pursuit in February." *Id.* at 32.

PAGE 6 – OPINION AND ORDER

Before his November 8, 2013 resignation as City Manager, Hanken gave comments to the *South County Spotlight* for the article. *Id.* at 10. Hanken told the *South County Spotlight* that the City had no account of the money found in Greisen's desk drawer. *Id.* at 32. Hanken also said that deposit slips from JP Morgan Chase Bank and Washington Mutual suggested that Greisen was using an unauthorized bank account because all of the City's accounts are with U.S. Bank. *Id.* at 32. The *South County Spotlight* article quoted Hanken: "'If any other officer had been caught using an unauthorized account, they would have been fired on the spot.'" *Id.* at 32.

Hanken allowed the reporter access to the money found in Greisen's desk drawer, and the reporter spread out the cash and photographed the bills. *Id.* at 11. During his deposition, Mayor Burge testified that he was upset by the photograph, which he characterized as inflammatory and reminiscent of a drug forfeiture photo. Dkt. 31-5 at 4.

**F.  Greisen's Termination**

On April 8, 2014, Interim City Manager Donald Otterman ("Otterman") wrote Greisen a letter giving Greisen notice that the City was terminating his employment without cause on May 8, 2014, as permitted by Greisen's employment contract. Dkt. 27-4 at 6. During Otterman's deposition, he testified that terminating Greisen without cause was the best course to follow because "the City had been through a lot of—in press and in all kinds of stuff and that the City needed to get a resolution to the issue." *Id.* at 3. Otterman stated that there had been "a lot of articles in the local newspaper about Mr. Greisen being put on suspension, about the former city manager being terminated, calls for the City to release what we felt were confidential reports . . . . And so there was quite a bit in the newspaper." Dkt. 31-2 at 3. On June 18, 2014, Greisen's termination was upheld after a PRC review. Dkt. 27-1 at 25.

Greisen alleges that he has suffered harm because he has been unable to find employment. Dkt. 30 ¶ 10. It is Greisen's belief that when potential future employers perform

PAGE 7 – OPINION AND ORDER

internet searches of his name, the photograph of the money from the November 15, 2013 *South County Spotlight* article appears. *Id.* Greisen also stated that he has suffered harm because it was "excruciating" to not be able to respond to the press, especially after Hanken was quoted in the *South County Spotlight*. *Id.* ¶ 8.

## DISCUSSION

Defendants move for summary judgment on Greisen's five remaining claims. The Court first addresses Defendants' motion with respect to Greisen's First Amendment retaliation claim. The Court then addresses Defendants' motion with regard to Greisen's state law claims.

### A.  First Amendment Retaliation Claim Against Hanken

Hanken makes three arguments regarding Greisen's § 1983 First Amendment retaliation claim: (1) there is no disputed fact that Greisen spoke as a public employee and not as a private citizen; (2) Hanken is entitled to qualified immunity; and (3) Greisen's claim for punitive damages should be stricken.[1]

#### 1.  Whether Greisen spoke as a public employee

To prevail on a First Amendment retaliation claim against a government employer, a plaintiff must establish that: (1) he or she spoke on a matter of public concern; (2) he or she spoke as a private citizen and not as a public employee; and (3) his or her speech was a

---

[1] Hanken also argues that Greisen's amended complaint does not state a First Amendment retaliation claim that satisfies the pleading standards of Federal Rule of Civil Procedure 8(a). In Greisen's amended complaint, he alleges that Defendants contrived a "sham investigation" because Greisen "raised budgetary questions and otherwise exercised his right to question City finances." Dkt. 20 at ¶ 6. Greisen asserts that he exercised his First Amendment right to free speech by reporting irregularities in the City's budget. *Id.* at ¶ 10. Greisen further alleges that Hanken "stifl[ed] any inquiry or question into the City's budget and expenditures or into Defendant Hanken's actions." *Id.* at ¶ 11. The Court finds that these allegations "plausibly suggest an entitlement to relief" and were sufficient to give Hanken "fair notice" of Greisen's First Amendment retaliation claim. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011); *see also* Dkt. 24 at 5 (Opinion and Order) (denying Hanken's motion to dismiss Greisen's First Amendment retaliation claim).

"'substantial or motivating'" factor for the adverse employment action. *Id.* at 1056. Defendants argue that summary judgment should be granted in their favor because Plaintiff spoke as a public employee, not as a private citizen.

A plaintiff speaks as a public employee when he or she makes statements pursuant to his or her official duties. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). In contrast, a plaintiff speaks as a private citizen "'if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform.'" *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1058 (9th Cir. 2013) (quoting *Eng v. Cooley*, 552 F.3d 1062, 1071 (9th Cir. 2009)). The scope and content of a plaintiff's job responsibilities is a question of fact. *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008). The "ultimate constitutional significance of the facts as found" is a question of law. *Id.* at 1129.

In *Dahlia v. Rodriguez*, 735 F.3d 1060 (9th Cir. 2013), the Ninth Circuit described three factors relevant to a determination of the scope of a plaintiff's job duties. *Id.* at 1074-76. First, "particularly in a highly hierarchical employment setting such as law enforcement," an appropriate factor is "whether or not the employee confined his communications to his chain of command." *Id.* at 1074. "When a public employee communicates with individuals or entities outside of his chain of command, it is unlikely that he is speaking pursuant to his duties." *Id.* For example, in *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006), the Ninth Circuit held that a correctional officer's communications with a state senator and the inspector general about inmate sexual misconduct were not made pursuant to her official duties and thus constituted speech protected by the First Amendment. *Id.* at 545-46.

PAGE 9 – OPINION AND ORDER

Second, the subject matter of the communication may be considered. *Dahlia*, 735 F.3d at 1074-75. "When an employee prepares a routine report, pursuant to normal departmental procedure, about a particular incident or occurrence, the employee's preparation of that report is typically within his job duties." *Id.* at 1075. For example, in *Freitag*, the correctional officer's internal reports of inmate sexual misconduct were *not* constitutionally protected speech. 468 F.3d at 546. Similarly, in *Garcetti*, the Supreme Court held that a deputy district attorney's memorandum regarding the merits of a case before him was not protected speech because he routinely prepared such memoranda as part of his job duties. 547 U.S. at 421. "By contrast, if a public employee raises within the department broad concerns about corruption or systemic abuse, it is unlikely that such complaints can reasonably be classified as being within the job duties of an average public employee." *Dahlia*, 735 F.3d at 1075. Third, "when a public employee speaks in direct contravention to his supervisor's orders, that speech may often fall outside of the speaker's professional duties." *Id.* at 1075.

At oral argument, Greisen conceded that discussions he had regarding the police department's budget—including the conversations Greisen had with Hanken regarding Ingham's request to hire additional police officers and the conversations Greisen had with the City's accounts payable clerk regarding unpaid police department invoices—were all made pursuant to his job duties as Chief of Police. These statements are not constitutionally protected.

Greisen, however, also presented evidence that he made statements regarding Hanken's role in the budget and expenditures for other departments, as well as about Hanken's general practice of holding invoices, including for other departments, until the new fiscal year. For these statements, the Court considers the three *Dahlia* factors.

PAGE 10 – OPINION AND ORDER

First, the Court considers whether the statements were made to individuals within Greisen's chain of command. The record indicates that Greisen raised concerns about Hanken's handling of the city budget with City finance officer Herr and with several City Councilors. Herr, as a City finance officer, was not within Greisen's chain of command. Although City Councilors are Hanken's supervisors, and thus within Hanken's chain of command, the record is unclear whether City Councilors are within Greisen's chain of command. Greisen asserts that he spoke to the City Councilors in part as "a concerned citizen," Dkt. 30 at 3, and Hanken has not presented evidence that it was part of Greisen's official duties to expose City-wide budgetary concerns to the City Council. Thus, the first *Dahlia* factor suggests that Greisen was speaking as a private citizen when he raised concerns about Hanken's general budgetary practices with Herr and the City Councilors. *See Freitag*, 468 F.3d at 545 (stating that the right to complain to an elected public official "is guaranteed to any citizen in a democratic society regardless of his status as a public employee").

Regarding the second *Dahlia* factor, Greisen's complaints about Hanken's handling of the budget for departments other than the police department and Hanken's practice of holding invoices can be viewed as "broad concerns about corruption or systemic abuse" made by a private citizen. *Dahlia*, 735 F.3d at 1074. Although Greisen's concerns regarding Hanken's practice of holding invoices began with Greisen's questions about unpaid police department invoices, his expressions of concern later extended to Hanken's more general practice of holding invoices until the new fiscal year. This practice arguably was a violation of sound accounting principles, as Greisen understood them. A reasonable fact finder could conclude that such complaints lay outside of Greisen's official duties as Chief of Police.

PAGE 11 – OPINION AND ORDER

Regarding the third *Dahlia* factor, the record, viewed most favorably to Greisen, shows that Greisen's statements were made in direct contravention to Hanken's orders because Hanken repeatedly told Greisen not to question Hanken's budget practices. Thus, all three *Dahlia* factors support the conclusion that Greisen acted outside of the scope of his official duties when he complained about Hanken's handling of the budget for departments other than the police department and Hanken's general practice of holding invoices until the new fiscal year. Drawing all reasonable inferences in favor of the non-moving party, which the Court must do at this stage of the litigation, there is a genuine dispute of material fact as to whether Greisen's complaints were made as a private citizen and not as a public employee.

### 2. Whether Hanken is entitled to qualified immunity

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine protects officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The privilege is an *immunity from suit* rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (quotation marks omitted) (emphasis in original). For this reason, the Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam).

In *Saucier*, the Supreme Court outlined a two-step analysis for determining the applicability of the qualified immunity doctrine. 533 U.S. at 200. The first step is to determine "whether a constitutional right would have been violated on the facts alleged." *Id*. The second

PAGE 12 – OPINION AND ORDER

step is to determine "whether the right was clearly established." *Id*. When considering whether qualified immunity applies, the court must resolve all factual disputes in favor of the party asserting the injury. *Ellins*, 710 F.3d at 1064.

### a. Step one

As the Court previously discussed, Greisen has identified sufficient evidence to create a genuine issue of material fact as to whether he spoke as a private citizen. Hanken does not dispute that Greisen spoke on "a matter of public concern" or that his "protected speech was a substantial or motivating factor in the adverse employment action." *Id.* at 1056 (quotation marks omitted). Thus, a reasonable jury could find that Greisen's constitutional right was violated.

### b. Step two

"'A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Hunt v. Cnty. of Orange*, 672 F.3d 606, 615 (9th Cir. 2012) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011)). "The 'clearly established' requirement 'operates to ensure that before they are subject to suit, [government officials] are on notice their conduct is unlawful.'" *Eng*, 552 F.3d at 1075 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)) (alteration in original).

The First Amendment right of public employees to be free from retaliation for commenting on matters of public concern outside of their official duties was well established by 2012. *See Ellins*, 710 F.3d at 1065 (stating that the right was established in 1968 with the Supreme Court's opinion in *Pickering v. Board of Education*). Thus, Greisen's First Amendment right to be free from retaliation for constitutionally protected speech was clearly established at the time of the alleged violation. Taking the facts in the light most favorable to the non-moving party, a reasonable fact-finder could conclude that Hanken violated Greisen's clearly established

PAGE 13 – OPINION AND ORDER

constitutional right by taking adverse action against him in retaliation for his constitutionally protected speech. Thus, the Court denies Hanken's motion for summary judgment with respect to qualified immunity.

### 3. Claim for Punitive Damages

Hanken also argues that Greisen's request for punitive damages on his § 1983 claim should be stricken. Greisen did not respond in writing to this argument, and at oral argument, conceded that his claim for punitive damages should be stricken.

## B. Greisen's State Law Claims

Defendants also move for summary judgment against Greisen's four remaining state law claims: (1) intentional infliction of emotional distress, against all Defendants; (2) invasion of privacy by false light,[2] against all Defendants; (3) unpaid wages or expenses, against the City; and (4) tortious interference with economic relations, against Hanken.[3] Greisen did not respond

---

[2] Although Greisen's amended complaint asserts a claim for "Defamation/False Light," (Dkt. 20 at 18), Greisen conceded at oral argument that he does not bring a classic defamation claim, but instead a false light claim.

[3] Greisen's intentional infliction of emotional distress and invasion of privacy by false light claims include "John Does 1-5" as additional unnamed defendants. As the Court noted in its January 5, 2015 Opinion and Order in this case (Dkt. 16), the use of "John Doe" to identify defendants is disfavored in federal courts. *See Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980). In some situations, the identities of alleged defendants are unknown to a plaintiff before filing the complaint, and the plaintiff "should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds." *Id.*; *see also Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999); *Ouma v. Clackamas Cnty.*, 2013 WL 1834662, at *2 (D. Or. Apr. 30, 2013). Discovery on this case was completed on June 5, 2015, and Greisen has yet to identify any Doe Defendants. The Court strikes all Doe Defendants *sua sponte*. *See, e.g.*, *Prods. & Leasing v. Hotel Conquistador, Inc.*, 573 F. Supp. 717, 725 (D. Nev. 1982) *aff'd sub nom. Prod & Leasing, Ltd. v. Hotel Conquistador, Inc.*, 709 F.2d 21 (9th Cir. 1983) ("The Ninth Circuit bars the use of 'Doe' Defendants, and such Defendants may be stricken by the Court sua sponte.") (citing *Craig v. United States*, 413 F.2d 854, 856 (9th Cir. 1969); *Wiltsie v. Cal. Dep't of Corr.*, 406 F.2d 515, 518 (9th Cir. 1968); *Tolefree v. Ritz*, 382 F.2d 566, 567 (9th Cir. 1967)).

PAGE 14 – OPINION AND ORDER

in writing to Defendants' argument regarding Griesen's wage claim, and at oral argument, Greisen conceded this claim.

As discussed in the Court's March 23, 2015 Opinion and Order in this case (Dkt. 24), Greisen's state law tort claims are subject to the Oregon Tort Claims Act ("OTCA"). Defendants argue that under the OTCA the City is the only proper defendant in Greisen's state law claims and that those claims are untimely under the tort claim notice requirement of the OTCA. The Court addresses each argument in turn.

### 1. Greisen's Claims Against Hanken

The OTCA provides the "sole cause of action for any tort committed by officers, employees or agents of a public body acting within the scope of their employment or duties and eligible for representation and indemnification" by the public body. ORS § 30.265(2). The OTCA bars actions against individual tortfeasors acting within the scope of their public employment and provides that the court upon motion will substitute the public body as the sole defendant. ORS § 30.265(3). Individual tortfeasors may be defendants only if they are acting outside "the scope of their employment or duties." ORS § 30.265(1); *see also Brungardt v. Barton*, 69 Or. App. 440, 443 (1984).[4] Thus, Greisen's state law claims against Hanken for alleged tortious conduct committed while Hanken was City Manager may only go forward if Hanken was acting outside the scope of his employment at the time of the alleged misconduct.

---

[4] Neither the amended complaint nor Greisen's response to Defendants' motion for summary judgment mentions either of the other two statutory grounds for allowing a tort claim to proceed against an individual public employee. One is if the employee is not subject to indemnification because the employee is sued for acts that amount to "malfeasance in office or willful or wanton neglect of duty." ORS §§ 30.285(2), 30.287(1); 30.265(3). The second is if the OTCA action alleges damages greater than the OTCA's statutory damage cap, which for local public bodies such as the City of Scappoose is $633,300 for causes of action arising on or after July 1, 2013 and before July 1, 2014. ORS §§ 30.265(4), 30.272(2)(e).

PAGE 15 – OPINION AND ORDER

Greisen brings three claims against Hanken: (1) intentional infliction of emotional distress; (2) invasion of privacy by false light; and (3) tortious interference with economic relations.[5] These claims are based upon the three LGPI investigations, Greisen's suspension, and the November 2015 *South County Spotlight Article*. Hanken asserts that he was acting within the scope of his employment for all relevant actions he took during his tenure as City Manager. Greisen did not respond to this argument. Based upon the facts of this case, the Court accepts the assertion that Hanken was acting pursuant to his duties as City Manager when he responded to employee complaints, disciplined Greisen, and spoke to the press on a City matter.[6] *See* Dkt. 31-3 at 7 (Hanken testifying that his job duties included speaking with the media). As a result, the OTCA requires that the City be substituted as the defendant for claims brought against Hanken for allegedly tortious actions he took during his time as City Manager. *See* ORS § 30.265(2). Additionally, Greisen has not identified any allegedly tortious action that Hanken took after Hanken's resignation. Thus, the Court substitutes the City as the sole defendant in Greisen's claims against Hanken. *See* ORS § 30.265(3).

---

[5] The amended complaint alleges tortious interference with contract against Hanken. Dkt. 20. In Greisen's response to Hanken's motion for summary judgment, Greisen discusses the separate tort of intentional interference with prospective advantage (economic relations). Greisen may not assert a new claim in his response to Hanken's motion for summary judgment. *See Wasco Prods. Inc. v. Southwall Tech., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("'[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings.'") (quoting *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 24 (1st Cir. 1990)). In addition, any purported intentional interference with prospective business claim is speculative. Greisen identifies no future business that he lost as a result of Hanken's allegedly tortious conduct.

[6] A public employee is acting within the scope of his or her employment if three elements are satisfied: (1) the act occurred substantially within the authorized time and space; (2) the actor was motivated, at least in part, by a motive to serve the employer; and (3) the act in question is of a kind the actor was engaged to perform. *Minnis v. Oregon Mut. Ins. Co.*, 334 Or. 191, 201 (2002).

### 2. Notice Requirement

Greisen's state law claims against the City are subject to the OTCA's tort claim notice requirement. The OTCA requires a plaintiff to provide notice of claim within 180 days of the alleged injury. ORS § 30.275(2)(b). "'The pleading and proof of notice sufficient to satisfy the requirements of ORS 30.275 [are] a mandatory requirement and a condition precedent to recovery under the Oregon Tort Claims Act. . . .'" *Beaver v. Pelett*, 299 Or. 664, 671 (1985) (*en banc*) (alteration in original) (quoting *Urban Renewal Agency of City of Coos Bay v. Lackey*, 275 Or. 35, 40 (1976)). A complaint that fails to allege that notice was given in accordance with the OTCA is subject to dismissal. *Brinkley v. Oregon Health Scis. Univ.*, 94 Or. App. 531, 537 (1988), *review denied*, 307 Or. 571 (1989).

Notice of claim is satisfied by "formal notice," "actual notice," or commencement of an action by or on behalf of the claimant. ORS § 30.275(3). The Oregon Supreme Court has held that:

> [F]or purposes of the OTCA notice of claim requirement, "actual notice" is a communication that (1) allows the recipient to acquire "actual knowledge of the time, place and circumstances" that give rise to the specific claim or claims that the plaintiff ultimately asserts; and (2) would lead a reasonable person to conclude that the plaintiff has a general intent to assert *a* claim.

*Flug v. Univ. of Oregon*, 335 Or. 540, 554 (2003) (emphasis in original). The notice "need not specify precisely *what* claim" the plaintiff intends to bring. *Id.* (emphasis in original).

The City argues that Greisen's amended complaint failed to plead that he timely provided tort claim notice as required by ORS § 30.275, and that as a result, the first notice of Greisen's tort claims was provided when Greisen commenced this lawsuit on August 29, 2014. Greisen initially did not respond to this argument, but later filed a motion to supplement the summary judgment record with an additional declaration asserting that he first provided the City with

PAGE 17 – OPINION AND ORDER

notice complying with ORS § 30.275 in letters to the City Mayor dated December 16, 2013 and January 16, 2014. Dkt. 38. The Court granted the motion to supplement and allowed the parties to provide the Court with additional briefing. Dkt. 39.

Greisen argues that his letters satisfy the actual notice requirement under ORS § 30.275(3) and that he properly pled such notice in the amended complaint, which quotes from the letters. Although Greisen's amended complaint references the letters, nowhere in the amended complaint does Greisen allege that he provided the City with tort claim notice.[7] *Cf. Jones v. City of Hillsboro*, 2015 WL 5737647, at *10 (D. Or. Sept. 29, 2015) (holding that the allegation in the complaint that the plaintiff "'sent a timely Notice of Tort Claim'" satisfies the pleading requirement). Thus, Greisen has failed to plead that he provided the City with timely notice of claim, as required by Oregon law.[8] *See Curtis v. Oregon*, 2013 WL 3466533, at *4

---

[7] The sections of the amended complaint referencing the letters read as follows:

> Despite a December 16, 2013 written warning, Defendant City continued Plaintiff's prolonged administrative suspension of Plaintiff . . . On that date, Plaintiff predicted in writing: "[T]he city may lack the courage to expose and remedy these injustices . . . .

> Despite multiple requests, specifically including a January 16, 2014 written request, Defendants continued to hold on to and refused to release reports to Plaintiff of the LGPI investigations . . . .

> On January 16, 2014, Plaintiff repeated his prediction in writing that "the City may lack the courage to expose and remedy these injustices . . . .

Dkt. 20 at 11-12, ¶¶ 26, 28, and 29.

[8] Because the Court finds that Greisen failed to plead notice of claim, the Court does not reach the City's additional argument that the December 16, 2013 and January 16, 2014 letters are insufficient to satisfy the OTCA's notice requirement. Additionally, the Court notes that Greisen did not request leave to further amend his complaint to allege timely notice of claim in either his response to Defendants' motion for summary judgment or his response to Defendants' supplemental briefing on this issue.

PAGE 18 – OPINION AND ORDER

(dismissing plaintiff's OTCA claims for failure to plead notice of claim as required by ORS § 30.275); *see also Wasco Prods.*, 435 F.3d at 992 ("'[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings.'").

Accordingly, the Court finds that the service of the complaint in this action constituted Greisen's first notice of a tort claim against the City. *See Yunker v. Mathews*, 32 Or. App. 551, 557 (1978) ("We hold that where the complaint is filed within the 180 days, it is unnecessary and superfluous to plead notice, inasmuch as the complaint on its face satisfies the notice requirement."). Because Greisen commenced this suit on August 29, 2014, his state law claims against the City are time-barred if they accrued before March 2, 2014.

As noted above, Greisen's state law claims for intentional infliction of emotional distress, invasion of privacy by false light, and intentional interference with economic relations are based on the three LGPI investigations, his suspension, and the November 2013 *South County Spotlight* article. All of these events occurred in 2013. Greisen's intentional infliction of emotional distress and invasion of privacy by false light claims appear also to be based on the City's failure to publicly release the LGPI reports exonerating him. Greisen requested that the City release these reports, however, in his letter dated December 16, 2013. Dkt. 38-1 at 29. Thus, Greisen has not identified any allegedly tortious conduct taken by the City after 2013 and as a result, his state law claims all accrued before March 2, 2014.[9] Because Greisen has failed to plead timely tort claim

---

[9] The Court notes that the "discovery rule" applies to an OTCA notice of claim. *Denucci v. Henningsen*, 248 Or. App. 59, 68 (2012). Under the discovery rule, the notice period applicable to an OTCA claim does not begin to run until a plaintiff knows or reasonably should have known of the facts giving rise to his claim. *Id.* Greisen has not presented any argument that he was unaware of the bases of any of his asserted state law claims until after March 2, 2014. Under the OTCA, the plaintiff has the burden of proving timely notice of claim. ORS § 30.275(7).

PAGE 19 – OPINION AND ORDER

notice, he may not recover on his OTCA claims and the City is entitled to judgment as a matter of law on Greisen's state law claims. *See Beaver*, 299 Or. at 671.

## CONCLUSION

The Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment (Dkt. 26.). The motion is denied with respect to Greisen's First Amendment retaliation claim against Hanken. The motion is granted with respect to all Greisen's state law claims, and those claims are dismissed.

**IT IS SO ORDERED**.

DATED this 28th day of December, 2015.

/s/ Michael H. Simon  
Michael H. Simon  
United States District Judge
