**KAREN M. VICKERS,** OSB No. 913810
kvickers@mershanlaw.com
**BLAKE H. FRY,** OSB No. 100128
bfry@mershanlaw.com
MERSEREAU SHANNON LLP
One SW Columbia Street, Suite 1600
Portland, Oregon 97258-2089
Telephone: 503.226.6400
Facsimile: 503.226.0383

Of Attorneys for Defendant Jon Hanken

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DOUG GREISEN, an individual, | Case No. 3:14-cv-01399-SI |
| Plaintiff, | |
| v. | **DEFENDANT HANKEN'S TRIAL MEMORANDUM** |
| JON HANKEN, an individual, JOHN DOES 1-5, and CITY OF SCAPPOOSE, an Oregon municipality, | |
| Defendants. | |

Defendant Jon Hanken respectfully submits the following trial memorandum.

## BACKGROUND

Plaintiff Doug Greisen was the police chief for the City of Scappoose. On

February 4, 2013, he became involved in a car chase during which he authorized one of

his officers to ram a fleeing hit-and-run suspect's car (the PIT maneuver). A subordinate

officer in the department, Sgt. Doug Carpenter, thought that plaintiff should not have

authorized the ramming and, in March, wrote a memo saying so to his superior, a department lieutenant named Norm Miller.  At the end of May, Lt. Miller, in turn, filed a formal complaint over the ramming with plaintiff's superior, the city manager and defendant Jon Hanken.  Among other things, Lt. Miller wrote that he thought some outside agency should investigate.  The City Attorney was also consulted about the complaint.

Mr. Hanken, not having any expertise by which to judge whether plaintiff's involvement in the chase and the ramming complied with accepted police tactics, contacted the Oregon State Police to conduct an investigation, but they were not available and referred him to the Local Government Personnel Institute, or LGPI.  (The LGPI is an intergovernmental entity formed as a joint venture between the League of Oregon cities and the Association of Oregon Counties.)  On July 17, 2013, Mr. Hanken informed plaintiff that LGPI would conduct an investigation.

The investigation was conducted by former police officer, Craig Stoelk.  On August 12, 2013, Stoelk submitted a lengthy report of his conclusions which, in short, were that plaintiff's involvement in the chase, and his authorization of the ramming, violated basic police protocol and department policy.  On August 23, Mr. Hanken notified plaintiff that he was going to suspend him two weeks without pay as a result. He told plaintiff, though, that he would allow him to use vacation time while serving his suspension.  Plaintiff immediately appealed his suspension to a committee that is formed

by the city council, under a city ordinance, whenever a city employee not part of any union challenges some discipline.  On September 3, this committee, called the Personnel Review Committee (PRC), held a meeting to consider plaintiff's appeal.

Sgt. Carpenter began to complain that plaintiff was retaliating against him for his complaint and creating a hostile work environment.  By the beginning of September, these complaints compelled Mr. Hanken to again engage LGPI to investigate plaintiff's alleged creation of a retaliatory, hostile work environment.  Mr. Hanken placed plaintiff on paid administrative leave for at least part of LGPI's investigation into these new complaints.

On September 9, while plaintiff was on leave, Lt. Miller discovered envelopes of cash in plaintiff's desk drawer.  This cash apparently came from charity donations solicited by the police department over the years which had never found its way to its intended, charitable purpose.  Lt. Miller advised Mr. Hanken of the cash.  On September 30, Mr. Hanken notified plaintiff  he was engaging LGPI to investigate the envelopes of cash and on October 14, Mr. Hanken engaged LGPI to conduct a forensic audit.

Also on October 14, the PRC committee considering plaintiff's two week suspension recommended to Mr. Hanken that it be rescinded.  Mr. Hanken was aware that many members of the City council were personal friends with plaintiff and would support him over Mr. Hanken.  So on November 7, Mr. Hanken resigned his position as city manager.  On January 1, 2014, the city hired an interim city manager, Don Otterman.

PAGE 3 -        DEFENDANT HANKEN'S TRIAL MEMORANDUM

On January 22, Mr. Otterman told plaintiff that he was upholding the two-week suspension, despite the PRC committee's recommendation, for his having authorized an officer to ram a car. He also told plaintiff that he was to continue on paid leave while LGPI continued its investigations into the alleged retaliatory, hostile work environment and the suspect cash. On February 27, Sgt. Carpenter filed a charge with BOLI over plaintiff's alleged retaliatory conduct.

On April 8, Mr. Otterman invoked a provision in plaintiff's contract that allowed him to terminate plaintiff without cause, and notified plaintiff he was terminated without cause effective 30 days hence. At no time did Mr. Hanken review the second and third investigation reports, nor did he speak to Mr. Otterman. Plaintiff appealed his termination. Another PRC committee was commenced, and on June 13, 2014, the PRC issued a written recommendation that Mr. Otterman's decision to terminate plaintiff under the without cause provision was in compliance with existing policy and law. On June 18, 2014, Larry Lehman, the Interim City Manager after Mr. Otterman, upheld plaintiff's termination. Defendant Hanken never spoke with Mr. Lehman.

## PROCEDURAL HISTORY

Plaintiff filed this lawsuit in August 2014. He named, as defendants, Jon Hanken, the City of Scappoose, and five "John Does." He made a variety of claims, including section 1983 due process and speech retaliation claims, a claim for whistleblowing

retaliation, a wage claim, and several claims for common-law torts, including wrongful discharge, defamation, invasion of privacy, and the intentional infliction of emotional distress.

In November 2014, defendants filed a motion to dismiss plaintiff's complaint. On January 5, 2015, this Court dismissed all plaintiff's claims without prejudice. On February 2, 2015, plaintiff filed an amended complaint. Plaintiff's amended complaint was almost identical to his original complaint, though it clarified which claims were asserted against which defendants. After plaintiff filed his amended complaint, defendants filed a motion to dismiss some of his claims. On March 23, 2015, this Court granted in part, and denied in part, defendants' motion to dismiss. Specifically, this Court dismissed the section 1983 claims plaintiff had made against the City of Scappoose, and the section 1983 due process claim plaintiff had made against defendant Mr. Hanken.

On June 15, 2015, defendants filed a motion for summary judgment on the remaining claims. On December 29, 2015, this Court granted in part, and denied in part, defendants' motion for summary judgment. After this Court's order following summary judgment, the only claim which remains is plaintiff's speech retaliation claim against Mr. Hanken.

**APPLICABLE LAW**

MERSEREAU SHANNON LLP
ONE SW COLUMBIA STREET, SUITE 1600
PORTLAND, OREGON 97258-2014
(503) 226-6400

The claim proceeding to trial is a speech retaliation claim under section 1983 against Mr. Hanken, who was the city manager for the City of Scappoose until November 2013. Mr. Hanken did not terminate plaintiff; he only issued him a two week suspension for which he was allowed to use his vacation time.

**1. The allegations behind plaintiff's speech retaliation claim**

As chief of police and head of the police department, one of plaintiff's responsibilities was to construct a proposed budget for the department according to the funding available. Mr. Hanken, as city manager, had the ultimate say-so on each department's budget. In that capacity, he might make changes to any department head's proposed budget before he collected all the department heads' proposed budgets into a final, overall budget for the budget committee. Plaintiff has alleged he sometimes did not like the changes Mr. Hanken made to the police department's proposed budget, and would question Mr. Hanken about those changes. Plaintiff has also alleged that he questioned the finance officer's practice of sometimes not paying a police department invoice until the following fiscal year, so that the invoice could be included in that fiscal year's budget. Plaintiff claims this speech is protected and defendant Hanken used the Stoelk report to retaliate against plaintiff for his protected speech.

Defendants argued during summary judgment that plaintiff's speech retaliation claim was not based on any speech protected by the First Amendment, mostly because it

MERSEREAU SHANNON LLP
ONE SW COLUMBIA STREET, SUITE 1600
PORTLAND, OREGON 97258-2014
(503) 226-6400

was spoken squarely in his capacity as a public employee.  Defendants also argued that

even if this speech was protected, there was no evidence to suggest that Mr. Hanken had

taken any adverse employment action against defendant because of any of his alleged,

protected activity.  In his response to summary judgment, plaintiff submitted a

declaration.  In that declaration, plaintiff alleged that he questioned the Mr. Hanken's

budgeting practices, in the spring and summer of 2012, in departments other than the

police department.  This allegation is supported only by plaintiff's own hearsay

statements.  Plaintiff claims he spoke to the finance officer and accounts payable clerk,

but they do not support plaintiff's testimony.

      During oral argument on defendants' motion for summary judgment, plaintiff, as

this Court observed in its summary judgment Order, "conceded that discussions he had

regarding the police department's budget—including…the conversations [plaintiff] had

with the City's accounts payable clerk regarding unpaid police department invoices—

were all made pursuant to his job duties as Chief of Police.  These statements are not

constitutionally protected."  The Court held that there were questions of fact about

whether plaintiff's comments about budgeting practices outside the police department

were protected speech, and denied summary judgment accordingly.

      Thus, the issues for trial are 1) whether plaintiff engaged in protected speech; and

2) whether defendant, Mr. Hanken, took an adverse employment action against plaintiff

because of this protected speech.

PAGE 7 -      DEFENDANT HANKEN'S TRIAL MEMORANDUM

## 2.  Liability for speech retaliation alleged by public employees

Plaintiff has made a retaliation claim under 42 U.S.C. section 1983 against an individual defendant.  Liability on a section 1983 claim depends, first, on a finding that a plaintiff has been denied a right secured by the Constitution.  Here, plaintiff has based his section 1983 claim on the allegation that defendant Hanken retaliated against him for protected speech, thus depriving him of a right secured by the First Amendment.

### a.  General standards

To be entitled to any protection under the First Amendment, plaintiff's speech must have been 1) spoken in his capacity as a citizen rather than his capacity as a public employee 2) on a matter of public concern.  *Brownfield v. City of Yakima*, 612 F.3d 1140, 1147 (9th Cir. 2010).  A public employee's speech which was not spoken as a citizen on a matter of public concern is not constitutionally protected from restriction by his employer.

#### i.    Employee speech not protected

Public employees speak as an employee when they "make statements pursuant to their official duties."  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("When public employees make statements pursuant to their official duties, the employees are not

MERSEREAU SHANNON LLP
ONE SW COLUMBIA STREET, SUITE 1600
PORTLAND, OREGON 97258-2014
(503) 226-6400

speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). Thus, where an employee has an official duty to speak, or his speech is merely "the product of performing the tasks the employee is paid to perform," the speech is spoken in his capacity as a public employee. *Eng v. Cooley*, 552 F.3d 1062, 1071 (9th Cir. 2009). This same concept is captured in other phrases: a public employee's speech is unprotected if it "owes its existence to [the employee's] professional responsibilities," or if it "fell within the scope of [the employee's] job responsibilities." *Garcetti v. Ceballos*, 547 U.S. 410, 421–22 (2006). The Court has already ruled that plaintiff's speech about the police department budget was part of his official duty and therefore not protected. Defendant is unaware of any speech by plaintiff that was not related to the police department.

### ii.    Speech must be a matter of public concern

Plaintiff bears the burden of showing that his other speech addressed an issue of public concern. *Eng*, 552 F.3d at 1070. Whether it did is a question of law, *id.*, that "must be determined by the content, form, and context of a given statement, as revealed by the whole record," *Connick v. Myers*, 461 U.S. 138, 147–48 (1983).

The content of speech is "the single greatest factor" in considering whether it addressed an issue of public concern. *Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009). "If employee expression relates to an issue of political, social,

MERSEREAU SHANNON LLP
ONE SW COLUMBIA STREET, SUITE 1600
PORTLAND, OREGON 97258-2014
(503) 226-6400

or other concern to the community, it may fairly be said to be of public concern." *Turner v. City and Co. of S.F.*, 788 F.3d 1206, 1210 (9th Cir. 2015). Likewise, speech that enables people to make "informed decisions about the operation of their government" is speech on an issue public concern. *Desrochers*, 572 F.3d at 710. "On the other hand, speech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of public concern." *Id.* The same can be said of "speech that relates to internal power struggles within the workplace," and speech which is of no interest "beyond the employee's bureaucratic niche." *Id.*

While the content of speech is the most important factor in determining whether it was on an issue of public concern, the form and context of speech are also relevant. "Form" and "context" is a reference to "the employee's motivation and the audience chosen for the speech." *Ulrich v. City of S.F.*, 308 F.3d 968, 979 (9th Cir. 2002). Context, in particular, includes "the point of the speech…: why did the employee speak (as best as we can tell)? Does the speech seek to bring to light actual or potential wrongdoing or breach of public trust, or is it animated instead by" something else, like "dissatisfaction with one's employment situation?" *Desrochers*, 572 F.3d at 715. And form, in particular, includes the method used by an employee to convey their speech. *Id.* at 714–15. For instance, the point of "First Amendment retaliation jurisprudence" is to ensure "the public's interest in receiving the well-informed views of government

employees engaging in civic discussion." *Id*. at 714.  Therefore, speech that is disseminated to a "limited audience," like the employer itself rather than the public, is a factor which "cuts against a finding of public concern." *Id*. at 714–15.  Defendant is at a loss to determine what speech plaintiff made as a citizen (not as Police Chief) on a matter of public concern.

### iii.    Retaliation must be for speech

Assuming there is some protected speech, plaintiff also bears the burden of proving that his protected speech was a "substantial or motivating" factor for his alleged adverse employment action.  *Eng*, 552 F.3d at 1071.  Even if plaintiff can convince a jury he spoke to the finance director or accounts payable clerk on a protected matter, there is no evidence defendant Hanken was aware of those communications.

### iv.    Adverse employment action

In discrimination claims, an adverse employment action is one which "materially affects the compensation, terms, conditions, or privileges of employment." *Davis v. Team Elec. Co*., 520 F.3d 1080, 1089 (9th Cir. 2008).  Under this standard, any employment decision which "inflicts direct economic harm"—like firings, failures to hire, demotions, and failures to promote—can support a discrimination claim.  *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761–62 (1998).  Other employment decisions may be

MERSEREAU SHANNON LLP
ONE SW COLUMBIA STREET, SUITE 1600
PORTLAND, OREGON 97258-2014
(503) 226-6400

considered adverse employment actions, too, but only if they are sufficiently material.

However, "not every employment decision amounts to an adverse employment action." *Strother v. S. Cal. Permanente Med. Group*, 79 F.3d 859, 869 (9th Cir. 1996). Among the employment decisions that do not count as adverse employment actions include scheduling an employee "to an unfavorable shift"; changing vacation schedules; negative evaluations that do not result in any tangible injury; "harsh and demeaning" treatment; written warnings or warning letters; "feeling slighted or insulted"; demotions not accompanied by any salary or status change or any other indication that the new position is less favorable; and so on.[1] These do not count as adverse employment actions because, without more, they do not cause a material change in the terms and conditions of employment.

The standard for what counts as an adverse employment action capable of supporting a retaliation claim is somewhat broader. In retaliation claims, an adverse employment action is one "that a reasonable employee would have found…materially adverse" such that "it well might have dissuaded" him from engaging in a protected activity. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006) (noting that Title VII's anti-retaliation provisions are not "a general civility code for the

---

1       These examples come from: *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000); *Kortan v. Cal. Youth Auth*., 217 F.3d 1104, 1113 (9th Cir. 2000); *Hess v. Multnomah Co*., 216 F. Supp. 2d 1140, 1154–55 (D. Or. 2001); *Campbell v. Knife River Corp.-N.W*., 783 F. Supp. 2d 1127, 1149–53 (D. Or. 2011); *Hoang v. Wells Fargo Bank, N.A*., 724 F. Supp. 2d 1094, 1104 (D. Or. 2010); *Tudor Delcey v. A–Dec, Inc*., 2008 WL 123855 at *9 (D. Or. Jan. 9, 2008).

PAGE 12 -       DEFENDANT HANKEN'S TRIAL MEMORANDUM

American workplace").

Still, alleged retaliation must at least be "material" in the sense that it produces some "injury or harm." *Gresham v. Safeway Stores, Inc.*, 2010 WL 437982 at *4 (D. Or. Feb. 3, 2010). As suggested above, whether an employment decision is "material" is an objective standard, determined by reference to a "reasonable employee." White, 548 U.S. at 68. So, for instance, low evaluations, low marks, or mere oral reprimands that were not nor could be used to take further action against an employee are insufficient to support a retaliation claim. See *Gresham*, 2010 WL 437982 at *4 (surveying cases). Similarly, changing an employee's job responsibilities—as long as the change is not material—does not qualify as an adverse employment action either. See *Shepard v. City of Portland*, 829 F. Supp. 2d 940, 961 (D. Or. 2011) (surveying cases).

If plaintiff proves the elements of his case, the burden shifts to defendant to show 1) that any adverse employment action was 2) based on protected activities *and* unprotected activities, and 3) that defendant would have taken the challenged adverse employment action if the unprotected activities alone had existed. *Eng*, 552 F.3d at 1071–72. If defendant satisfies this burden, then he prevails.

### b. Standard of liability for individual defendants

The remaining defendant is an individual. Because section 1983 does not provide for vicarious liability, an individual can only be liable under section 1983 "for his or her

MERSEREAU SHANNON LLP
ONE SW COLUMBIA STREET, SUITE 1600
PORTLAND, OREGON 97258-2014
(503) 226-6400

own misconduct." *Aschcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Under this standard, an individual's liability can arise in two ways. First, an individual can be liable under section 1983 if he "personally participated" in the alleged constitutional deprivation (or that he was "personally involved," as it is often phrased). *Ortez v. Washington Co.*, 88 F.3d 804, 809 (9th Cir. 1996). And second, an individual can be liable if he "causes" a constitutional deprivation. The "requisite causal connection can be established [if an individual set] in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Gilbrook v. City of Westminster*, 177 F.3d 839, 854 (9th Cir. 1999).

Mr. Hanken left his job as city manager in November 2013. Meanwhile, the final decision to suspend plaintiff for two weeks for his involvement in the car chase was not issued until January 2014. And the final decision to terminate plaintiff was not made until June. Most of plaintiff's alleged damages stem from his termination. But under the standards listed above, Mr. Hanken can only be liable for plaintiff's termination if he set in motion a series of acts by others which he knew or reasonably should have known would cause another city manager to terminate plaintiff. Mr. Hanken never spoke to Mr. Otterman, never reviewed the second and third investigative reports, and had no way of knowing plaintiff would be terminated.

In fact, Mr. Hanken resigned from the City because the Council supported plaintiff and Mr. Hanken assumed he would be subject to retaliation by the Council (his boss)

MERSEREAU SHANNON LLP
ONE SW COLUMBIA STREET, SUITE 1600
PORTLAND, OREGON 97258-2014
(503) 226-6400

because he attempted to suspend plaintiff for two weeks.

### c.  Individual defendants and qualified immunity

Government officials enjoy qualified immunity to claims against them which allege that their conduct violated the Constitution.  *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134 (9th Cir. 2003).  Therefore, plaintiffs who sue government officials under section 1983 bear the burden of proving that the officials lost their qualified immunity.  *Moran v. Washington*, 147 F.3d 839, 844 (9th Cir. 1998).

Qualified immunity is designed "to ensure that…[government officials] are on notice their conduct is [clearly] unlawful" before they can be subject to civil suit.  *Saucier v. Katz*, 533 U.S. 194, 206 (2001).  Accordingly, government officials will not be liable for civil damages "insofar as their conduct does not violate clearly established…constitutional rights of which a reasonable person would have known."  *Id.*  Under this standard, the question is whether the contours of the right were "sufficiently clear that every reasonable official would have understood that what he [was] doing violate[d] that right."  While courts "do not require a case directly on point,…existing precedent must have placed the statutory or constitutional question beyond debate" as applied to the particular conduct, and the particular set of circumstances, at issue.  *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011).  Whether an individual defendant lost his qualified immunity in a section 1983 claim is a pure question of law.  *See Phillips v.*

MERSEREAU SHANNON LLP
ONE SW COLUMBIA STREET, SUITE 1600
PORTLAND, OREGON 97258-2014
(503) 226-6400

*Hust*, 477 F.3d 1070, 1079 (9th Cir. 2007).

Here, it is not beyond debate that the alleged speech plaintiff is basing his speech

retaliation claim on was spoken in his capacity as a private citizen.  Likewise, and

considering that speech's content, form, and context, it is not beyond debate that that

speech was on a matter of public concern.  Exactly what was protected speech is unclear

at this time so defendant Hanken would have had no way to know what was protected in

August 2013, and should be entitled to qualified immunity.

### 3.  Damages in section 1983 employment claims

The compensatory damages available in section 1983 claims are intended to

provide a remedy for the actual injuries caused by a deprivation of a constitutional right.

Moreover, when plaintiffs seek damages under section 1983, "the level of damages is

ordinary determined according to principles derived from common law torts."  *Memphis*

*Community Sch. Dist. v. Stachura*, 477 U.S. 299, 306–07, 313 (1986).  Thus, three kinds

of damages are available to a plaintiff in section 1983 claims: compensatory damages,

including special and general damages; nominal damages; and punitive damages.

Plaintiff has conceded that he cannot maintain a claim for punitive damages under section

1983.

Regarding any award of back pay or front pay, defendant Hanken notes, again,

that he did not terminate plaintiff.  Rather, plaintiff was terminated about seven months

MERSEREAU SHANNON LLP
ONE SW COLUMBIA STREET, SUITE 1600
PORTLAND, OREGON 97258-2014
(503) 226-6400

after Mr. Hanken left the city's employment, by the Interim City Manager who replaced the interim city manager who replaced Mr. Hanken.  Therefore, plaintiff's damages should be limited to the two week suspension, for which he took vacation time.

Plaintiff has a duty to use reasonable efforts to mitigate his damages.  If plaintiff failed to use reasonable efforts to mitigate his damages, then plaintiff cannot recover the amount of damages he could have avoided.  9th Cir. Pattern Jury Instr. § 5.3.

Plaintiff seeks about $1.8 million in economic damages, which represents lost income and diminished retirement benefits from the date of his termination until dates long from now.  Plaintiff has a duty to mitigate those damages.  Plaintiff has testified, and the evidence at trial will show, that plaintiff does not want to work full-time for a public employer because he does not want to be returned to active PERS service, which would stop his PERS benefits until he retires again.


DATED: June 17, 2016.

MERSEREAU SHANNON LLP


_____s/ Karen M. Vickers_____
**KAREN M. VICKERS,** OSB No. 913810
kvickers@mershanlaw.com
**BLAKE H. FRY,** OSB No. 100128
bfry@mershanlaw.com
503.226.6400
Of Attorneys for Defendant Jon Hanken

MERSEREAU SHANNON LLP
ONE SW COLUMBIA STREET, SUITE 1600
PORTLAND, OREGON 97258-2014
(503) 226-6400