**John D. Ostrander, OSB No. 87394**, john@eoplaw.com
**William A. Drew, OSB No. 95253**, billd@eoplaw.com
ELLIOTT, OSTRANDER & PRESTON, P.C.
707 SW Washington Street, Suite 1500
Portland, Oregon 97205
Telephone:  (503) 224-7112
Facsimile:  (503) 224-7819

      Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| **DOUG GREISEN**, an individual, | Case No. 3:14-cv-01399-SI |
|     **PLAINTIFF**, | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTIONS FOR NEW TRIAL AND REMITTITUR** |
|   v. | |
| **JON HANKEN**, an individual, | |
|     **DEFENDANT**. | |

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................ 1

II.     FACT SUMMARY .................................................................................... 1

III.    ANALYSIS ................................................................................................ 6

1.      DEFENDANT'S RENEWED RULE 50 MOTIONS SHOULD BE DENIED................. 6

    A.  RULE 50 STANDARDS ........................................................................ 6

    B.  THE VERDICT IS SUPPORTED BY SUBSTANTIAL EVIDENCE IN THE
        RECORD ............................................................................................ 6

    1.  The Verdict is Supported by Substantial Evidence that Plaintiff Engaged in Protected
        Speech, and that Defendant Knew It....................................................... 6

        (a)  City-Wide Budget and Budget Process Discussions were Protected Speech. 7

        (b)  Questions to Jill Herr and other Department Heads Regarding Late Paid
             Invoices and Audit Changes were Protected Speech. ............................ 10

        (c)  Testimony to the Personnel Review Committee and Plaintiff's Offer to
             Testify Further Before the City Council was Protected Speech. ............ 13

    2.  The Verdict is Supported by Substantial Evidence that Plaintiff Spoke as a Citizen
        and Not as Part of his Official Duties. ................................................... 15

        (a)  Plaintiff's Speech was Not Confined to his "Chain of Command." ............ 16

        (b)  The Content of Plaintiff's Speech was not Routine or Ordinary for his
             Position as Chief. ...................................................................... 17

        (c)  Plaintiff's Speech was Against Defendant's Wishes. ........................... 17

    3.  The Verdict is Supported by Substantial Evidence that Plaintiff's Protected Speech
        was a "Substantial or Motivating Factor" in Defendant's Retaliation........... 18

        (a)  Defendant's Adverse Actions Closely Followed Plaintiff's Protected Speech,
             or Plaintiff's Resistance to Earlier Adverse Action for Protected Speech........... 19

        (b)  Defendant Expressed Opposition to Plaintiff's Speech to Plaintiff and
             Others. .................................................................................... 23

        (c)  Defendant's Proffered Explanations for His Actions Were False and
             Pretextual. ............................................................................... 25

            (1)  Defendant's Explanation for the Traffic Stop Investigation was not
                 Credible. ............................................................................ 25

            (2)  Defendant's Notice of Discipline and Suspension was a Pretext to
                 Punish Plaintiff for his Protected Speech................................... 27

            (3)  Defendant's Gag Orders Were Pretextual, and Intended to Prevent
                 Plaintiff from Defending Himself Against Defendant's Allegations to the
                 Press. ................................................................................. 29

            (4)  Defendant's Investigation of Workplace Harassment was a Pretext to
                 Punish Plaintiff for not Accepting his Earlier Punishment................. 29

(5)   Defendant's Implementation of the Administrative Leave and the Exclusionary Order was a Pretext to Isolate Plaintiff, and to Stop Him from Asking More Questions.................................................. 31

(6)   The Charity Account Investigation was a Sham Investigation of Facts Defendant Already Understood. .............................................. 31

(7)   The False, November 15, 2013, News Story and "Drug Bust" Photo was Intended to Ruin Plaintiff's Career.................................................. 32

4.   The Jury's Verdict is Supported by Substantial Evidence that Defendant's actions constituted "Adverse Employment Actions." .................................................. 34

5.   The Jury's Verdict is Supported by Substantial Evidence that Defendant's Adverse Employment Actions Caused Economic and Non-Economic Damage........................... 35

(a)   Substantial Evidence of Economic Damages. ............................................... 36

(b)   Substantial Evidence of Non-Economic Damages. .................................... 37

6.   Defendant's Rule 50 motion for judgment as a matter of law based on "Qualified Immunity" must be rejected.................................................. 39

2.   DEFENDANT'S ALTERNATIVE RULE 59 MOTIONS FOR NEW TRIAL AND REMITTITUR SHOULD BE DENIED .................................................. 40

A.   Rule 59 Standards.................................................. 40

B.   Defendant is Not Entitled to a New Trial. .............................................. 41

1.   Defendant's Rule 59 Motion Should Be Denied Because the Damages Awarded by the Jury were Not Excessive. .................................................. 42

(a)   The Jury's Non-Economic Damages Award is Supported by Convincing Evidence.................................................. 42

(b)   The Jury's Non-economic Damages Award is Consistent with Recoveries Approved in Similar Cases. .................................................. 43

(c)   The Jury's Economic Damages Award is Well Supported........................... 44

2.   Defendant's Rule 59 Motion Should be Denied Because Plaintiff Engaged in Protected Speech. .................................................. 45

3.   Defendant's Rule 59 Motion Should be Denied Because No Evidentiary Rulings are Plainly Wrong or Would Constitute Harmful Error. .................................................. 46

(a)   Evidence Admitted Regarding the Police Budget Discussions Was Necessary and Appropriate. .................................................. 46

(b)   Evidence of Mr. Bickmore's Deranged Appearance was Properly Admitted. 48

(c)   The Admission of Several Media Reports was Not Error. .......................... 48

4.   Jury Instruction No. 17 Accurately Reflects the Law Applicable to This Case......... 49

CONCLUSION.................................................. 50

# TABLE OF AUTHORITIES

42 U.S.C. § 1983 (2012)……………………………………………………………2, 34, 40, 44

*Bippes v. Hershey Chocolate U.S.A.*,
   180 F.R.D. 386 (D. Or. 1998) ........................................................................ 44

*Brady v. Gebbie*,
   859 F.2d 1543 (9th Cir. 1988) ...................................................................... 44

*Costa v. Desert Palace*,
   299 F.3d 838 (9th Cir. 2002) .......................................................................... 7

*D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*,
   692 F.2d 1245 (9th Cir. 1982) ...................................................................... 48

*Dahlia v. Rodriguez*,
   735 F.3d 1060 (9th Cir. 2013) ................................................................. 19, 19

*DSPT Int'l v. Nahum*,
   624 F.3d 1213 (9th Cir. 2010) ...................................................................... 42

*EEOC v. Pape Lift, Inc.*,
   115 F.3d 676 (9th Cir. 1997) ........................................................................ 42

*Gotthardt v. AMTRAK*,
   191 F.3d 1148 (9th Cir. 1999) ...................................................................... 45

*Harper v. City of L.A.*,
   533 F.3d 1010 (9th Cir. 2008) .............................................................. 43, 45, 44

*Keyser v. Sacramento City Unified Sch. Dist.*,
   265 F.3d 741 (9th Cir. 2001) ........................................................................ 12

*L.A. News Serv. v. CBS Broad., Inc.*,
   305 F.3d 924 (9th Cir. 2002) ........................................................................ 51

*Lakeside-Scott v. Multnomah County*,
   556 F.3d 797 (9th Cir. 2009) ........................................................................ 52

*Landes Constr. Co. v. Royal Bank of Can.*,
   833 F.2d 1365 (9th Cir. 1987) ...................................................................... 43

*Longfellow v. Jackson County*,
   2007 WL 682455 .......................................................................................... 46

*Molski v. M.J. Cable, Inc.*,
   481 F.3d 724 (9th Cir. 2007) ........................................................................ 43

*Oracle Corp. v. SAP AG*,
   765 F.3d 1081 (9th Cir. 2014) ................................................................. 46-47

*Passantino v. Johnson & Johnson Consumer Prods.*,
    212 F.3d 493 (9th Cir. 2000) ........................................................... 43, 46

*Paul v. Asbury Auto Group*,
2009 WL 188592 ....................................................................................48

*Pavao v. Pagay*,
    307 F.3d 915 (9th Cir. 2002) ................................................................. 9

*Richardson v. Marsh*,
    481 U.S. 200 (1987) ............................................................................ 51

*Seymour v. Summa Vista Cinema*,
    809 F.2d 1385 (9th Cir. 1987) ................................................... 44, 45, 46, 48

*Snyder v. Freight, Constr., Gen. Drivers, Warehousemen & Helpers, Local No. 287*,
    175 F.3d 680 (9th Cir. 1999) ................................................................ 47

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
    768 F.2d 1001 (9th Cir. 1985) ................................................................ 9

*Velazquez v. City of Long Beach*,
    793 F.3d 1010 (9th Cir. 2015) .............................................................. 53

## I.  INTRODUCTION

After carefully considering the evidence, the Jury unanimously found in favor of Plaintiff Doug Greisen.  The Jury disbelieved Defendant Jon Hanken and believed Plaintiff.  There is no question, and Defendant raises none, of any Jury misconduct. The Jury did its job, and its well-founded decision should be respected.

## II.  FACT SUMMARY

The Jury heard evidence on Plaintiff's claim against Defendant for 42 U.S.C. § 1983 (2012) retaliation in violation of Plaintiff's protected First Amendment rights.  By Court order, each side's case presentation was limited to a total of six hours.  Plaintiff used every minute of his six hours.

The Jury was properly instructed that, for Plaintiff to prevail on his claim it had to find that Plaintiff engaged in "protected speech," and also that the speech was a substantial or motivating factor for an adverse employment action taken by the Defendant.

> "Under the First Amendment, a public employee has a qualified right to speak on matters of public concern.  In order to prove the Defendant deprived the Plaintiff of his First Amendment right of free speech, the Plaintiff must prove each of the following additional elements by a preponderance of the evidence:
>
> 1. The Plaintiff spoke as a citizen and not as part of his official duties;
> 2. The Plaintiff's speech was on a matter of public concern;
> 3. The Defendant took an adverse employment action against the Plaintiff; and
> 4. The Plaintiff's speech was a substantial or motivating factor for the adverse employment action." Dkt. 105 (Instruction No. 14).

The Jury was further instructed,

> "[I]f you find that the Plaintiff made comments or asked questions about the City's budgeting or financial management practices in other departments or offices, beyond just the Scappoose Police Department, then making those comments or asking those questions constitutes speech on a matter of public concern."  *Id.*

Page 1 – PLAINTIFF'S MEM. IN OPP. TO DEF'S RENEWED MOTION FOR JMOL AND
        MOTIONS FOR NEW TRIAL AND REMITTITUR

Plaintiff presented evidence that he engaged in four types of protected speech:  (1) speech with City Councilors Ingham and Gedlich, related to the overall budget, and budget practices of Defendant; (2) questions to Jill Herr, Steve Wabschall, and the other department heads at Water, Sewer, and Public Works about Defendant's city-wide policy of holding past due invoices for expenses incurred in one budget cycle for payment out of the next year's budget: (3) questions to Jill Herr and city councilors about why Defendant moved the city audits "off site;" and (4) his testimony to the Personnel Review Committee ("PRC") that he believed Defendant was retaliating against him for questioning Defendant's financial and budgeting practices, and his follow up email to the city offering to testify to the full city council, in executive session, on the "financial stuff" so that they could look into it.

Plaintiff presented evidence that after Defendant learned, at a budget meeting, that Plaintiff and Councilor Ingham had obviously been talking behind his back about his overall budget, Defendant yelled at him, telling him to "stay on your side of City Hall." Tr. 72:3.  Months later, Defendant told Plaintiff that if he continued to talk with Ingham about her budget questions, it would "ruin your career here in the City of Scappoose."  Tr. 76:4-5. After taking a course on government budgeting, Plaintiff continued to ask questions of finance director Jill Herr about Defendant's policy of holding invoices for payment in the next budget cycle despite Defendant "getting wind" of the speech, Tr. 77:23, and Defendant followed through on his threats to ruin Plaintiff's career.

Defendant began with the initiation of a bogus investigation of Plaintiff's authorization of a PIT maneuver traffic stop of a hit and run suspect.   The Jury heard evidence that the impetus for the investigation was a "complaint" that actually was against another officer, Anthony Miltich.  It learned that the investigator's report omitted critical testimony provided by a state trooper on the

scene, Trooper Justin Oxenrider, and that Plaintiff did the right thing under the circumstances to "keep everybody safe." Tr. 505:2-7. When Plaintiff was disciplined for authorizing the PIT maneuver, and nine other violations of policy, he appealed his discipline. The Jury learned that the PRC reviewed all of the evidence and concluded that the PIT maneuver investigation report "purposely omitted pertinent and material facts" and was "not an objective review, but a prosecutorial document that was colored to arrive at a predetermined result." Exhibit 49.

Plaintiff's appeal of Defendant's pretextual "discipline" triggered a firestorm response from Defendant. Defendant abandoned the city's policy not to embarrass employees for their discipline, and brazenly and inappropriately spoke to the press about the PIT maneuver investigation and two more misplaced investigations he initiated without ever bothering to talk to Plaintiff about the charges. While Defendant regularly spoke to the press about investigations he initiated against Plaintiff, he made sure that Plaintiff couldn't fight back or question his policies by ordering Plaintiff not to talk to anyone, including the press, about the matters, by placing him on an indefinite administrative leave, and by further ordering him not to step foot on public property without his permission. As a result, Plaintiff was stopped from continuing to ask budget and financial questions. Tr. 95:17-96:1. Plaintiff was effectively put on ice.

The Jury learned that Defendant caused both economic and non-economic damage to Plaintiff. Defendant's false statements and the "drug bust" style photograph made Plaintiff look like a "dirty cop" in the media, and Plaintiff was unable to defend himself due to the gag orders placed by Defendant. Plaintiff became, sick, depressed, and unable to keep food down. He lost friends, and his formerly stellar reputation was destroyed. People expected him to explain himself, or tell his story, but he couldn't without violating Defendant's orders. As a consequence, Plaintiff

suffered the ugly sting of community hostility and alienation.  While Plaintiff repeatedly pleaded to come back to work, he was eventually let go "without cause".

Don Otterman, Defendant's successor as city manager, tried to testify that his decision to terminate Plaintiff was completely independent of Defendant's acts.   But Otterman admitted that Plaintiff's termination was partly because Plaintiff had been in the press a lot, Tr. 313:1-25, that Plaintiff's employment had become very controversial, Tr. 308:16-22, and that elected officials, including Mayor Burge, did not want to deal with the controversy.  Tr. 307:15-308:15.   Otterman also admitted that he did not examine what Defendant had done to Plaintiff in the press, and did not investigate why Plaintiff had become so controversial or why the press was so aggressive with respect to Plaintiff.  He didn't investigate Defendant for anything.  Tr. 309:11-311:3.  Former city manager Jerry Gillham testified that Plaintiff is now "un-hireable" as a police chief, or second in command.  He testified that when his city "googled" Plaintiff's name, it pulled up all the bad press, and they couldn't offer him a job.  CPA Ronald Greisen provided expert testimony as to the value of Plaintiff's lost income.

In the face of this evidence, Defendant defended himself by denying that he made any threatening statements, denying that he knew Plaintiff was speaking on matters of public concern, and denying that his actions were retaliatory.  He denied knowing that Plaintiff was speaking to Councilors Ingham and Gedlich, Jill Herr, the PRC or to others about financial matters.  He denied telling Plaintiff to "stay on his side of City Hall", Tr. 432:25-433:2, denied telling Plaintiff that Councilor Ingham was going to ruin his career, Tr. 433:21-23, denied saying anything to Councilors Hayden and Reed about anything Plaintiff had raised "about the budget," Tr. 434:3-6, and denied knowing that Plaintiff spoke to the PRC "about the budget" Tr. 434:7-9.  Defendant denied that he took *any* action against Plaintiff "because of anything he might have said about the

budget or financial practices." Tr. 434:10-13. But that testimony was contradicted by evidence that he was very controlling regarding his budget, he took any dissent personally, and that he had, in fact, threatened Plaintiff and councilors Ingham, Hayden, Reed, and the PRC when they were in a position to oppose him. Defendant's veracity was directly challenged by a broad array of witnesses and evidence at trial, and the Jury didn't believe him.

The chronology of punitive events brought by Defendant against Plaintiff begged for a plausible explanation from Defendant, but none was provided. Defendant's proffered explanation, to the effect that he did everything to Plaintiff because he "took all complaints seriously," was simply beyond belief. Tr. 438:7-14.

Defendant admitted that the local press was "a significant force" in a small town, Tr. 463:4-6, which "could have a significant impact on your career." Tr. 463:17-19. He also admitted that he wrote to Plaintiff that, "I cannot help but wonder if you would be able to maintain your position if this report was known by or reported to the news media." Exhibit 35. He admitted that he "knew better" when he went to the press and provided misleading statements on behalf of the city about a "bag of money found in the desk drawer with no accounting whatsoever." Tr. 491:14-21. He admitted that his statements to the press that Lt. Miller "found" a bag of money in Plaintiff's desk, while searching for a badge, that the city lacked any account of the money, and that the accounts were "unauthorized," *were all untrue* at the time he made them. Tr. 481:12-482:21; 482:22-483:22; 484:7-485:15; 489:3-23. And finally, he testified that he did not believe giving the "drug bust style" photograph to the press would "damage" Plaintiff's career as a chief of police. Tr. 492:16-22. The Jury didn't believe him, because his earlier lies were exposed, and his self-serving testimony was unbelievable. It believed Plaintiff, and awarded him the damages he suffered.

## III. ANALYSIS

### 1. DEFENDANT'S RENEWED RULE 50 MOTIONS SHOULD BE DENIED.

#### A. RULE 50 STANDARDS

Under Rule 50, a renewed motion for judgment as a matter of law is properly granted "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). The jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, "even if it is also possible to draw a contrary conclusion." *Id.* A court can overturn the jury's verdict and grant such a motion "only if there is no legally sufficient basis for a reasonable jury to find for that party on that issue." *Costa v. Desert Palace*, 299 F.3d 838, 859 (9th Cir. 2002). If there is sufficient evidence before the jury on a particular issue, and if the jury instructions on the issue were correct, then the jury's verdict must stand. *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1014 (9th Cir. 1985).

The court "may not substitute [its] view of the evidence for that of the jury," nor can the court "make credibility determinations nor weigh the evidence." *Costa*, 299 F.3d at 859. The "high hurdle" of the 50(b) standard thus "recognizes that credibility, inferences, and fact-finding are the province of the jury, not [the] court." *Id.*

#### B. THE VERDICT IS SUPPORTED BY SUBSTANTIAL EVIDENCE IN THE RECORD

### 1. The Verdict is Supported by Substantial Evidence that Plaintiff Engaged in Protected Speech, and that Defendant Knew It.

### (a) City-Wide Budget and Budget Process Discussions were Protected Speech.

In the City of Scappoose, the administration of the City's budget, as a whole, is not the police chief's job. Tr. 242:6-9. It is the City Manager's job. Tr. 242:10-12. Defendant did not like challenges to his decisions regarding budget matters, whether from Plaintiff or from city councilors. *See* Tr. 52:10-21 (Defendant was "very, very defensive [regarding anyone questioning anything that he did regarding the budget] and * * * took it very personally."). Defendant admitted that Plaintiff's official role in the budgetary process was limited to the police department and, although Defendant met with each department individually as he put the overall budget together, he limited his meetings with Plaintiff to discussion of only the police department budget. Tr. 430:22-433:8. Defendant directed each of his department heads to support "his" overall budget as he presented it, and belittled those who questioned his decisions regarding the budget. Tr. 70:4-23.

Ms. Ingham was a city councilor. While the city council, as a body, had authority to hire and terminate the City Manager, Tr. 190:17-20, it did not have that authority over the Police Chief. The City Manager hired, fired and supervised the Police Chief. Tr. 401:12-16. Ms. Ingham believed it was her responsibility as a city councilor to communicate with the department heads to keep abreast of what was going on with the city. Tr. 47:1-9. She met Plaintiff shortly after he became Chief of Police, Tr. 46:23-25, and that "as time went on, we did discuss more and become more and more involved in the budget process." Tr. 47:10-15. She said that "there are a lot of issues that would come up under the budget. New parks, swimming pool – that was always an issue – the air park and development at the air park. And, as time went on, more and more discussion was had regarding the budget and all facets of the budget, not just the police department budget." Tr. 47:23-48:3. She testified that her discussions with Plaintiff were "absolutely" outside

of the police department budget, Tr. 48:8, because "Mr. Greisen was very involved in the community and was interested, as all of the councilors were, in what was going on in the community." Tr. 48:4-13.

Ms. Ingham testified that, in 2012, Plaintiff discussed with her the allocation of the overall city budget, including city interests over which Defendant (and not Plaintiff) had budgetary control, like the swimming pool and parks. Tr. 49:14-24. Ms. Ingham testified that she spoke often to Plaintiff about city matters, and that their communications were not confined to his appearances at city council meetings, or when he was in uniform. Tr. 50:20-51:4. He spoke to her about city issues wherever they met, whether it was at the grocery store, Tr. 51:6-7, or social gatherings. Tr. 52:22-53:12. In 2012, they also discussed how "very frustrating" it was that Defendant presented his budget very close to the time frame of when the budget process started, and that Defendant gave people little time to consider his proposed budget before a council meeting. Tr. 53:13-54:10.

Plaintiff testified that, in 2012, he and Ms. Ingham discussed the reallocation of the overall budget before a budget committee meeting "and * * * Councilor Donna Gedlich would also call me over to start inquiring with me about different budgets throughout the whole city." [1] Plaintiff knew that this was outside of his police chief duties: "Now, my only responsibility was just the police department's budget, not – not water or sewer or any plans, and so we talked about other things on the budget." Tr. 72:12-20. This was not part of his official duties as Chief of Police. In fact, it was contrary to Defendant's directives to support only his budget as presented.

---

[1] Defendant misinterprets Councilor Ingham's testimony to assert that Ingham's "most recent" discussion with Plaintiff occurred in 2003. Dkt. 120, at 6 (citing Tr. 48:14-21). Clearly that isn't the case. Ingham testified that her most recent discussion with Plaintiff was "that there was quite a decrease in the police budget from the previous city manager to when Mr. Hanken came in * * * *" but she said nothing about the date of that discussion. She clearly testified to more recent conversations, in 2012, about Defendant's budget antics. *See, e.g.,* Tr. 54:4-15.

At a May 14, 2012 budget hearing, it became clear to everyone that Plaintiff had candidly spoken with Councilor Ingham about Defendant's proposed overall budget, against his wishes. Plaintiff panicked when Ingham asked him to support changes to the overall budget at the meeting. He said he was "dancing around" at the meeting because "I'm supposed to support the budget as presented, and you have two councilors who want to add police officers to the force, and I could not freely say, 'Yes, I support it.'" Tr. 71:9-19. Ms. Ingham testified that she was "taken aback" that Plaintiff didn't offer his support for reallocation of the budget to gain additional officers "because of the conversations we had had prior to the budget – the starting of the budget process." Tr. 57:6-14. Her question gave him away, and let Defendant know that Plaintiff had conducted unauthorized discussions with a city councilor, behind Defendant's back, regarding the overall budget —an action that was clearly not in his job description.

Defendant was visibly angry when he learned that Plaintiff had engaged in budget discussions with Councilor Ingham behind his back. He was "combative, and belligerent and argumentative," and showed "very poor body language; very gruff; very demeaning." Tr 57:21-85:1. "You could tell he was mad." Tr. 71:18-19. The next day, Defendant stopped Plaintiff in City Hall, pointed his finger at him, and told him "I'm mad at you. You stay on your side of City Hall. I don't want to see you over here." Tr. 71:20-72:4. The exchange made Plaintiff feel sick. He understood it to mean "Don't talk about – don't bring up anything with the budget. You just stay and you deal with the police department." Tr. 72:7-11.

Defendant's anger at Plaintiff for talking with Councilor Ingham about the overall budget did not subside. As Plaintiff testified, "As a matter of fact, after he told me to stay on my side – that was May. We did the budget thing. The budget was passed. I think it was about August. I finally went over on the Hall – City Hall side, trying to meet with Jon Hanken and talk to him, and

he – he said that I need you to be -- I need you to quit listening to Councilor Ingham about her – the budget and – for the best interest – 'Ms. Ingham will be the one that will ruin your career here in the City of Scappoose' – if I continued to listen to her budget inquiries." Tr. 75:19-76:5.

In summary, councilor Ingham provided direct evidence that Plaintiff, in fact, discussed the overall city budget with her while both of them knew Defendant desired to control and limit all discussion and criticism of "his" budget. Plaintiff testified that he was directed *not* to advocate for anything that was not presented in Defendant's budget. Councilor Ingham and Plaintiff provided direct testimony of how Defendant learned of their prior discussions, and how angry he became. Plaintiff provided evidence of Defendant's continuing and lingering anger regarding his unauthorized communications with councilor Ingham regarding the city's overall budget. Plaintiff, therefore, presented substantial evidence that that Defendant "knew" of his protected speech, and that he expressed opposition to the protected speech. *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 750-51 (9th Cir. 2001). As explained, below, Plaintiff also introduced evidence that Defendant's given reasons for the adverse employment actions were false or pretextual.

### (b) Questions to Jill Herr and other Department Heads Regarding Late Paid Invoices and Audit Changes were Protected Speech.

When Defendant told Plaintiff to "stay on his side of City Hall," his statement triggered "red flags" for Plaintiff, telling him that "there was more to this." Plaintiff testified "I would go over when [Hanken] wasn't around, and I was just being more sneaky, careful with my questions, being on thin ice. * * * * I talked to Jill Herr. I talked with a lot of the other department heads from Water, Steve Wabschall, Sewer, Public Works, and I started to inquire more about the budget." Tr. 73:5-12. Jill Herr was the Finance Director for the City of Scappoose. She was responsible for the day-to-day processing of revenue and expenses for the City, and reported

directly to Defendant.  The finance director is a department head, and co-equal of the police chief, who reports directly to the City Manager.  Tr. 243:3-5.  The Finance Director is not in the chain of command between the Chief of Police and the City Manager.  Tr. 243:6-12.

Plaintiff testified that he first questioned Jill Herr about unpaid invoices in 2012, and learned that it was Defendant's city-wide practice to withhold payment on invoices to city vendors and suppliers at the end of a fiscal year if it appeared that the City was going over budget, and to then pay those vendors in the next fiscal year out of the next year's budget, which then used up money that was budgeted for the next year's purchases.  Tr. 73:10-74:4. Plaintiff's initial inquiry was about his own department's invoices, but he also asked Jill Herr and the other department heads about other departments, beyond the police department, and learned that every other department's invoices were also being withheld.  Tr. 74:5-10.  Plaintiff did not believe that city vendors should be paid months late, so that Defendant's budget would have the illusion of balancing at the end of the year, while in reality, the budget deficit would actually only be transferred to the next fiscal year.  Tr. 73:10-74:10, 76:6-15.  Defendant's practice was generally unknown and a matter of public concern.

Plaintiff also discovered, in 2012, that Defendant had "all of a sudden" changed the audit process.  Plaintiff asked "Jill Herr, and some of the councilors" and learned that Defendant had hired a new audit firm that didn't conduct its audits on site anymore.  That brought up more "red flags" with Plaintiff about the City's financial practices as a whole.  Tr. 75:10.  In his review of audit reports, Plaintiff noticed the new audits no longer followed GAAP accounting principles. Tr. 160:10-19.  When Plaintiff raised these budget and financial issues with Defendant, Defendant told him that he "didn't know what he was talking about."  Tr. 76:16-21. So Plaintiff found, enrolled and completed a government budget and financial management course at Willamette University.

Plaintiff then continued his inquiries in the Spring of 2013 about department invoices being held at that time.  At that time, Jill Herr told him that she was "just doing what she's being told:  Hold the invoices."  Tr. 77:3-25.  Plaintiff was not just inquiring about police department invoices.  He asked about all departments, and was told by Herr that invoices were being withheld for departments other than the police department.  Tr. 78:1-3.

The Jury could infer from the evidence that Defendant knew about Plaintiff's inquiries to Jill Herr about invoice account practices and audit concerns because in 2012 Defendant told Plaintiff he "didn't know what he was talking about," and because after Plaintiff's inquiries about withheld invoices in 2013, Ms. Herr first responded that she was just doing what she was told by Defendant, and then later paid some of the withheld invoices before the end of the fiscal year.  Tr. 78:4-7.    Plaintiff also noticed that during this same period, "March, April, May" of 2013, Defendant "kept calling my lieutenant, and my lieutenant kept going over to the city manager's office, which is odd, because that was not normal procedures, you know, protocol."  Tr. 78:10-20.  Defendant made Plaintiff feel uncomfortable.  "Hanken was dealing more with the lieutenant than with me; but, yet, he doesn't want me to – yeah, I did go over there and talk to him, but not -- I didn't – you definitely didn't feel comfortable going there all the time."  Tr. 79:2-5.

In summary, Plaintiff provided direct evidence that despite being told to "stay on his side of City Hall," he began to question Jill Herr and the other department heads about Defendant's citywide practice of withholding payment on city vendor invoices.  At the same time, Plaintiff inquired about new audit procedures with Jill Herr and city councilors. After taking the government budget course, Plaintiff made further inquiries to Jill Herr, who initially told him that she was "doing what she was told" by Defendant, and then unexpectedly paid some of the withheld invoices.  At the same time, contrary to protocol, Defendant stopped talking with Plaintiff

and started dealing directly through Plaintiff's first lieutenant, Mr. Miller. The Jury could reasonably infer from the evidence, as did Plaintiff, that Defendant knew Plaintiff was inquiring in the Spring of 2013 about his eleventh hour "budget balancing" practices involving the transfer of unpaid expenses to the next fiscal year, and didn't like it. Plaintiff presented substantial evidence that Defendant "knew" of this protected speech, that he expressed opposition to the protected speech ("you don't know what you are talking about"), and that, at the same time Plaintiff was asking these questions, Defendant began talking with Lt. Miller, who brought the first "complaint" against Plaintiff in May of 2013. *Keyser,* 750-51.

### (c)    Testimony to the Personnel Review Committee and Plaintiff's Offer to Testify Further Before the City Council was Protected Speech.

In September of 2013, Plaintiff was asked to testify before the PRC, regarding the appropriateness of Defendant's discipline of Plaintiff for the February 2013 PIT maneuver. Councilor Reed testified that, before the meeting, Defendant threatened the PRC members that they would need to see things "his way, and, if we didn't, it would affect the future of our relationship." Tr. 193:7-15. Councilor Hayden testified that Defendant called her into his office, showed her the Notice of Discipline he had issued to Plaintiff, and "leaned over across the table at me and said, 'How you handle this is going to determine our future working relationship.'" Tr. 182:11-25. Councilor Hayden was later randomly chosen to sit on the PRC, and testified that Defendant told the review committee at their first meeting that, "if Doug [Greisen] would have just taken his punishment, that all of this would not be going on."

Plaintiff testified that when he was asked by the PRC (which included the city attorney, Ron Guerra, Ex. 49) "why all this was happening", he explained that he believed Defendant was retaliating against him for asking questions about Defendant's budget and financial management practices. Tr. 93:18-94-15. Plaintiff told the PRC all that he discovered about how department

invoices "were being withheld for so long and not getting paid until a new fiscal year." He testified at trial that, after the gag order and the ban from public property, his interview with the PRC was the only opportunity he had to tell the city council what Defendant was doing to him, and why. Plaintiff further testified that, after the meeting was over, he sent an email to "the City" that, "after I got done disclosing the financial stuff, if the city council wanted to talk to me any more about what I was starting to learn more about, the inquiry, that I would be more than willing to meet with them in executive session so that they could start looking into matters." Tr. 94:16-23.

Councilor Reed's testimony at trial confirmed that when Plaintiff was speaking at the PRC meeting, he had "questioned how some budget items, some invoices, were paid; how they were moved from the current fiscal year to another fiscal year – the following fiscal year – and apparently he had questioned whether or not that was a good move or not." Tr. 193:23-194:7. Councilor Hayden testified, similarly, that at the PRC meeting with Plaintiff, "[t]here was some information that was divulged to us about the financial bookkeeping and budgetary information that we had no prior knowledge of." Tr. 185:9-14. Defendant attempted to paint this speech to the PRC as "unprotected" during his cross examination of the two councilors, by leading them to agree that Plaintiff talked to them "about the police department budget and invoices being withheld." Tr. 191:3-07, 198:19-22. But Defense counsel did not ask either witness whether Plaintiff talked to them *solely* about the police department, or whether he also talked to them about the other departments suffering the same problems with unpaid invoices.

It was reasonable for the Jury to infer from the testimony of Plaintiff, Reed and Hayden, that (1) Plaintiff told what he knew about Defendant's questionable financial practices, including his city-wide practice of withholding invoices for payment in the next fiscal year (a practice to which the councilors admitted that they were not privy), and (2) about how Defendant was

retaliating against him for questioning those practices.   It was also reasonable to infer that Defendant knew about this protected speech to the PRC from the evidence that: (1) Plaintiff wrote to "the city" after giving testimony to the PRC, offering to testify further into the financial matters in an executive session of the city council, (2) the city attorney, Mr. Guerra, attended the PRC meetings, (3) Defendant admits he called the city attorney, Mr. Guerra, on the day he received the PRC findings and recommendations, and (4) Defendant called Local Government Personnel Institute ("LGPI") to commence the third investigation on the same day that he received the PRC recommendations and spoke to Mr. Guerra.   Therefore, Plaintiff presented substantial evidence, from which the Jury could reasonably infer, that Defendant knew of Plaintiff's protected speech to the PRC, and that he took immediate adverse action against Plaintiff (calling LGPI to commence the third investigation, and then going to the press while the investigation was pending) within a close proximity in time after the PRC's recommendations.  *Keyser*, 750-51.

### 2.   The Verdict is Supported by Substantial Evidence that Plaintiff Spoke as a Citizen and Not as Part of his Official Duties.

Defendant incorrectly argues that this Court must reverse the Jury's verdict, because the record does not include "substantial evidence" that he spoke as a citizen, and not as part of his "official duties" as police chief.  *Garcetti v. Ceballos*, 547, U.S. 410, 421 (2006).  The Ninth Circuit described three factors relevant to the determination of the scope of a plaintiff's job duties in *Dahlia v. Rodriguez*, 735 F.3d 1060 (9th Cir. 2013).  Those factors are:  (1) whether or not the employee confined his communication to his chain of command, *Dahlia*, 735 F.3d at 1074 the subject matter of the communication (whether or not it is routine or typical for him to perform in his job), *Dahlia*, 735 F.3d at 1074-75, and (3) whether the speech is in direct contravention of a supervisor's orders.  *Id.* at 1075.  Each of these three factors shows that Plaintiff was speaking as a citizen, and not as part of his official duties.

**(a) Plaintiff's Speech was Not Confined to his "Chain of Command."**

The first *Dahlia* factor weighs in Plaintiff's favor. Plaintiff did not confine his speech to his "chain of command." Plaintiff spoke *individually* to Councilors Ingham, Reed, Hayden, and Gedlich. City Councilors, by themselves, are not in Plaintiff's chain of command. Defendant argues in its motion that, as a city councilor, Ms. Ingham was in Plaintiff's "chain of command." Dkt. 120, at 13. That is misplaced for several reasons: (1) Defendant admitted that he holds supervisory responsibility over all department heads, with the power to hire and fire those department heads, not city council. Plaintiff didn't report directly to city council. He reported to Defendant. Tr. 401:12-16. (2) Plaintiff's contract, Exhibit 212, provides that he is to perform the duties outlined in his job description, "and any other duties and responsibilities authorized or directed *by the City Manager*." While the contract also says that, in the "performance of those duties," he "shall abide by the policies, rules and directives of the City Manager and City Council", it goes on to say that he shall act in accordance with the charter, ordinances of the City, and the Constitution and laws of the State of Oregon and the United States. Exhibit 212, ¶ 3. To argue that the City Council is in Plaintiff's "chain of command" is to argue that the Oregon legislature and the U.S. Congress is also in his chain of command. Neither is true; And most importantly, (3) Even if the "City Council" is the direct supervisor of the City Manager, and therefore in Defendant's chain of command, individual city councilors are not the "City Council." A City Council can only act as a body. Individual councilors have no authority to speak for, or bind, the City as individuals. As Hanken testified, the "city council" was his employer, and it took "four votes" to terminate him. Tr. 436:6-12. As a "councilor", Ms. Ingham was merely a representative of the citizens of Scappoose, and not within Plaintiff's "chain of command."

Finance Director Jill Herr, and the other department heads from "Water, Steve Wabschall, Sewer, [and] Public Works," Tr. 73:9-12, were also not in Plaintiff's chain of command. As the

Finance Director for the City of Scappoose, Jill Herr was responsible for the day to day processing of revenue and expenses for the City, and reported directly to Defendant. The Finance Director is a department head, and co-equal of the police chief, who reports directly to the City Manager. Tr. 243:3-5. The Finance Director is not in the chain of command between the Chief of Police and the City Manager. Tr. 243:6-12.

### (b) The Content of Plaintiff's Speech was not Routine or Ordinary for his Position as Chief.

The second *Dahlia* factor also weighs in Plaintiff's favor. The subject matter of Plaintiff's speech has already been briefed, above at pg. 4-9, 11-14. Plaintiff's speech, including his questions, went beyond the police department's budget, and involved the overall budget, city finances, audits, and Defendant's city-wide cost shifting and budget balancing practices as a whole. Defendant admits that city-wide budget matters were beyond the scope of Plaintiff's job. Tr. 430:22-433:8. Plaintiff's offer to testify to the City Council, in executive session, on what he learned about Defendant's cost shifting/budget balancing financial practices, was not ordinary for him as police chief.

### (c) Plaintiff's Speech was Against Defendant's Wishes.

Finally, the third *Dahlia* factor weighs in Plaintiff's favor. Plaintiff's speech to Councilor Ingham about the overall budget, and presumably his speech with the other councilors, was clearly against Defendant's wishes. Defendant took his Defendant did not discuss the other department's budgets with Plaintiff, and directed his department heads to support "his" budget with the City Council. Tr. 430:22-433:8. Defendant belittled department heads, like Plaintiff, who asked questions his decisions about the overall budget. Tr. 70:4-23. Defendant was outwardly and visibly upset when he learned that Plaintiff had been talking to Councilor Ingham, prior to the budget meeting, about her desires to change the overall budget, Tr. 57:21-85:1, 71:18-19, and

yelled at Plaintiff the next day in City Hall to "stay on your side of City Hall." Tr. 71:20-72:4. Months later Defendant told Plaintiff not to listen to Ingham's questions about the budget, or it would ruin his career. Tr. 75:19-76:5. Now Defendant argues that his directives and threats only related to discussions about the police department budget, and not to the budget as a whole. But that makes no sense. Defendant disapproved of Plaintiff talking to Ingham, or others, precisely because it was *not Plaintiff's job* to craft the overall budget, and because it was outside Plaintiff's authority to discuss any changes to the budget Defendant presented. Tr. 242:6-9. Crafting the overall budget was Defendant's job. Tr. 242:10-12. The Jury heard evidence that Defendant did not appreciate Plaintiff's questions about his end of year budget practices, Tr. 76:16-21 ("you don't know what you're talking about"), and other evidence that Defendant disapproved of Plaintiff's unwillingness to keep quiet. Tr. 183:19-24 ("if Doug [Greisen] would have just taken his punishment, that all of this would not be going on."). The three *Dahlia* factors support Plaintiff, not Defendant.

### 3. The Verdict is Supported by Substantial Evidence that Plaintiff's Protected Speech was a "Substantial or Motivating Factor" in Defendant's Retaliation.

Defendant denied that Plaintiff's speech was a substantial or motivating factor in the adverse actions he took against Plaintiff. But the jury heard direct evidence that the multiple investigations, together with the exclusionary order, caused Plaintiff to suspend his inquiries into budgeting or financial wrongdoing. Tr. 95:17-96:1. Additionally, the *Keyser* court observed that the Ninth Circuit has permitted proof of retaliatory motive by circumstantial evidence of at least three types: (1) "proximity in time between the protected action and the allegedly retaliatory employment decision", (2) "evidence that [the] employer expressed opposition to [the] speech." And (3) "evidence that [the] employer's proffered explanations for the adverse employment action were false and pre-textual."

**(a) Defendant's Adverse Actions Closely Followed Plaintiff's Protected Speech, or Plaintiff's Resistance to Earlier Adverse Action for Protected Speech.**

The close proximity of Defendant's multiple adverse employment acts against Plaintiff, coupled with Plaintiff's efforts to restore his good name, was reasonably perceived by at least one city councilor as an effort by Defendant to continue making false allegations against Plaintiff until one of them "stuck." "It just seemed like the chronology that occurred – my thought was why aren't these all being taken care of simultaneously at the same point? And what seemed to happen was if the first allegation didn't pan out, then they just – [Defendant] just reached for another one. If that one didn't pan out, [Defendant] reached for another one, hoping that eventually one would stick." Tr. 195:10-24. The Jury was entitled to reasonably infer from the evidence that Plaintiff's protected discussions with city councilors outside of the budget hearings, his protected questions to Jill Herr and other city department leaders about city-wide withholding of invoices for payment in the next fiscal year and audits, Plaintiff's testimony to the PRC that the PIT maneuver discipline was retaliation for his questioning of Defendant's financial practices, and Plaintiff's offer to further testify to an executive session of the city council on the same financial issues, were substantial or motivating factors for Defendant's serial, close in time, adverse employment actions. Importantly, when considered in the full context of the earlier adverse actions, and earlier press releases, the appeal, and the findings of the PRC, the Jury reasonably inferred that Plaintiff's protected speech was the seminal trigger for all of Defendant's retaliatory acts.

Plaintiff introduced evidence that, after the 2012 budget meeting, and Defendant's angry instructions to "stay on your side of city hall," he complied and went back to work. "[T]hat was May. We did the budget thing. The budget was passed." Tr. 75:23-24. Later, in August of that year, Defendant demonstrated to Plaintiff that he was still angry when he delivered the instruction to "quit listening to Councilor Ingham" and that "Ms. Ingham will be the one that will ruin your

career here in the City of Scappoose."  Tr. 75:19-76:5. While these events and statements were not particularly close in time with Defendant's first pre-textual investigation of Plaintiff, they were both related to the budget process, which reoccurred in May each year.  In the spring of 2013, when Plaintiff started again asking questions related to the late payment of invoices, including the payment of invoices in other departments, the budget process was starting again in earnest.  It was *deja vu* all over again.

In "March, April, May" of 2013, the tension with Defendant resumed.  Defendant began calling Lt. Miller to his office instead of Plaintiff, which "was not normal procedures, you know, protocol."  Tr. 78:10-79:5. During that spring, Sgt. Carpenter's PIT maneuver complaint against Mitich was then formulated against Plaintiff.  As early as March 2013, when the secret meetings between Miller and Defendant began, Defendant was probably aware of Carpenter's March 4, 2013 complaint.  Ex. 201, p. 3.  While Defendant was having private meetings with Miller, Miller was asking Carpenter to re-write his complaint against Plaintiff, but Carpenter told him that "he did not want to go back and change anything in the memo."  Ex. 201, p 2.  When Carpenter refused to make a complaint against Plaintiff, Miller attached a cover memo to the complaint against Miltich, and recast the complaint as against Plaintiff. Ex. 201, p. 1.  When Miller then presented his cobbled-together complaint to Defendant, Defendant didn't balk at commencing an immediate and full investigation of Plaintiff.  Tr. 382:23-383:8.  Thus the complaint, and the decision to investigate Plaintiff was close in time to (1) Plaintiff's renewed questions to Jill Herr about late paid invoices for all departments, and (2) the one year anniversary of Plaintiff's out-of-school budget discussions with councilor Ingham.

Plaintiff's discipline followed the investigation.  Defendant's harshly worded discipline letter, Exhibit 35, was issued on August 23, 2013.  That same day, Defendant wrote an email,

Exhibit 36, to Plaintiff telling him that his suspension would only last until September 9th, and that "in keeping with the City's policy of not embarrassing employee[s] related to disciplinary matters," Defendant preferred that Plaintiff let him manage Plaintiff's appointment schedule while he was "absent". Exhibit 36 (the "nice guy" email).

The close proximity in time between the harshly worded discipline letter, containing a veiled threat that Defendant would release the investigation report to the press, Ex. 35, and the "nice guy" email, Ex. 36, implied a bargain: Plaintiff would take his punishment and let Defendant "have one over on him," and would forever mind his own business (staying on his side of City Hall), and in return Defendant would hold the report back from the press and allow Plaintiff maintain his position as Chief of Police.

Plaintiff's appeal from the discipline expressed his refusal of the implied bargain and, within two weeks of Plaintiff's appeal, Defendant completely abandoned city policy, and the "nice guy" email, and reported Plaintiff's discipline to the press.  The front page story reporting Plaintiff's discipline appeared on September 6, 2013, the Friday before Plaintiff was to return to service.  In that same story, Defendant announced that a second investigation of Plaintiff was getting underway.   Also on that same day, September 6, Defendant placed Plaintiff on administrative leave pending completion of a second LGPI investigation for "harassment" and a "hostile workplace."  The letter placing Plaintiff on administrative leave, Exhibit 38, included the exclusionary order "not to come to the Police Department, City Hall, or any other City owned or leased building unless authorized by me or my representative."

The very close proximity in time between Plaintiff's appeal from the pre-textual discipline by Defendant, Exhibit 37, and Defendant's punitive report to the press of his discipline, Exhibit 39, Defendant's improper report of a second investigation, Exhibit 39, and Defendant's letter

placing Plaintiff on administrative leave and banning him from all city property, Exhibit 38, is evidence that Defendant acted in further retaliation for Plaintiff's protected speech, and his failure to keep quiet and take his pretextual punishment.

Plaintiff's appeal to the PRC reached its conclusion on October 14, when the PRC reported to Defendant and the other city councilors that the LGPI report was "an erroneous mischaracterization of the events * * * that purposely omitted pertinent and material facts, to arrive at a conclusion that the PRC finds untenable." It further reported that "the LGPI report was not an objective review, but a prosecutorial document that was colored to arrive at a predetermined result." Exhibit 49. That same day, Defendant called both the mayor, and the city attorney to tell them that he would be resigning as the city manager of Scappoose. Tr. 495:22-496:6. Also that *same* day, Defendant hired an investigator at LGPI to conduct a third "forensic" investigation of Plaintiff for his alleged mishandling of allegedly "unauthorized" funds allegedly "discovered" in his desk. Tr. 495:9-17.

The close proximity in time between (1) the PRC's announcement of its decision in Plaintiff's favor and calling out Defendant's pre-textual discipline, (2) Defendant's telephone call with the city attorney (who himself attended the PRC meetings and knew of Plaintiff's testimony about retaliation by Defendant), (3) Defendant's decision to resign as city manager, and (4) Defendant's engagement of LGPI to conduct yet another investigation of Plaintiff, is evidence that Defendant acted in *further* retaliation for Plaintiff's (now successful) refusal to take his pretextual punishment quietly.

Defendant eventually left office on November 7, 2013. But just before he left office, he reported the existence of the third investigation to the press, lied about the facts to suggest that an "unauthorized" bag of money was "found" in Plaintiff's desk drawer, and that the city did not

know about the money and had no account of it.  Defendant admitted at trial that the police reserve account and the donut days accounts were "authorized", that they were known to be kept in the chief's desk, and that he hadn't yet asked for an accounting of the money when he spoke to the press.  Tr. 481:16-483:22; 484:12-485:15; 487:12-15; 489:16-490:21.  To accompany the lies in this career-ending story, Defendant also supplied an inflammatory photograph of money laid out on Plaintiff's desk in the manner of a "drug bust" photo.  The story was published, with the photo, on the front page of the newspaper on November 15, 2013.

The close proximity in time between Defendant's resignation on November 7, 2013 and his provision of false information and a "drug bust" photo to the press is evidence that Defendant provided the information and photo in retaliation for Plaintiff's successful appeal of his pretextual punishment, Plaintiff's disclosure to the PRC that Defendant was retaliating against him for asking questions about city finances, including late paid invoices, and Plaintiff's offer to testify further regarding the financial issues.

**(b) Defendant Expressed Opposition to Plaintiff's Speech to Plaintiff and Others.**

Defendant's opposition to Plaintiff's speech was both direct and indirect.  Defendant expressed direct opposition to Plaintiff's protected speech with councilor Ingham.  Defendant had instructed his department heads to support his budget.  When he learned, at a budget committee meeting, that Plaintiff had been talking behind his back to councilor Ingham, he was visibly angry. Plaintiff testified that he was threatened and rebuked in May of 2012 for having private conversations with Councilor Ingham about budget matters.  Defendant told him to "stay on his side of City Hall" and then, three months later told him that Councilor Ingham would be the end of his career, if he continued to listen to her budget issues.  Defendant also expressed direct opposition (telling Plaintiff he "didn't know what [he's] talking about") to Plaintiff's questions to

Jill Herr and others about Defendant's end of year practice for all departments to hold invoices incurred in one budget cycle, for payment in the next, and about audit inquiries.

Defendant also indirectly opposed Plaintiff's speech, by threatening a number of people regarding the budget, and his management of it. Councilor Ingham was emotionally threatened by Defendant, and she observed Defendant be "belligerent," and "combative," with her and other councilors when came to the budget. Tr. 54:14-55:21. In 2012, months after the May budget committee meeting that prompted the "stay on your side of city hall" directive, Defendant threatened to "ruin his career" if he didn't stop talking to councilor Ingham. He told Plaintiff "I need you to quit listening to Councilor Ingham about her – the budget" and also "Ms. Ingham will be the one that will ruin your career here in the City of Scappoose." Tr. 75:19-76:5. Plaintiff submits that Defendant's threat to ruin Plaintiff's career if he continued to talk with Ingham is evidence of his intent to do so.

At trial, Defendant denied threatening anyone. The Jury heard testimony that he was a bully when questioned about his budget, Tr. 69:24-70:3. Defendant also threated councilors Hayden and Reed. *Infra*, p. 14, which is additional circumstantial evidence of retaliatory motive.

Defendant made other threats too. In his Notice of Discipline letter, Exhibit 35, he wrote, "As I draft this letter, I cannot help but wonder if you would be able to maintain your position if this report was known by, or reported to the news media." As the City information officer, Defendant had the power to report the investigation and the discipline to the press. Tr. 462:5-13. Defendant knew "what the news media, what they printed, could have a significant impact on your career." Tr. 463:17-19. Later, after Plaintiff's appeal, Defendant's discipline letter threat became reality. Defendant disregarded his "nice guy" email and city "non-embarrassment" policy and reported (and, in the end, misrepresented) to the press, each of the investigations he commenced.

Defendant admitted that his later investigations and actions were motivated by Plaintiff's refusal to take his initial (pretextual) punishment, when Defendant told the PRC committee that, "if Doug [Greisen] would have just taken his punishment, that all of this would not be going on." Tr. 183:19-24.    Under the circumstances, the Jury could reasonably infer that "taking his punishment" referred not just to his initial suspension, but also more broadly to accepting the bargain that Defendant insinuated through his presentation of the notice of discipline letter, Exhibit 35, followed by the nearly contemporaneous "nice guy" email, Exhibit 36.    Plaintiff was to acknowledge that Defendant "had one over [him]", Tr. 87:18-21, and was not to bring "up anything about the budget" Tr. 72:7-11, and in exchange, Defendant would "keep[] the City's policy of not embarrassing employee[s] relating to disciplinary matters," Tr. 87:24-88:15, and would refrain from reporting Plaintiff's private personnel matters to the press, so that he could "maintain his position" as chief.  Exhibit 35.

### (c) Defendant's Proffered Explanations for His Actions Were False and Pretextual.

#### (1)    Defendant's Explanation for the Traffic Stop Investigation was not Credible.

Defendant testified that he received a complaint from Lt. Miller on or about May 30th, 2013, about a traffic stop maneuver (the "PIT" maneuver) authorized by Plaintiff on February 4, 2013.  Tr. 435:15-21. Defendant offered no explanation of his decision to immediately proceed with a full-blown, third-party investigation of Plaintiff based on the unusual complaint against Miltich other than he "did not have the background in terms of the police science," Tr. 438:1-3, and "thought an investigation was necessary because we had officers who made a formal complaint, and * * * we take all complaints seriously." Tr. 438:6-10.

In fact, there was no formal complaint against Plaintiff.    Tr. 332:2-4.    Rather, the "complaint," Exhibit 201, consisted of a short memo attached to a written complaint against

another officer Miltich, who *performed* the PIT maneuver.  See Infra p. 18.  The Miltich complaint did not contain any allegations against Plaintiff and no one prepared any list of allegations against Plaintiff to give to the LGPI investigator.   Tr. 332:5-14.   The "complaint" originated from Carpenter, who Defendant knew had a tense relationship with Plaintiff.  Tr. 493:2-22.  And when Defendant received the "complaint", he didn't ask any questions of Miller about why Carpenter refused to make the complaint against Plaintiff, or about whether the PIT maneuver might have been justified by the danger posed by the suspect.  383:9-14.  Nevertheless, Defendant was "not at all reluctant" to start an investigation of Plaintiff based on the allegations by Carpenter against Miltich.  Tr. 382:23-383:8.

Defendant chose LGPI to conduct the investigation.  Tr. 437:15-25.  He did not provide a copy of any "complaint" to Plaintiff.  Tr. 123:9-13.  He never asked Plaintiff to explain himself or his actions at any time before the formal investigation was completed and Plaintiff was disciplined.  Tr. 87:6-14; 478:11-13.   He did not provide Plaintiff a due process hearing as a part of the investigation, or after it.  Tr. 478:14-20.

Contrary to Defendant's testimony and written correspondence suggesting that the "complaint" contained "10 allegations" against Plaintiff, and that "ALL TEN" allegations were "SUSTAINED", *See* Exhibit 35, the LGPI investigator invented the "allegations" to include in his report and the sustained them all.  Tr. 337:21-16.  No allegations were written before LGPI drafted its findings.  Tr. 338:1-16.

Defendant's proffered explanation of his motives, i.e. that he had no alternative but to initiate a third-party investigation of Miller's cobbled-together complaint, was unbelievable.  Mr. Gillham testified that he would have called Plaintiff in, told him about the complaint, and asked

him to explain himself.  Tr. 246:4-6. During cross examination, Mr. Gillham elaborated on the city

manager's duty to figure out the problem before ordering a full blown investigation:

> "Question, by Ms. Vickers:  So if you have a department where there's a complaint that there's a hostile work environment and there is a hostile work environment, you need to make sure that stops; right?

> "Answer, by Mr. Gillham:  Well, what – I've got to define what *that* is.  That's the city manager's role is to go figure out what "that" is.

> "Q:  Okay.

> "A:  And then – then go from there."  Tr. 248:9-15.

In the case of the PIT maneuver investigation, Gillham testified:

> "If I were the city manager and my chief of police did that, I'm not going to launch a full investigation. I would pat him on the back and say, 'You saved lives. You got lucky this time, but don't ever let it happen again.  I want to see a plan from you in the next 90 days and how you're going to be current on your current policies.'"  Tr. 249:17-22.

The Jury heard that Defendant had, himself, previously testified that "the reasonable way to

do it, if you had an investigation or concern about somebody, is first to talk to the person."  Tr.

486:23-487:5.  But Defendant didn't act in the "reasonable way" in any of his investigations of

Plaintiff.  Defendant never once talked to Plaintiff about the substance of the February arrest and

the PIT maneuver before he was investigated and later disciplined. Tr. 492:23-493:1.  Defendant's

proffered excuse for conducting the first investigation the way he did was simply not believable.

### (2)    Defendant's Notice of Discipline and Suspension was a Pretext to Punish Plaintiff for his Protected Speech.

Once LGPI delivered the traffic stop report to Defendant, he rushed to punish Plaintiff with

a "private" disciplinary letter, and a suspension from duty.  Defendant didn't give Plaintiff a

chance to defend himself.  Tr. 87:6-23. He seized upon findings in the report that even he found

"surprising", Tr. 473:24-474:1., did not check its accuracy, Tr. 473:20-23, 474:2-18, did not give

Plaintiff a due process hearing, Tr. 478:14-20, and failed to even discuss the report with Plaintiff before he prepared a scathing discipline letter.  Tr. 87:6-14.  In that disciplinary letter, Defendant misrepresented the complaint at issue, berated Plaintiff, quoted matter from the report that had been taken out of context by the investigator, and issued a veiled threat that if Plaintiff didn't accept his punishment, his discipline letter would be disclosed or reported to the press.  Exhibit 35.

Plaintiff testified that Defendant offered to meet with Plaintiff to discuss the report but that when Plaintiff showed up for the meeting, Defendant had already written the disciplinary letter. 87:6-14. When Defendant delivered the disciplinary letter, "he was sitting behind the desk, I will never forget when he was just gloating – just gloating like – like he had one over me, and I just – I felt sick." Tr. 87:18-21.  A few hours later, Defendant sent Plaintiff the "nice guy" email. *Infra*, pp. 15-16.  Plaintiff testified that he felt sick that Defendant was acting like he wanted to be friends after beating him up.  Plaintiff testified that the email reminded him of something a pimp might say after he had beaten up a prostitute.  "It wasn't right."  Tr. 87:24-88:15.

Plaintiff also testified that as soon as he appealed the disciplinary letter to the PRC, Defendant completely disregarded the "city's policy" and followed through on his threat to report the discipline to the newspaper.  Exhibit 39; Tr. 474:19-476:16.  A few weeks after that, at a time when Defendant was clearly on notice that Plaintiff *disagreed* with the content and conclusions of the investigation report, Tr. 471:12-474:17, and while the report was still under review by the PRC, Tr. 479:4-6, Defendant gave the full investigative report and the notice of discipline letter to the press for publication.  He admitted that he did not ask the District Attorney whether the report or letter were subject to public disclosure laws before disclosing them to the press.  Tr. 479:10 480:1.  The newspaper then published another reputationally harming front page story on the report.  Exhibit 46; Tr. 477:11-479:6.

The Jury was entitled to infer from the discipline letter, its threating tone, the gloating manner in which it was delivered, the "nice guy" email, the implicit bargain, Plaintiff's appeal, and the immediate public disclosure of Plaintiff's discipline to the press following Plaintiff's appeal (contrary to the "nice guy" email and the city's non-embarrassment policy), that Defendant's discipline letter was more than a routine and private discipline of policy violations, but was instead another message.  The discipline letter was a directive, consistent with Defendant's prior verbal directives, to "Keep quiet and mind your own business, or I will ruin your career."

### (3)    Defendant's Gag Orders Were Pretextual, and Intended to Prevent Plaintiff from Defending Himself Against Defendant's Allegations to the Press.

Defendant testified that he imposed the gag orders on Plaintiff so that he would not "influence the investigations."  Tr. 494:12-14. He also testified that it was improper to speak to the press during an investigation of a private personnel matter.  Tr. 480:8-13.  But Defendant also admitted that the gag orders were not mutual and that he talked to the press in the middle of the ongoing investigations.  Tr. 494:15-17. The Jury is permitted to infer from this one sided gag order, and Defendant's repeated negative (and later, false) offerings to the press, that the gag orders were intended to keep Plaintiff from contradicting Defendant's damaging retaliatory statements or from defending himself in the press or in the community, and also to foreclose any opportunity for Plaintiff to inquire further about any budget or financial improprieties.

### (4)    Defendant's Investigation of Workplace Harassment was a Pretext to Punish Plaintiff for not Accepting his Earlier Punishment.

After Plaintiff appealed the Notice of Discipline, rejecting Defendant's implicit bargain, Defendant completely disregarded his "nice guy" email to Plaintiff that the city would follow its "policy" not to embarrass employees by publicizing discipline actions. Exhibit 36.  Within two

weeks of Plaintiff's appeal of his two week suspension, Defendant reported the discipline to the press and initiated a second LGPI investigation of allegations that Plaintiff created a "hostile workplace" in the police department.  Tr. 444:8-13.

Defendant testified that he received a complaint of harassment from Sgt. Carpenter and that he simply had to investigate it.  But given the timing and overall circumstances, the Jury was entitled to reasonably infer that the true motivation for the "hostile workplace" investigation was to punish Plaintiff for appealing Defendant's retaliating discipline for Plaintiff's protective speech.  Neither Defendant, nor Lt. Miller, had ever seen any instances anything constituting a hostile workplace or retaliation by Plaintiff.  Tr. 495:1-8 (Hanken); Tr. 386:12-20 (Miller).  Defendant did not ask Miller or Plaintiff about the charges, or their source, before initiating the full blown investigation.  Plaintiff was completely exonerated of all workplace retaliation and hostile workplace charges, Tr. 315:6-8, which was no surprise to Lt. Miller, who believed the truth would come out.  Tr. 386:2-11.

In following through on the threats and the retaliation set up in the disciplinary letter, Defendant reported the "hostile workplace" investigation to the newspaper before LGPI's investigation had even begun.  Tr. 475:8-21; Exhibit 39.  The resulting front page news article about the second investigation was published on the last day of Plaintiff's two week suspension, and less than two weeks after Plaintiff had appealed Defendant's pretextual discipline to the PRC.  Defendant admitted at trial that it "wasn't appropriate" for him to disclose the second investigation to the press.  Tr. 476:11-13.

**(5)    Defendant's Implementation of the Administrative Leave and the Exclusionary Order was a Pretext to Isolate Plaintiff, and to Stop Him from Asking More Questions.**

Defendant testified that he placed Plaintiff on paid administrative leave and banned him from public property during the hostile workplace investigation because the investigator was going to be interviewing people in his department, and it was "probably best not to have him there while this was – the investigation was going on."  Tr. 449:22-450:1. The leave was supposed to last approximately 45 days.  Exhibit 38.  But Defendant did not lift the administrative leave or the exclusionary order once the interviews were concluded.  Instead, he appointed Lt Miller as "acting chief of police" and never talked to Plaintiff again.  The effect of the Exclusionary Order was to completely halt Plaintiff's investigations into Defendant's financial practices, Tr. 95:17-96:1, 103:24-104:4 ("he shut me down"), and to make it virtually impossible to lead his department in any meaningful way.  *Id.*

The Jury was entitled to reasonably infer that Defendant's true motive for placing Plaintiff on administrative leave and banning him from all public property was to retaliate for Plaintiff's resistance to his earlier "punishment" and to *ensure* that Plaintiff would stop questioning his financial practices with Jill Herr or with other department heads.

**(6)    The Charity Account Investigation was a Sham Investigation of Facts Defendant Already Understood.**

Defendant's newspaper account of the origins of the charity account investigation, and the statements he admitted making, quoted in Exhibit 51, Tr. 481-9-11, were proven false.  Defendant claimed that the investigation was necessary because Lt. Miller "found" a bag of money in Plaintiff's drawer, the accounts were "unauthorized," and the city had "no account" of the money that passed through them.  He claimed that these circumstances forced him to investigate.

In fact, Lt. Miller had written to Defendant in Exhibit 204 that he *knew* of certain police reserve and charity accounts that the chief kept locked in his desk, and needed access to the chief's desk keys to inventory and account for the funds while the chief was on leave.  Defendant knew about the charity fund called "Donut Day", and admitted that it was an "authorized" account.  Tr. 485:2-11.  Former City Manager, Gillham also testified that a "donut fund" existed when he was city manager, and was "authorized," and known to Defendant, who was the community development director at that time.  Tr. 236:17-237-5.  Miller knew about the police reserve account and had been a signer on the account in 2001 and later in 2011.  Tr. 388:21-25.  Defendant admitted that he was *informed* of the police reserve account in a memo from Plaintiff in 2004.  Tr. 489:3-18; Exhibit 80.  Defendant testified at trial that he assumed the account for the police reserves was authorized "before my time" and admitted that he did not object to it at the time it was disclosed to him in 2004.  Tr. 489:16-490:2.  In any event, before the investigation was initiated, Defendant also admitted that he made no attempt to contact Plaintiff or ask him about the funds in his desk, or to account for them.  Tr. 483:1-484:1.

The Jury was entitled to reasonably infer from this evidence that Defendant's stated motives were a pretext, and that his true motive for initiating the third investigation was to continue his retaliation against Plaintiff for his protected speech and for successfully challenging Defendant's pretextual punishment at the PRC.

### (7)    The False, November 15, 2013, News Story and "Drug Bust" Photo was Intended to Ruin Plaintiff's Career.

Defendant admitted that he went to the press during his third investigation of Plaintiff to prevent the City Council from halting the investigations and covering up Plaintiff's misdeeds.  Tr. 490:15-23.  But Defendant's motive of "protecting the public" from a cover-up failed to withstand scrutiny at trial.

Defendant admitted that he supplied all of the statements to the press quoted in the November 15, 2013 article (Exhibit 51). Tr. 496:12-15. Defendant spoke to the newspaper about the third LGPI investigation while he was still city manager. Tr. 490:24-491:21. The press didn't know about the third investigation before he told them about it. Tr. 481:1-3. Defendant admitted that he went to the press in the middle of the investigation and before key facts came out, despite knowing that "while an investigation is going, while something is under review, the best thing to do is not to talk about it and let the process finish." Tr. 480:4-13.

Defendant also admitted that he made false statements to the press, including false statements that money was "discovered" or "found" in the chief's desk, Tr. 481:12-482:21, statements that the city "had no account of the donation money", Tr. 482:22-484:5, repeated false statements that the accounts were "unauthorized", Tr. 484:12-485:15, 489:16-23, and knowingly speculative statements that $28,000 had gone through "the unauthorized account," despite that it was not "wise to speculate in a news article about a matter under investigation." Tr. 485:16-486:12.

Defendant also admitted that he provided the photograph printed in the newspaper of money spread out on a desk. Tr. 496:11:14; 481:9-11; Exhibit 51. He admitted that he had seen similar photos printed in instances where money was seized or stolen and in drug bust articles, Tr. 491-25-492:8, although he refused to admit it was inflammatory. Tr. 492:16-22. Plaintiff elicited testimony that the photograph was not supposed to be released to the press and that it was, in fact, inflammatory and damaging. Tr. 390:22-393:19 (Miller); Tr. 239:1-5, 240:11-242:3 (Gillham); Tr. 186:24-187:9 (Hayden); Tr. 178:3-180:11 (M. Greisen); Tr. 273:274:1 (Burge); Tr. 99:2-104:18 (D. Greisen).

In sum, the Jury was entitled to infer that Defendant provided false and damaging allegations against Plaintiff, to the press, just before he left as city manager, *because* Plaintiff had engaged in protected speech and had successfully appealed Defendant's first wrongfully motivated adverse employment action (the PIT maneuver investigation and discipline). From Defendant's own testimony, the Jury could reasonably conclude that Defendant intended to create such a controversy over the "money found in Plaintiff's desk", that the council would have no choice but to continue his punitive investigations. And he succeeded. Defendant's false and misleading publications were never corrected or withdrawn. The November 15, 2013 story can still be found on the Internet, along with the inflammatory photograph.

Defendant argues in his motion briefing that he cannot be held liable for the "drug bust" photograph because it was a "true" photograph of the money kept in Plaintiff's desk. Dkt. 120, at 34. Defendant misperceives the action against him. Plaintiff did not seek damages for traditional defamation. Plaintiff sought damages under 42 U.S.C. § 1983 for retaliation on account of his exercise of his qualified First Amendment rights. "Truth" is not a defense to unlawfully motivated, retaliatory actions.

### 4. The Jury's Verdict is Supported by Substantial Evidence that Defendant's actions constituted "Adverse Employment Actions."

Defendant maintains, in his motion, that "the only adverse employment action Defendant took was issuing a two week suspension," and further that "the only adverse employment action for which plaintiff sought damages was his termination." Dkt. 120, at 17. Neither of those statements are true. The Jury was instructed before trial that,

> "According to Mr. Greisen, Mr. Hanken's retaliation consisted of one or more of the following: (1) commencing an investigation into a traffic stop authorized by Mr. Greisen; (2) suspending Mr. Greisen from his position as Police Chief for two weeks; (3) instituting a "gag order" that prohibited Mr. Greisen from talking to the press; (4) instituting a second investigation of Mr. Greisen regarding a claim

that Mr. Greisen was creating a "hostile work environment:" (5) banning or excluding Mr. Greisen from all public property; (6) placing Mr. Greisen on administrative leave pending the determination of all investigations against Mr. Greisen; (7) instituting a third investigation related to what Mr. Greisen describes as "police reserve and charity accounts:" (8) misrepresenting those accounts to the press as "unauthorized" before the completion of the investigation; and (9) giving the press access to an inventory photograph that Mr. Greisen says was "inflammatory." Dkt. 105 (Instruction No. 2).

The Jury was further instructed that an "action" was an "adverse employment action" if,

> "a reasonable employee would have found the action materially adverse, which means it might have dissuaded or discouraged a reasonable worker from engaging in protected activity." Dkt. 105 (Instruction No. 14).

The Jury was entitled to reasonably infer, from the evidence admitted at trial, that each of the quoted actions initiated by Defendant was an "adverse employment action." Defendant stipulated that he was, at all times, acting as the city manager of Scappoose. He initiated each act in his capacity of city manager. Plaintiff testified about the negative effects each action had on him, and how they might dissuade a reasonable person from engaging in protected speech.

Contrary to Defendant's claim that "the only adverse action for which plaintiff sought damages was his termination", Plaintiff did not bring a claim for retaliatory discharge. Plaintiff concedes that Defendant did not terminate Plaintiff. But by his acts, especially his final adverse act of publishing mistruths and supplying a "drug bust" photograph for publication in the paper on his way out of office, Defendant made Plaintiff's employment in Scappoose so controversial in the press that he was (1) unable to maintain his position as chief, and (2) un-hireable for any similar position across the country. Surely that act constituted an adverse employment action.

### 5. The Jury's Verdict is Supported by Substantial Evidence that Defendant's Adverse Employment Actions Caused Economic and Non-Economic Damage.

In his Rule 50 motion regarding evidence of damages, Defendant again asserts that "the only adverse employment action for which plaintiff sought damages was his termination," and that

"Hanken played no part in the decision to terminate plaintiff." Dkt 120, at 17. Defendant is mistaken about Plaintiff's claims. As the Jury was instructed before and after the evidence, Plaintiff claimed that Defendant subjected him to multiple adverse employment actions *while Defendant was the City Manager for the City of Scappoose*. Plaintiff also produced evidence at trial that Defendant's wrongfully motivated retaliatory actions caused economic and non-economic damage to Plaintiff.

### (a) Substantial Evidence of Economic Damages.

Plaintiff's evidence of economic damages was provided by Plaintiff, Michelle Greisen, Ronald Greisen, Gerold Gillham and Lt. Miller. Doug and Michelle Greisen each testified about the effects of the November 15, 2013 article initiated by Defendant just before he left Scappoose on Plaintiff's unsuccessful efforts to find work. Tr. 108:18-113:6; Exhibit 61. Mr. Gillham testified that, even though he knew and respected Plaintiff, and wanted to hire him in Sutherlin, Oregon, as the successor to his police chief, Plaintiff was deemed "un-hireable" after they did an initial google search of news articles written about him. "[T]hat was my experience in understanding the significant negative this has had to his career, because even I couldn't, based on that, hire him with – the chief of police is a very highly politically – and – and very, very – everybody watches the chief of police, even more so that the city manager, and I – I could not move to bring him on board." Tr. 241:17-24. Plaintiff testified that he had applied for over 200 positions all across the country, and has not received a single job offer in law enforcement. Exhibit 61; Tr. 108-18-110:24. Mr. Miller testified that, in his transition from acting chief to official chief of police in Scappoose, he was interviewed four separate times and competed against twelve other applicants. It was a "rigorous process," and he admitted that pictures like the one in Exhibit 51 wouldn't help. Tr. 393:2-19. Mr. Otterman admitted that most public officials like to

avoid controversy, Tr. 307:15-308:15, and that Doug's employment issues, and the many articles in the press, had created a lot of controversy at the city.  Tr. 308:16-22.

Ron Greisen, a CPA, provided an analysis of Plaintiff's lost income to the date of trial, and his expected loss of income for the next seven years, based on his expected work life and life expectancy.  Tr. 254:6-259:23.  He concluded that Plaintiff suffered past monetary losses through the date of trial of $300,194.  Tr. 256:14-17.  He also calculated the discounted value of future lost earnings, over the next seven years, to be $817,294.  The total evidence of economic damages presented to the Jury was $1,117,488.  The Jury awarded the full amount.  Dkt. 107.

### (b) Substantial Evidence of Non-Economic Damages.

Plaintiff's evidence of non-economic damages was provided by multiple witnesses. Plaintiff testified about how Defendant's releases to the newspapers, kept him on the front page of the newspaper for "months on end."  Tr. 97:7-8.  Exhibit 51, the November 15, 2013 article, "made me look like a – a drug dealer.  It made me look like a – bad cop.  It made me look like a criminal."  Tr. 97:12-15. When others approached him about the article, he couldn't talk about it because of the gag orders.

> "So I would be in the post office getting my mail, 'Oh, so you're in another investigation?' You know, you just – you start losing friends too."

> "I lived in Scappoose for so many years.  I was raised and my family was raised there, and my brother is the fire chief there for the fire district.  I mean, it was just – you're that guy."  104:5-14.

Plaintiff was sick.  He lost a lot of weight.  He got very depressed. 106:25-107:10. He had to try to hold his food down, and not throw it back up.  He was mentally and physically exhausted. Tr. 113:7-22.  He suffered the ugly pain of social alienation.  The hardest part was losing the chance to serve his community, and the feeling of pride he had in being a good cop and good chief

of police.  Tr. 113:15-21.  Being the Chief of Police in his home town of Scappoose, had been

Plaintiff's dream job.  Tr. 67:6-12, 113:17-18.

Michelle Greisen testified that Plaintiff enjoyed a great reputation in the community before

Defendant started his retaliation.  She testified that Plaintiff had been named "Top Cop" in

Columbia County by a 2012 newspaper reader poll.  She testified that, after Plaintiff's appeal of

Defendant's discipline letter, they were constantly in the newspaper, but unable to talk to anyone

about it because of the gag orders.  They had to decide whether or not to go to ordinary public

events (e.g. a Friday night football game).    169:4-21. Plaintiff was embarrassed by the

exclusionary order, and the fact that he had to ask his daughter to turn in city business papers at

city hall.   Tr. 171:2-14. He had to ask permission to attend traditional city events (the Sauerkraut

Festival, the Christmas ceremony). Tr. 171:15-22; 172:16-23.  With all of the press initiated by

Defendant, and the gag orders, "Everybody wanted to know Doug's side of the story, and he

couldn't say anything."  Tr. 173:2-174:3. When people didn't get the answers they wanted to hear,

they began to doubt Plaintiff's abilities and his performance as chief.  Tr. 175:7-14.  Mrs. Greisen

testified that they lost friends over the press coverage and their inability to respond.

> "There were people who worked for the City, who had been friends with us, that
> just cut us off completely.  * * * *.

> "There were people who just didn't want to deal with it.  They didn't want to be
> part of the publicity circus that was around us.  I'm sure there were people who, in
> the end, started to assume the worst because Doug wouldn't talk to them about it."
> Tr. 175:15-25.

She further testified that after the publication of Exhibit 51 on the front page of the local

paper, Plaintiff became more depressed, and was no longer able to hold it together.  He had trouble

sleeping at night.  He was anxious about everything.  He stopped eating, and lost weight.  People

started to worry about his health.  He also started withdrawing from his family.  They lost more

friends because with the gag order in place, Plaintiff couldn't explain himself.  Other friends would only let Plaintiff associate with them if he and Michelle came to their house.  They wouldn't be seen in public with him.  Tr. 178:3-179:18.  Plaintiff was left to suffer the lies and mistruths said about him by Defendant, with no ability to correct them.

Councilor Hayden testified that before the fall of 2013, when all of the newspaper stories were printed, Plaintiff was "very well thought of in the community" and that as she watched him walk through crowds of people at events "he could not go five feet without someone stopping him to shake his hand or pat him on the back or tell him what a good job he was doing * * *."  Tr. 186:18-23.  She said that the news story marked as Exhibit 51 made Plaintiff look like a "drug dealer" and that it impacted his reputation in the community.  Tr. 186:24-187:9.

Councilor Ingham testified that she saw how the negative articles instigated by Defendant affected Plaintiff's reputation in the community.  She talked to a lot of people and was surprised and concerned about how quickly reading something in the newspaper could change people's minds about someone.  People would say to her, "'Wow, what's going on with Doug?' and "'It's really too bad about what he's done.'"  Tr. 59:15-60:5. Mayor Scott Burge testified that Plaintiff's reputation at the end of 2012, before the investigations by Defendant, was good, people liked him, and the community was happy with him.  Tr. 272:10-18.  Mayor Burge was "angry" and "upset" when he saw that someone had released a city photo of money laid out on the table to the press. He thought it was improper to release the photo because it was inflammatory ("it inflames") and it should have been kept private.  Tr. 273:2-274:1.

**6.  Defendant's Rule 50 motion for judgment as a matter of law based on "Qualified Immunity" must be rejected.**

The Jury in this case was not instructed to decide the issue of qualified immunity.  Instead, the Jury was instructed that Defendant could only be liable under 42 U.S.C. § 1983 if he engaged

in adverse employment actions against Plaintiff and if Plaintiff's speech, as a private citizen, on matters of public concern, was a substantial or motivating factor in those actions. The Jury was instructed as to this standard more than once. The Court instructed the Jury twice, (once before opening arguments, and once before deliberations at Tr. 522-523). Plaintiff's counsel repeated the distinction between protected and unprotected speech in closing argument. *See* Tr. 529. Defense counsel repeated the instructions in opening and closing argument. Tr. 38:7-13, 547:8-24. When the Jury rendered its verdict in favor of Plaintiff, it found that Defendant retaliated against Plaintiff on account of his "protected" speech, as a citizen and not as part of his official job duties as chief of police, on matters of public concern.

Defendant's attempt to insert a "beyond debate" standard into this Rule 50 motion is misplaced. The Jury was properly instructed as to what findings were necessary for Defendant to be liable and not immune, and we must uphold its verdict if it is, itself, supported by substantial evidence in the record.

## 2. DEFENDANT'S ALTERNATIVE RULE 59 MOTIONS FOR NEW TRIAL AND REMITTITUR SHOULD BE DENIED

### A. Rule 59 Standards.

A Rule 59 motion will only be granted if the verdict "is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result." *EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir. 1997). "Doubts about the correctness of the verdict are not sufficient grounds for a new trial: the trial court must have a firm conviction that the jury has made a mistake * * * * Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1372 (9th Cir. 1987). "A jury verdict should be set aside only when the evidence

permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *DSPT Int'l v. Nahum*, 624 F.3d 1213, 1218 (9th Cir. 2010) (internal citations omitted). A denial by this Court of a motion for a new trial would be reversible only if the record contained no evidence in support of the verdict, or if there is a mistake of law. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729-30 (9th Cir. 2007).

In reviewing a jury's damages award, "[a]n otherwise supportable verdict must be affirmed when it is grossly excessive or monstrous or shocking to the conscience" *Brady v. Gebbie*, 859 F.2d 1543, 1557 (9th Cir. 1988). However, when a trial court reviews an award that has been attacked as excessive, it must consider the evidence of damages in the light **most** favorable to the prevailing party. *Seymour v. Summa Vista Cinema*, 809 F.2d 1385, 1387 (9th Cir. 1987). Emotional distress damages may be awarded based on testimony alone or appropriate inference from circumstances. *Passantino v. Johnson & Johnson Consumer Prods., 21*2 F.3d 493, 513 (9th Cir. 2000).

Finally, a new trial should be granted upon an erroneous evidentiary ruling only when it has 'substantially prejudiced' a party. *Harper v. City of L.A.*, 533 F.3d 1010, 1030 (9th Cir. 2008). "A reviewing court should find prejudice only if it concludes that, more probably than not, the lower court's error tainted the verdict." *Id.*

### B.  Defendant is Not Entitled to a New Trial.

The same body of substantial evidence that provides a proper foundation for the Jury's verdict in this case also negates the assertion that this Jury's verdict is contrary to the clear weight of the evidence or constitutes a miscarriage of justice. All favorable inferences must still be drawn against Defendant's Rule 59 motion regarding excessive damages. *Seymour*, 809 F.2d 1385. And while this Court, on Defendant's Rule 59 motion regarding protected speech, is not

limited to considering only the most favorable inferences or credibility determinations, the credibility determinations made and the inferences drawn by the Jury on that issue were reasonable. The Jury's work in this case is entitled to respect. This trial was not infected by harmful legal error. And even if this Court might have concluded some issues differently, as a juror, the conclusions and verdict drawn by this Jury are not contradicted by the clear weight of the evidence and do not shock the judicial conscience.

1. **Defendant's Rule 59 Motion Should Be Denied Because the Damages Awarded by the Jury were Not Excessive.**

    **(a) The Jury's Non-Economic Damages Award is Supported by Convincing Evidence.**

    The evidence admitted at trial supporting Plaintiff's non-economic damages is set forth in detail at pages 37-39 above. Plaintiff was subjected to months of destructive media coverage, to which he was ordered not to respond. He was made to look like a dirty cop or a criminal. While Plaintiff was being painted as a dirty cop, the community wanted to know his side of the story; but because of the gag order, when people didn't get any answers, they concluded he was guilty. His valued reputation as the "Top Cop" in Columbia County was destroyed. He was cut off by many of his friends and his remaining friends wouldn't be seen with him in public. He was barred from city property and couldn't attend public events without permission. Plaintiff and his family were deeply embarrassed and avoided ordinary public events. He got sick, lost weight and fell into deep depression. Plaintiff is a man who had extraordinarily committed to, and in turn was respected by, the community where he spent most of his life. Instead, he was ostracized. The respect that he earned as the city's Police Chief and the county's "Top Cop" will never be replaced. Defendant contends that the Jury's $3 million non-economic damage award is excessive but, with all favorable inferences drawn in favor of the award as *Seymour*, 809 F.2d

1385, requires, this award does not contradict the clear weight of the evidence and is not "grossly excessive or monstrous."

### (b) The Jury's Non-economic Damages Award is Consistent with Recoveries Approved in Similar Cases.

The Jury's $3 million award of non-economic damages fits within the accepted range of recovery where the wrongdoing resulted in the destruction of a prized occupation, of an identity, and of an honored place in a community. The Ninth Circuit reached that same conclusion in *Harper*, 533 F.3d 1010, when it affirmed awards of $5,000,001 to each of three police officers who had been wrongfully prosecuted. In *Harper*, as in our case, the plaintiff police officers were subject to inappropriate investigation, publicly humiliated, and tried in the press, but eventually acquitted. *Id.* at 1020. All three *Harper* plaintiffs suffered serious career setbacks, some equally as bad as Plaintiff suffered. *Id.* at 1029. The *Harper* plaintiffs and Plaintiff also all suffered serious personal and family consequences as a result of their wrongful treatment. *Id.* And although it took more than six damaging months for the allegations against the *Harper* plaintiffs to be resolved by a jury acquittal, it took twenty-three months for Plaintiff to obtain the results of the three different investigations launched by Defendant. Exhibit 33; Tr. 92:21-93:2. No two cases are exactly the same, but *Harper* is strikingly similar to our case. Greisen was awarded just less than 60% of the $5 million that the Ninth Circuit approved for *each Harper* plaintiff under similar circumstances, for similarly wrongful treatment, in a similar 42 U.S.C. § 1983 case.[2] This Jury's non-economic damage award therefore falls within the approved range in the

---

[2] When reviewing the excessiveness of the awards in *Harper,* the Ninth Circuit also used the same standard of review applicable in this Rule 59 motion. *Harper*, 533 F.3d at 1028 ("Unless 'the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork,' we uphold the jury's award."). *Compare Snyder v. Freight, Constr., Gen. Drivers, Warehousemen & Helpers, Local No. 287, 175* F.3d 680, 689 (9th Cir. 1999).

Ninth Circuit.[3]  Remittitur is not appropriate in this circuit when the Jury's verdict is within the "maximum amount sustainable by the proof so as to prevent the court's substitution of its judgment for that of the jury."  *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1081, 1094 (9th Cir. 2014). "This rule prevents the court's substitution of its judgment for that of the jury".  *D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co., 692 F.*2d 1245, 1249 (9th Cir. 1982).

**(c) The Jury's Economic Damages Award is Well Supported.**

The evidence supporting Plaintiff's economic damages is set forth in detail at pages 36-37 above and reflects the solid basis for this Jury's economic damage award.   The investigations

---

[3] While he overlooked the *Harper* case, Defendant cited seven cases to support his assertion that there are "no cases that come close to supporting" the non-economic damages awarded in this case.  Four of those seven cases provide little help to Defendant, as they each affirm a jury award, finding in each instance that the jury award was not excessive.  The three cases cited by Defendant that actually found remittitur justified are easily distinguished and are plainly dissimilar.   In the first, *Bippes v. Hershey Chocolate U.S.A.*, 180 F.R.D. 386 (D. Or. 1998), a case before the Internet age, the plaintiff was rehired before the case was tried.  The wrongful disparagement committed by Hersey was heard by only a few people and did not end a career.  *Bippes*, 180 F.R.D. at 390.  In contrast, Plaintiff has most likely forever lost his reputation and honored position in the small town where he was raised and lived his adult life.  With an unshakable Internet history, he is no longer able to serve anywhere in a position of public trust.  Tr. 241:1-24.  The second case, *Longfellow v. Jackson County*, 2007 WL 682455 (D. Or. 2007), is also plainly distinguishable for the many reasons frankly set forth in Defendant's brief, e.g., the plaintiff was quickly re-employed, suffered no long-term damage, did not have her career destroyed and did not have her reputation dragged through the mud on television or the Internet.  Dkt 120, at 27.  The third case, *Paul v. Asbury Auto Group*, 2009 WL 188592 (D. Or. 2009), involved four car salesmen who were subject to racially derogatory remarks at work between January and September of 2005.  None of the plaintiffs were fired and the dealership took significant steps to support them while they were being harassed.  The dealership was sold in November and no one testified they couldn't work thereafter.  None of the plaintiffs suffered any long-term emotional distress.  On these facts, Judge King decided that "the emotional distress they described was fairly minor and was much less than most reported cases."  He contrasted the *Paul* plaintiffs' suffering with *Passantino*, 212 F.3d 493, because Ms. Passantino suffered four years of discrimination and retaliation and so was justified with her $1 million noneconomic damage award.  Chief Greisen's career-ending humiliation is worse than Ms. Passantino suffered and is not like the "minor" distress that was suffered by the *Paul* plaintiffs.  In sum, the cases cited by Defendant provide no authority from a similar case that suggests Plaintiff's non-economic damages are grossly excessive or that remittitur is required, or even warranted.

and selective press disclosures initiated by Defendant were an admitted factor in Mr. Otterman's decision to terminate Plaintiff from his job as Scappoose Chief of Police. Tr. 303:7-13, 317:17-23. Plaintiff has unsuccessfully applied for over 200 positions in law enforcement across the country, in the last two years. Ex. 61; Tr. 108:19-24. Mr. Gillham provided convincing testimony as to why Plaintiff is "unhireable," even for colleagues who knew and trusted him. Meanwhile, Plaintiff's damages expert did not overreach when he calculated Plaintiff's economic damages. His seven year estimate of lost income was far less than the fifteen years Plaintiff planned to be chief in Scappoose, Tr. 112-113:3, and Plaintiff's applicable thirteen-year statistical work-life expectancy. Tr. 257:1-17. *See Gotthardt v. AMTRAK*, 191 F.3d 1148, 1156-57 (9th Cir. 1999). An accurate and unexceptional economic damages figure was constructed by a credible CPA expert based on that reasonable assumption. Tr. 256:15-259:23. With all favorable inferences drawn in favor of this award, as required by *Seymour*, 809 F.2d at 385, this Court should conclude that the past and future non-economic damages awarded by this Jury are neither grossly excessive nor monstrous.

### 2. Defendant's Rule 59 Motion Should be Denied Because Plaintiff Engaged in Protected Speech.

The evidence of Plaintiff's protected speech is detailed on pages 7-15, above. Plaintiff had repeated discussions with Councilor Ingham about city budget issues outside the police budget, including funding of pools and parks and development of the city's air park, allocation of the overall city budget, and sewer and water plans. Plaintiff's discussions with Jill. Herr, involving budget and payment activities of other departments, were protected speech. Plaintiff's discussions with other department heads about their budgets were protected speech. Plaintiff's discussions with Jill Herr and councilors about questionable audit procedures was protected speech. And although the testimony regarding Plaintiff's testimony before the PRC, and

subsequent offer to the City to discuss his financial finding, may not be a model of clarity, it is not unreasonable to conclude that the PRC hearing also included protected speech. Plaintiff's offer to testify about Defendant's financial practices before an executive session of the City Council was protected speech. The Jury concluded that there was protected speech by Plaintiff. That conclusion is not contrary to the clear weight of the evidence presented and does not constitute a miscarriage of justice.

### 3. Defendant's Rule 59 Motion Should be Denied Because No Evidentiary Rulings are Plainly Wrong or Would Constitute Harmful Error.

The three evidentiary rulings that are attacked in Defendant's Motion for New Trial are well-founded and correct; and, even if incorrect, are not so substantially prejudicial that they warrant a new trial.

#### (a) Evidence Admitted Regarding the Police Budget Discussions Was Necessary and Appropriate.

There is no dispute that Plaintiff spoke with numerous city counselors and officials about the Scappoose city budget. Defendant argued vigorously that those discussions were limited to only the police budget. Plaintiff and others testified that they went beyond the police budget. The Jury did not accept Defendant's argument; but in order to even consider the issue, the Jury had to consider the background of, and to parse apart the evidence of, Plaintiff's budget communications, which inevitably and properly included some speech regarding the police budget. To illustrate, Defendant argues that the May 14, 2012 city budget meeting involved only unprotected speech. We agree that Plaintiff's speech, at that meeting, was not protected. But the testimony introduced about that meeting provided evidence that (1) Plaintiff had *earlier* spoken to Ingham about the overall city budget, and not just the Police Department budget (Ingham's surprise that his testimony didn't conform to their earlier discussion), (2) Plaintiff knew that he wasn't authorized

by Defendant to discuss the overall city budget with Ingham (his "dancing around" and evasiveness), and (3) that Defendant strongly disapproved of that prior protected speech (his immediate and angry demeanor).   Counselor Ingram's surprise, Plaintiff's evasiveness, and Defendant's angry response at the May 14, 2012 meeting are all critically informed about the combination of protected and non-protected speech in which Mr. Plaintiff was engaged.  Similarly, Plaintiff and Defendant disagree about whether two witnesses admitted on cross-exam that Plaintiff's speech at the PRC hearing concerned *only* unprotected speech.  Hotly disputed evidence of the protected and unprotected budget speech was presented and tested in this trial.  The Jury was properly allowed to view appropriate evidence of protected and non-protected speech and make their decision about the role *protected* speech played in Defendant's actions.

In any event, no substantial prejudice resulted if surplus evidence was admitted about the police budget.   The Court, in Jury Instruction No. 16, and both parties, reiterating that same instruction in their closing statements, clearly communicated to the Jury that Plaintiff's speech concerning *only* the police budget could *not* be used to impose liability in this case.  Tr. 524:18-525:1) ( "concerns over the police department budget * * * are not constitutionally protected free speech and may not serve as the basis for finding liability"); Tr. 531:17-24 (Plaintiff's closing) ("questions about the budget, that portion of the budget, the police budget, are not protected"); Tr. 547:13-24 (Defense closing) ("any speech about the police department budget * * * is not speech that is to be considered in this case").   After these instructions and closing statements, the Jury concluded that Plaintiff did engage in protected speech, speech that was not limited to the budget of his own department.   Jurors are presumed to have followed their instructions. *Richardson v. Marsh*, 481 U.S. 200, 206 (1987).   Any prejudice that was suffered as a result of the alleged

surplus evidence of unprotected speech was cured by the Court's Jury instruction and both counsel's reiteration thereof.

**(b) Evidence of Mr. Bickmore's Deranged Appearance was Properly Admitted.**

Plaintiff presented evidence that Defendant's investigation of the Bickmore arrest, and the subsequent investigation, was retaliatory.    Part of that evidence consisted of the facts demonstrating that neither Defendant, nor the investigator he hired (Mr. Stoelk), considered the circumstances of the arrest, including Bickmore's "deranged" demeanor.  Tr. 472:10-13 (Hanken); Tr. 334:15-17, 336:5-22 (Stoelk).    Plaintiff and Officers Miltich and Oxenrider all observed Bickmore in person.  They all concluded that he was dangerous to the community and that a PIT maneuver was necessary and appropriate to stop him. Tr. 206:3-9, 207:1-11 (Miltich); Tr. 80:17-81:4 (Plaintiff); Tr. 503:14-20, 504:16-505:11 (Oxenrider).   Each of these witnesses considered Bickmore's deranged demeanor in making their decision that the arrest of Bickmore required the use of potentially deadly force.  It was established that the Bickmore photographs, Exhibits 27 through 30, accurately represented the person Plaintiff stopped on the night of February 4, 2013. Tr. 83:3-5.  Defendant ignored the circumstances of this arrest and pretextually punished Plaintiff for the PIT maneuver he authorized that night.  The Jury was entitled to understand the threat that Defendant willfully ignored.  Beyond all of this, there is little suggestion that the Jury was confused or inflamed by this evidence, or that they strayed from the agreed issue in the case: retaliation for protected speech.  Admitting pictures of Mr. Bickmore did not substantially prejudice the Jury.

**(c) The Admission of Several Media Reports was Not Error.**

Defendant's Rule 59 motion on this point suggests, at Dkt 120, p. 33, that Defendant's feeding of selective information to the press (while Plaintiff was gagged) may have constituted "protected speech" by Defendant.  That novel defense was not pleaded or tried as part of this case

and deserves short shrift.   Among the argument's substantive deficiencies is that Defendant's official duties as City Manager included communications with the press.  As confirmed repeatedly in this case, when a public employee is discharging his official duties he is not engaged in protected First Amendment speech.

The media reports, selectively provided to the press by Defendant, which destroyed Plaintiff's reputation, were central to the damages in this case.   Those media reports (newspaper articles and television footage) were not offered by Plaintiff – nor admitted by the Court – for the truth of the matters asserted in those reports.   Plaintiff did not seek to prove that he was actually reckless or dishonest.   The media reports were offered and admitted because of the palpable effect that they had on the people who saw them, including Plaintiff.   Mrs. Greisen testified that the KOIN 6 footage, for example, had observable effects on her husband.  Tr. 177:22-178:2.   The statements in that television footage, and in other media reports, were not offered for their truth and are not hearsay.  *See L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 935-36 (9th Cir. 2002).  The evidence was offered subject to a limiting instruction.  Tr. 97:16-98:23.  *See Velazquez v. City of Long Beach*, 793 F.3d 1010, 1028 (9th Cir. 2015).  It was not error to admit them.

### 4.  Jury Instruction No. 17 Accurately Reflects the Law Applicable to This Case.

As fully briefed and argued before the Court, Mr. Hanken's retaliatory acts profoundly changed Mr. Greisen's employability as a police chief.  (Dkt. 90, 93, 95-97, 100, 101); (Tr. 9:21-12:9)   It does not matter whether Mr. Otterman, the city manager who eventually fired Plaintiff, shared Defendant's retaliatory motive; no more than it matters whether officials at the City of Sutherlin who later declined to hire Plaintiff (as Mr. Gillham  testified, Tr. 241) shared Defendant's retaliatory motive.  Once Hanken's liability was established for the retaliatory acts he *himself* took as Scappoose City Manager, the question shifted to what damages foreseeably

resulted.  Defendant did not insulate himself from those continuing damages just because he resigned while the foreseeable consequences of his wrongful acts were still playing out; and no public policy suggests that it should.  *Lakeside-Scott v. Multnomah County*, 556 F.3d 797 (9th Cir. 2009), says that when liability is sought for *discharge* as a retaliatory act, the actor performing the discharge must be motivated by the wrongful, retaliatory motive.  This case is distinguished from *Lakeside-Scott* because the series of wrongful, retaliatory acts that were proved to this Jury did not include discharge.  Mr. Greisen's resulting unemployability, including his discharge by the City of Scappoose, is a foreseeable, recoverable form of damage.   Jury Instruction No. 17 correctly states the law and does not require a new trial.

## **CONCLUSION**

The Jury found that Plaintiff proved his claim by the preponderance of the evidence.  For the above reasons, Plaintiff respectfully requests that this Court deny Defendant's motions.

DATED this 1st day of September, 2016.

ELLIOTT, OSTRANDER & PRESTON, P. C.


By:___/s/ John D. Ostrander_____
William A. Drew, OSB No. 95253, billd@eoplaw.com
John D. Ostrander, OSB No. 87394, john@eoplaw.com
    (503) 224-7112
    (503) 224-7819 fax
      Of Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that the attached **PLAINTIFF'S MEMORANDUM IN OPPOSITION**

**TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

**AND MOTIONS FOR NEW TRIAL AND REMITTITUR** was served on:

Karen M Vickers
Blake H. Fry
Mersereau Shannon LLP
1 SW Columbia St Ste 1600
Portland OR  97258
kvickers@mershanlaw.com

[ ]    by mailing to said attorney(s) a full and correct copy therefor, contained in a sealed envelope, with postage paid, addressed to said attorney(s) as stated above and deposited in the United States Post Office at Portland, Oregon.

[X]    by hand delivering to said attorney(s) a true copy thereof.

[ ]    by faxing to said attorney(s) a true copy thereof.

[ ]    by emailing to said attorney(s) a true copy thereof.

[X]    by electronic filing with the Court's CM/ECF system.  The CM/ECF system generated Notice of Electronic Filing constitutes proof of service upon a Filing User in accordance with Fed. R. Civ. P. 5(d).

Dated this 1st day of September, 2016

ELLIOTT, OSTRANDER & PRESTON, P. C.

By:____/s/ John D. Ostrander_____
John D. Ostrander, OSB No. 87394, john@eoplaw.com
(503) 224-7112
(503) 224-7819 fax
Of Attorneys for Plaintiff