# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **DOUG GREISEN**, | Case No. 3:14-cv-1399-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **JON HANKEN**, | |
| Defendant. | |

John D. Ostrander and William A. Drew, ELLIOTT, OSTRANDER & PRESTON, P.C., 707 S.W. Washington Street, Suite 1500, Portland, OR 97205. Of Attorneys for Plaintiff.

Karen M. Vickers and Blake H. Fry, MERSEREAU SHANNON LLP., One S.W. Columbia Street, Suite 1600, Portland, OR 97258. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff, Doug Greisen ("Greisen"), is the former Chief of Police of Scappoose, Oregon. Greisen brought this lawsuit against Defendant Jon Hanken ("Hanken"), the former City Manager for the City of Scappoose, and others. Before trial, the Court dismissed all defendants other than Hanken. From July 19, 2016 through July 21, 2016, this action was tried before a jury on Greisen's claim that Hanken violated 42 U.S.C. § 1983 by retaliating against Greisen based on Greisen's exercise of speech protected under the First Amendment. The jury found in favor of Greisen and awarded him $1,117,488 in economic damages and $3,000,000 in non-economic

damages. Hanken timely filed post-trial motions seeking, in the alternative, judgment as a matter of law, a new trial, or remittitur. ECF 120. For the reasons that follow, Hanken's post-trial motions are denied.

## STANDARDS

### A. Renewed Motion for Judgment as a Matter of Law

Under Rule 50(b) of the Federal Rules of Civil Procedure, a court may grant a renewed motion for judgment as a matter of law if "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (quotation marks omitted); *see also Weaving v. City of Hillsboro*, 763 F.3d 1106, 1111 (9th Cir. 2014) (explaining that judgment as a matter of law must be granted if it is clear that "the evidence and its inferences cannot reasonably support a judgment in favor of the opposing party"). Because a motion under Rule 50(b) is a renewed motion, a party may not "raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion." *Go Daddy Software*, 581 F.3d at 961 (quotation marks omitted).

In evaluating a motion for judgment as a matter of law, the Court must view all the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Experience Hendrix, LLC v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014). The Court may not make credibility determinations, weigh the evidence, or "substitute its view of the evidence for that of the jury." *Krechman v. Cty. of Riverside*, 723 F.3d 1104, 1110 (9th Cir. 2013) (quotation marks omitted). A jury's verdict must be upheld if it is supported by substantial evidence. *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014); *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001). Substantial evidence is "such relevant evidence as reasonable minds might accept as

adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from

the evidence." *Weaving*, 763 F.3d at 1111 (quotation marks omitted).

## B. New Trial

Under Rule 59(a) of the Federal Rules of Civil Procedure, a court "may grant a new trial

only if the verdict is contrary to the clear weight of the evidence, is based upon false or

perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481

F.3d 724, 729 (9th Cir. 2007) (quotation marks omitted); *see also Shimko v. Guenther*, 505

F.3d 987, 993 (9th Cir. 2007). Unlike a determination under Rule 50, the Court is not required to

view the evidence in the light most favorable to the non-moving party when considering a

motion for new trial under Rule 59(a). *Experience Hendrix*, 762 F.3d at 842. Instead, the Court

"can weigh the evidence and assess the credibility of the witnesses." *Id.* (citing *Kode v.

Carlson*, 596 F.3d 608, 612 (9th Cir. 2010) (per curiam)).

As explained by the Ninth Circuit, after weighing the evidence, the trial judge faces a

difficult task:

> On the one hand, the trial judge does not sit to approve
> miscarriages of justice. His power to set aside the verdict is
> supported by clear precedent at common law and, far from being a
> denigration or a usurpation of jury trial, has long been regarded as
> an integral part of trial by jury as we know it. On the other hand, a
> decent respect for the collective wisdom of the jury, and for the
> function entrusted to it in our system, certainly suggests that in
> most cases the judge should accept the findings of the jury,
> regardless of his own doubts in the matter. Probably all that the
> judge can do is to balance these conflicting principles in the light
> of the facts of the particular case. If, having given full respect to
> the jury's findings, the judge on the entire evidence is left with the
> definite and firm conviction that a mistake has been committed, it
> is to be expected that he will grant a new trial.

*Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371-72 (9th Cir. 1987). Thus, a

district judge should not award a new trial unless the court has a definite and firm conviction that

the jury has made a mistake. *Id.* at 1372. "While the trial court may weigh the evidence and credibility of the witnesses, the court is not justified in granting a new trial merely because it might have come to a different result from that reached by the jury." *Roy v. Volkswagen of Am., Inc.*, 896 F.2d 1174, 1176 (9th Cir. 1990) (quotation marks and citation omitted).

## C. Remittitur

Remittitur is available to reduce an excessive verdict. *Pershing Park Vilas Homeowners Ass'n. v. United Pac. Ins. Co*., 219 F.3d 895, 905 (9th Cir. 2000) (citation omitted). "Where there is no evidence that passion and prejudice affected the liability finding, remittitur is an appropriate method of reducing an excessive verdict." *Seymour v. Summa Vista Cinema, Inc*., 809 F.2d 1385, 1387 (9th Cir. 1987), *amended on other grounds*, 817 F.2d 609 (9th Cir. 1997). In considering a motion for remittitur, the trial court must view the evidence concerning damages in a light most favorable to the prevailing party. *Id*. If the trial court concludes that an award of damages is excessive, it may either grant the defendant's motion for a new trial or deny the motion conditioned upon the prevailing party's acceptance of a remittitur. *Silver Sage Partners v. City of Desert Hot Springs*, 251 F.3d 814, 818 (9th Cir. 2001); *see also Seymour*, 809 F.2d at 1387.

The Ninth Circuit has explained, however, that a district court "must uphold the jury's finding unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996); *see also Brady v. Gebbie*, 859 F.2d 1543, 1557 (9th Cir. 1988) ("An otherwise supportable verdict must be affirmed unless it is 'grossly excessive' or 'monstrous' or 'shocking to the conscience.'"). Thus, when granting a motion for remittitur, the trial court does not substitute its judgment for that of the jury, but instead reduces

the judgment to the "maximum amount sustainable by the proof." *Oracle Corp. v. SAP AG*, 765

F.3d 1081, 1094 (9th Cir. 2014).

## BACKGROUND

In 2001, Greisen became the Chief of Police in Scappoose, Oregon. In 2004, Hanken

became the City Manager of Scappoose. The City Manager has the authority to hire, fire, and

supervise the Chief of Police. The City Manager also is responsible for the City's budget, among

other things. The Scappoose City Council, as a body, has the authority to hire and fire the City

Manager. The City Council has no direct authority over the Chief of Police.

### A.  Greisen's Statements About Hanken's Management of the City Budget

By 2012, Greisen had become concerned about Hanken's management of the City's

overall budget. Greisen voiced his concern to several people outside his chain of command,

including City Councilor Judi Ingham. In addition to discussing his specific concerns about the

Police Department's budget, Greisen discussed with Councilor Ingham matters concerning

Hanken's management of the overall City budget, including the budgets of other departments.

Greisen also discussed his concerns regarding several other departmental budgets with City

Councilor Donna Gedlich.

On May 14, 2012, the Scappoose City Council held a budget meeting. Two councilors

expressed a desire to hire more police officers than Hanken's proposed City budget would have

allowed. At that meeting, Greisen did not voice support for Hanken's overall budget. The

following day, May 15, 2002, Hanken said to Greisen, "I'm mad at you. You stay on your side of

City Hall. I don't want to see you over here." Trial Transcript 72. After Hanken told Greisen to

stay on his side of City Hall, Greisen began to ask himself, "What's being hidden?" *Id*. at 73.

Greisen then spoke with City Finance Administrator Jill Herr and with other departmental heads,

including the heads of the Water Department, the Sewer Department, and the Public Works

Department. From these conversations, Greisen learned that, shortly before going into the budgeting process, Hanken had been holding back the City from paying invoices received from various City vendors for as much as three or four months. Greisen also learned that vendors had been asking when they would be paid. Eventually, the vendors would be paid in the following fiscal year. Greisen learned that this practice was happening not only with the Police Department's budget but in other department budgets throughout the City.

Greisen also raised questions about the city's audit. In August 2012, Hanken told Greisen that Greisen had better "quit listening to Councilor Ingham about her—the budget." *Id*. at 76. Hanken added: "Ms. Ingham will be the one that [*sic*] will ruin your career here in the City of Scappoose." *Id*.

In the spring of 2013, Greisen continued to be concerned about the fact that vendor invoices were still being held back by more than 30 days throughout the City's departments. Greisen asked City Finance Administrator Herr about that practice. Herr confirmed that vendor invoices were still being held back for payment in other City department besides the Police Department, explaining that she was just doing what she had been told to do by Hanken.

## B. Hanken's Actions Against Greisen in 2013

### 1. The First Investigation: Allegations Relating to the PIT Maneuver

In February 2013, Greisen learned that one of his officers was attempting a traffic stop and arrest of a hit-and-run suspect. The officer requested backup. Greisen was less than a mile away, so he left a city council meeting to assist. It was common for Greisen to assist his officers when they needed help. After observing the suspect, Greisen directed another officer to perform a PIT maneuver, to stop the suspect's vehicle. ("PIT" is an acronym for "precision immobilization technique." A PIT maneuver is a law enforcement pursuit tactic by which a pursuing car causes a pursued car to turn sideways, resulting in the pursued driver losing control

and being forced to stop.) The suspect was arrested and later pleaded guilty to reckless driving and recklessly endangering another.

On July 17, 2013, Hanken sent Greisen a letter notifying Greisen that Hanken had directed an outside agency to investigate Greisen's February 3, 2013 authorization of the PIT maneuver. In his letter, Hanken also told Greisen, "You are hereby notified and ordered not to discuss this matter with anyone except your spouse, significant other, or your attorney." Trial Ex. 33. As a result of this investigation, on August 23, 2013, Hanken imposed a disciplinary sanction on Greisen of two weeks suspension without pay. Hanken informed Greisen of that suspension by letter, adding: "As I draft this letter, I cannot help but wonder if you would be able to maintain your position if this report was known by or reported to the news media." Trial Ex. 35. Until this time, this was the only disciplinary sanction that Greisen had received in 26 years in law enforcement.

On August 26, 2013, Greisen appealed his disciplinary sanction to the City's Personnel Review Committee. Trial Ex. 37. On October 14, 2013, the Personnel Review Committee concluded that "the degree of discipline issued to Police Chief Doug Greisen . . . is entirely out of proportion based on the totality of the circumstances on the night of Feb. 4th." Trial Ex. 49. The Personnel Review Committee further recommended that "the City Manager retract, and the Scappoose City Council oversee the retraction, all discipline issued to Chief Greisen." *Id*.

### 2. The Second Investigation: Allegations of a Hostile Work Environment

On August 1, 2013, Hanken sent Greisen a letter notifying him that the City will be conducting a second investigation into Greisen's conduct. This investigation related to the management of the Scappoose Police Department. According to Hanken, information had come forward "that raises the issue of whether a hostile work environment exists within the City's Police Department." Trial Ex. 34. Again, Hanken wrote to Greisen, directing: "You are hereby

notified and ordered not to discuss this matter with anyone except your spouse or your attorney."
*Id*. On September 6, 2013, less than two weeks after Greisen filed his appeal on August 26, 2013, relating to his disciplinary sanction concerning the February 2013 PIT maneuver, Hanken placed Greisen on paid administrative leave pending the outcome of the investigation relating to the allegation of a hostile work environment. Hanken also informed the local newspaper that there are additional "potential issues" that are prompting a second investigation into Greisen. Trial Ex. 39. This was contrary to City policy and "wasn't appropriate." Trial Transcript 467, 474-76.

Retired Oregon State Police Officer Aaron Olson investigated Police Chief Greisen for the City. After interviewing witnesses and reviewing documents, Olson concluded that the allegation that Greisen harassed employees or maintained a hostile work environment was not supported by the evidence. *Id*. at 217.

### 3. The Third Investigation: Allegations of Unauthorized Bank Accounts

On September 30, 2013, Hanken sent Greisen a letter notifying him that the City will be conducting a third investigation into Greisen's conduct. This investigation related to allegations that Greisen may have violated the City's financial policies by using unauthorized bank accounts. Trial Ex. 47. Again, Hanken directed Greisen: "You are hereby notified and ordered not to discuss this matter with anyone except your spouse, significant other, or your attorney." *Id*.

This investigation related to charitable fundraising activities that the Scappoose Police Department had been conducting since the mid-1980s, including under three police chiefs who came before Greisen. Trial Transcript 101. As Greisen explained at trial, when people contributed small amounts of money to the police for charitable programs run by the police, the money was deposited into accounts maintained by the Police Department at Chase Bank. Eventually, these accounts had more than $2,000, and Chase began to charge a $15 per month

service fee. After discussing this with then-Lieutenant Norman Miller of the Scappoose Police Department (who later succeeded Greisen as chief), Greisen closed the Chase accounts and kept the charitable money in cash in a bag maintained in the chief's office. *Id.*

When people would donate money, they would be given a receipt. According to Greisen, everyone in the City "knew about this account," and no one ever told Greisen that it was unauthorized. *Id.* at 102-03. Miller knew about the charitable contributions, the fact that the bank accounts that had been maintained for that money for a long time were closed in September 2012, and that the cash, then totaling approximately $2,400, was afterwards kept in the police chief's office. In fact, in 2011, Miller had been one of the signers on the bank accounts. *Id.* at  375-77, 388-89. After Hanken appointed Miller as interim Police Chief while Greisen was on administrative leave, Miller had another Police Department employee take several photographs of the money spread out on a desk. *Id.* at 391. Copies of those photographs were given to Hanken. *Id.*

Hanken then provided comments and a photograph of the cash spread to the newspaper, in violation of City policy. *Id.* at 467, 474-76. Based on information provided by Hanken, the local newspaper ran a story with the headline, "Greisen's use of unauthorized account probed" and depicted a spread of several hundred dollar bills. Trial Exhibit 51; Trial Transcript 480-81. When Miller saw the photograph of the money spread in the local newspaper his reaction was to wonder, "How did it get there?" *Id.* at 391. Miller had not authorized the photograph to be sent to the newspaper because "[t]his was an internal investigation that needed to be dealt with internally, not outside." *Id.* at 392. Miller knew all about the charitable source of the cash and its history. At trial, Miller confirmed that when "you lay it out on a table like this and you take a picture of it," it could be "perceived" as a "drug bust photo." *Id.*

At trial, Hanken admitted during cross examination that he provided a copy of the photograph to the news media and made the statements that were attributed to him in the newspaper article. Trial Transcript 481; Trial Ex. 51. He admitted that he told the news media "that a bank bag was discovered in the chief's desk and that its contents raised questions about whether the chief was maintaining an unauthorized account." Trial Transcript 481. But Hanken also admitted during cross examination that at the time he knew that this was not money that had just been found or discovered in Greisen's office. *Id*. at 481-82. Indeed, Hanken admitted that he had known for some time about the Police Department's charitable fundraising activities (indeed, Hanken had contributed to them), that the money had not being going through the City's budgetary process, and that the practice of maintaining this money outside of the City's budgetary process had in fact previously been "authorized." *Id*. at 482-89. Hanken also admitted that he knowingly made false statements to the news media, including stating that the money in Greisen's desk was "unauthorized." *Id*.

## C. Hanken Resigns

On October 14, 2013, the City's Personnel Review Committee recommended retracting all discipline issued against Greisen relating to the PIT maneuver. Hanken "viewed this as being the end of [Hanken's] career in Scappoose." Trial Transcript 456. Less than 30 days later, on November 8, 2013, Hanken resigned his position as City Manager.

As described previously, however, shortly before Hanken resigned, he went to the local news media and told them about finding cash in Greisen's desk drawer. Hanken also provided the news media with a photograph of the discovered cash, which the news media published. Trial Transcript 491; Trial Ex. 51. As Hanken further admitted at trial

> Q.      Isn't it true that you called up the media in the middle of
> the investigation to give them this information, this false
> information that you testified is incorrect, because you learned city

councilors were sending emails to each other and the one that you had received had basically said wanted to stop the investigations of Mr. Greisen?

A.      Correct.

Q.      And you didn't want that to happen, did you?

A.      No, I didn't.

*   *   *

Q.      Before you resigned, you went to the press and gave these statements about a bag of money found in the desk drawer with no accounting whatsoever when you know, you've testified, that those were not true statements; correct?

A.      I believed the statements were true at the time.

Q.      Well, I believe your testimony was earlier that you knew better.

A.      Right.

Q.      And you gave them this photograph, Exhibit 51? This photograph?

A.      Yes, I did.

Q.      Have you seen photographs like that before?

A.      Yes, I have.

Q.      Where?

A.      In the news, on TV, in newspapers.

Q.      In instances where money is seized or stolen; correct?

A.      Some, yes.

Q.      Or drug busts, yes?

A.      Yes. I've also seen where the money is in piles related to an economic development effort.

Trial Transcript 490-92.

Also, regarding the second investigation, Hanken admitted the following:

Q.      And you had never observed anything about Mr. Greisen that led you to believe there was a hostile work environment?

A.      Not with Carpenter.

Q.      Not with anyone?

A.      No. There was a incident a few years back with an Officer Scott Hanley who came to complain about an incident but came back the next day and said, "No, I'm not going to file a complaint."

Q.      You testified in your deposition that you had never observed anything that seemed to be a hostile work environment with Mr. Greisen. Did you make that statement in your deposition?

A.      Yes, I did.

Q.      Okay. And you had no knowledge of any retaliation by Mr. Greisen?

A. None.

Trial Transcript 494-95.

## D.  Greisen Is Later Fired by Interim City Manager Otterman

After Hanken resigned, Mayor Scott Burge briefly served as interim City Manager. In January 2014, the City Council appointed Donald Otterman as the new interim City Manager, succeeding Mayor Burge. Otterman served for four months. In May 2014, just before he resigned, Otterman made the decision to terminate Greisen's employment pursuant to a "no-cause" termination provision in Greisen's contract. Otterman explained at trial that he had "reviewed the three reports that had been done – the report regarding the pursuit, the financial report, and the hostile work environment report – and after I reviewed those reports, I felt that it was the best for the City if he [Greisen] was to leave." Trial Transcript 291. Otterman also testified that he was aware of the news articles about Greisen and the controversy related to the Chief of Police in Scappoose. Otterman said that it is "difficult for a city to be in turmoil for any extended period of time." *Id*. at 303. According to Otterman, "There were several articles about

it and about what was going on in the City. The city manager had been fired. The police chief was on administrative leave. And that causes commotion or turmoil in the organization and needs to be resolved as soon as possible." *Id*. at 303-304. Otterman "just felt that the best situation for the City was to exercise the, quote, 'no-cause,' unquote, clause." *Id*. at 313.

## E.  Greisen's Economic and Non-Economic Damages

Greisen received Otterman's letter dated April 8, 2014, informing Greisen that his employment with the City is terminated effective May 8, 2014. Trial Exhibit 59. Greisen and his wife then spent about 25 to 30 hours preparing his resume. Trial Transcript 108; Trial Exhibit 60. Over the next two years, Greisen applied for more than 200 different jobs, from Alaska to Arizona to New York. Trial Transcript 108-09; Trial Exhibit 61. He received some temporary, part-time work, which he described at trial. Trial Transcript 110.

At trial, Greisen presented expert economic damage testimony from a certified public accountant, Ronald Greisen, Plaintiff's brother. *Id*. at 253-54. Plaintiff's expert witness concluded that Greisen's economic damages through trial, less the part-time wages earned by Greisen in mitigation, totaled $300,194. *Id*. at 256. Plaintiff's expert witness also testified that Greisen's future economic losses over the next seven years, discounted to present value, totaled $817,294. *Id*. at 259. The sum of these two figures is $1,117,488, which is the precise amount awarded by the jury as economic damages. ECF 107 at 2. At trial, Greisen also described his emotional distress caused by Hanken's conduct. Trial Transcript at 113. Greisen's wife gave further and more detailed testimony about her husband's emotional distress, based on her observations of him. *Id*. at 163-80. The jury awarded Greisen $3,000,000 in non-economic damages. ECF 107 at 2.

**DISCUSSION**

**A. Renewed Motion for Judgment as a Matter of Law**

  The only claim the Court allowed to proceed to trial was Greisen's claim against Hanken alleging that Hanken violated 42 U.S.C. § 1983. "Traditionally, the requirements for relief under [§] 1983 have been articulated as: (1) a violation of rights protected by the Constitution or created by federal statute, (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Greisen alleges that Hanken violated Greisen's rights under the First Amendment by causing adverse employment actions to be taken against Greisen, while Greisen was a public employee, in retaliation for Greisen's exercise of speech protected under the First Amendment. Colloquially, this is referred to as a claim of "First Amendment retaliation against a public employee."

  During the time when Hanken took the actions that Greisen alleges, Hanken was the City Manager of the City of Scappoose. "[M]unicipalities and other local government units . . . [are] among those persons to whom § 1983 applies." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). In addition, municipal government officials also are persons for purposes of § 1983. *Id.* at n.55. Hanken does not dispute that he was a person acting under color of state law.

  Regarding the issue of whether Hanken violated Greisen's constitutional right to free speech, "[t]he First Amendment shields a public employee if he speaks as a citizen on a matter of public concern. However, when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1056 (9th Cir. 2013) (quotation marks and citations omitted). The Ninth Circuit follows a sequential five-step inquiry to determine whether a public employer,

including a municipal government officer, impermissibly retaliated against a public employee for engaging in protected speech.

> First, the plaintiff bears the burden of showing: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; and (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action. Next, if the plaintiff has satisfied the first three steps, the burden shifts to the government to show: (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Id.* (quotation marks and citations omitted); *see also Allen v. Iranon*, 283 F.3d 1070, 1076 (9th Cir. 2002). Hanken did not assert either the "adequate justification" or the "same action" defense. Thus, only the first three steps are relevant in this case to Defendant's renewed motion for judgment as a matter of law.

Hanken raises four arguments in support of his renewed motion. First, Hanken argues that Greisen did not present sufficient evidence of "protected speech" to support his claim of First Amendment retaliation, either because Greisen did not establish that his speech was related to an issue of public concern or because Greisen spoke not as a private citizen but only in his capacity as a public employee under his official duties. These points concern the first two steps discussed in *Ellins*. Second, Hanken argues that Greisen did not establish that his allegedly protected speech was a substantial or motivating factor in any adverse employment action taken by Hanken against Greisen. This concerns the third step, also known as "retaliatory motive." Third, Hanken argues that Greisen did not prove that Hanken caused the termination of Greisen's public employment, which occurred after Hanken had resigned from his official position. Finally, Hanken argues that he is protected under the "qualified immunity" doctrine. Each argument is addressed in turn.

### 1. Protected speech

Hanken argues that Greisen did not establish at trial either that his speech was related to an issue of public concern or that Greisen spoke as a private citizen, in contrast to speaking as a public employee as part of his official duties. If Hanken is correct on either point, then Greisen would not have shown that he engaged in speech protected under the First Amendment, which is required for a claim of First Amendment retaliation against a public employee.

### a. Matters of public concern

"Speech involves a matter of public concern when it can fairly be considered to relate to any matter of political, social, or other concern to the community." *Ellins*, 710 F.3d at 1057 (quotation marks and citations omitted). "Speech that deals with individual personnel disputes and grievances that would be of no relevance to the public's evaluation of the performance of governmental agencies generally is not of public concern." *Id.* (quotation marks and citations omitted). "'Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.'" *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)).

The trial record shows that, among other things, Greisen made statements critical of Hanken's general approach to city budgeting and specifically to Hanken's practice of withholding payments on vendor invoices until the next fiscal year, including invoices sent to departments other than the Police Department. These are not statements about individual personnel disputes or grievances that would be of no relevance to the public's evaluation of the performance of governmental agencies and officials generally. Instead, these are statements of concern about potential systemic financial abuse on a citywide basis. Thus, they are matters of public concern.

### b. Speaking as a private citizen, rather than as a public employee

A plaintiff speaks as a public employee when he or she makes statements pursuant to his or her official duties. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). In contrast, a plaintiff speaks as a private citizen "'if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform.'" *Ellins*, 710 F.3d at 1058 (quoting *Eng v. Cooley*, 552 F.3d 1062, 1071 (9th Cir. 2009)). The scope and content of a plaintiff's job responsibilities is a question of fact. *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008). The "ultimate constitutional significance of the facts as found" is a question of law. *Id.* Moreover, *Garcetti* requires the undertaking of a "practical inquiry." *Brandon v. Maricopa Cty.*, 849 F.3d 837, 845 (9th Cir. 2017).

In *Dahlia v. Rodriguez*, the Ninth Circuit described three factors that are relevant to a determination of the scope of a plaintiff's job duties. 735 F.3d 1060, 1074-76 (9th Cir. 2013). First, "particularly in a highly hierarchical employment setting such as law enforcement," an appropriate factor is "whether or not the employee confined his communications to his chain of command." *Id.* at 1074. "When a public employee communicates with individuals or entities outside of his chain of command, it is unlikely that he is speaking pursuant to his duties." *Id.* For example, in *Freitag v. Ayers*, the Ninth Circuit held that a correctional officer's communications with a state senator and the inspector general about inmate sexual misconduct were not made pursuant to her official duties and thus constituted speech protected by the First Amendment. 468 F.3d 528, 545-46 (9th Cir. 2006).

Second, the subject matter of the communication may be considered. *Dahlia*, 735 F.3d at 1074-75. "When an employee prepares a routine report, pursuant to normal departmental procedure, about a particular incident or occurrence, the employee's preparation of that report is

typically within his job duties." *Id.* at 1075. For example, in *Freitag*, the correctional officer's internal reports of inmate sexual misconduct were *not* constitutionally protected speech. 468 F.3d at 546. Similarly, in *Garcetti*, the Supreme Court held that a deputy district attorney's memorandum regarding the merits of a case before him was not protected speech because he routinely prepared such memoranda as part of his job duties. 547 U.S. at 421. "By contrast, if a public employee raises within the department broad concerns about corruption or systemic abuse, it is unlikely that such complaints can reasonably be classified as being within the job duties of an average public employee." *Dahlia*, 735 F.3d at 1075.

Third, "when a public employee speaks in direct contravention to his supervisor's orders, that speech may often fall outside of the speaker's professional duties." *Id.* at 1075. Under this scenario, the speech likely is not being made pursuant to the employee's official duties.

Greisen concedes that the discussions he had regarding the Police Department's budget— including the conversations Greisen had with Hanken regarding Ingham's request to hire additional police officers and the conversations Greisen had with the City's Finance Administrator regarding unpaid and delayed Police Department vendor invoices—all were made pursuant to Greisen's job duties as Chief of Police. Thus, these statements are not constitutionally protected and are not part of Greisen's claim. They only provide background or context for the issues at trial, and the jury was so instructed.

Greisen, however, also presented evidence at trial that he made statements critical of Hanken's general approach to city budgeting, not limited to the Police Department, and specifically to Hanken's practice of withholding payments on vendor invoices until the next fiscal year, including invoices sent to departments other than the Police Department. For these statements, the Court applies the three *Dahlia* factors.

First, the Court considers whether the statements were made to individuals within Greisen's chain of command. The trial record indicates that Greisen raised concerns about Hanken's handling of the city budget with City Finance Administrator Herr and with several City Councilors, including Councilors Ingham and Gedlich. As City Finance Administrator, Herr was not within Greisen's chain of command. In addition, although City Councilors are *Hanken's* *s*upervisors, and thus within *Hanken's* chain of command, the City Councilors are not within Greisen's direct chain of command. The Scappoose City Council, as a body, has the authority to hire and fire the City Manager, but it has no direct authority over the Chief of Police.

Greisen testified that he spoke to City Councilors Ingham and Gedlich in part as a concerned private citizen. Hanken presented no evidence that it was among Greisen's official duties as Police Chief to expose city-wide budgetary concerns to the City Council. Thus, the first *Dahlia* factor suggests that Greisen was speaking as a private citizen when he raised concerns about Hanken's budgetary and invoice payment practices with Herr and City Councilors Ingham and Gedlich. *See Freitag*, 468 F.3d at 545 (stating that the right to complain to an elected public official "is guaranteed to any citizen in a democratic society regardless of his status as a public employee").

Regarding the second *Dahlia* factor, Greisen's complaints about Hanken's handling of the budget for departments other than the Police Department and Hanken's practice of holding back vendor invoices for payment until the next fiscal year can be viewed as an expression of "broad concerns about . . . systemic abuse" made by a private citizen. *Dahlia*, 735 F.3d at 1074. Although Greisen's concerns regarding Hanken's practice of holding back and delaying payment on invoices began with Greisen's questions about unpaid vendor invoices related to Police Department acquisitions, Greisen's critical statements later extended to Hanken's more

widespread practice of holding back and delaying payment on vendor invoices until the new

fiscal year for other City departments as well. This practice, according to Greisen, was a

violation of sound accounting principles. Greisen questioned whether Hanken had engaged in

serious misconduct in the management of the City's finances. This fact also distinguishes this

case from the Ninth Circuit's recent decision in *Brandon*, 849 F.3d at 845 ("Indeed, if Brandon

alleged any sort of misconduct this would be a different case.").

Regarding the third *Dahlia* factor, the record, viewed most favorably to Greisen, shows

that Greisen's statements were made in direct contravention to Hanken's orders because Hanken

repeatedly told Greisen not to question Hanken's budget practices. This includes Hanken's

practices relating to other departments in the City besides the Police Department.

Thus, all three *Dahlia* factors support the jury's conclusion that Greisen acted outside of

the scope of his official duties when he complained about Hanken's handling of the budget for

departments other than the Police Department and Hanken's practice of holding back or delaying

payment of vendor invoices until after the new fiscal year. Drawing all reasonable inferences in

favor of Greisen, who prevailed at trial, there was substantial evidence supporting the jury's

finding that Greisen's statements at issue were made as a private citizen.

### 2. Retaliatory motive: substantial or motivating factor

Hanken argues that Greisen failed to present evidence at trial that Hanken was aware of

Greisen's protected speech. Hanken further argues that Greisen failed to present evidence at trial

required to show retaliatory motive.

In cases alleging First Amendment retaliation, the Ninth Circuit has explained that the

plaintiff must produce evidence that the defendant knew of the plaintiff's protected speech. "In

order to retaliate against an employee for his speech, an employer must be aware of that speech."

*Allen*, 283 F.3d at 1076. In addition, the plaintiff must produce evidence that the plaintiff's

constitutionally protected conduct was a motivating factor in the adverse actions taken against

him. *Id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). In

other words, there must be evidence of a defendant's retaliatory motive.

A plaintiff may prove retaliatory motive with either direct or circumstantial evidence.

When only circumstantial evidence is relied upon to prove retaliatory motive, however, the

plaintiff must present "at least one of three general types of circumstantial evidence of such

motive." *Allen*, 283 F.3d at 1077. According to the Ninth Circuit:

> The three types of circumstantial evidence are: (1) proximity in
> time between the protected speech and the alleged retaliation;
> (2) the employer's expressed opposition to the speech; and
> (3) other evidence that the reasons proffered by the employer for
> the adverse employment action were false and pretextual.

*Id.* (citing *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 751–52 (9th Cir. 2001)).

The Court refers to these three types of circumstantial evidence as the "*Keyser* plus factors."

Before directly addressing Hanken's argument, however, the Court notes that termination

of employment is not the only type of adverse employment action that can be actionable. Greisen

argues that Hanken's initiation of three meritless investigations are each an adverse employment

action. Greisen adds that imposing a suspension without pay also is an adverse employment

action. The Court agrees with Greisen. As the Ninth Circuit explained in *Ellins*,

> In addressing a First Amendment retaliation claim, we also
> examine whether the actions taken by the defendants were
> reasonably likely to deter [the public employee] from engaging in
> protected activity under the First Amendment. The government's
> act of retaliation need not be severe and it need not be of a certain
> kind.

*Ellins*, 710 F.3d at 1061 (quotation marks and citations omitted). Being subjected to one or more

meritless investigations is the sort of employment action that is reasonably likely to deter a

public employee from engaging in activity protected under the First Amendment.

At trial, Greisen presented evidence of the following facts. On May 15, 2002, Hanken said to Greisen, "I'm mad at you. You stay on your side of City Hall. I don't want to see you over here." Greisen, however, did not stop making his inquiries and statements. In August 2012, Hanken told Greisen that Greisen had better "quit listening to Councilor Ingham about the budget." Hanken added: "Ms. Ingham will be the one that [*sic*] will ruin your career here in the City of Scappoose."

In the spring of 2013, after Greisen expressly asked City Finance Administrator Herr about the City's practice of holding back payment of vendor invoices until the next fiscal year, Herr responded that she was just doing what she had been told to do by Hanken. Then, within a matter of months after Greisen spoke with Herr, Hanken took his first adverse employment action against Greisen. On July 17, 2013, Hanken sent Greisen a letter notifying Greisen that an investigation had been opened relating to Greisen's February 2013 authorization of the PIT maneuver. On August 1, 2013, Hanken took his second adverse employment action against Greisen. On that date, Hanken sent Greisen a letter notifying him that the City will be conducting a second investigation into Greisen's conduct, this time related to an allegation that Greisen had maintained a hostile work environment within the Police Department. Three weeks later, on August 23, 2013, Hanken sent a letter to Greisen imposing a disciplinary sanction of a two-week administrative suspension without pay relating to the PIT maneuver. One month later, on September 30, 2013, Hanken initiated the third investigation into Greisen and sent Greisen a letter notifying him that the City would be conducting an investigation into Greisen's conduct related to allegations that Greisen may have violated the City's financial policies by using unauthorized bank accounts.

When Hanken told Greisen in May 2012 that Hanken was "mad" at Greisen and that Greisen had better stay on his "side of City Hall," this is evidence that Hanken was aware of Greisen's protected statements and opposed them. The reference to Greisen staying on his "side of City Hall" reasonably can be understood to refer to Greisen's comments about City matters other than those involving only the operation of the Police Department and its budget.

When Hanken told Greisen in August 2012 that Greisen had better "quit listening to Councilor Ingham about the budget" and that "Ms. Ingham will be the one that [*sic*] will ruin your career here in the City of Scappoose," this is evidence that Hanken was aware that Greisen and Ingham had been communicating in violation of Hanken's earlier warning to Greisen and that Hanken continued to oppose this. It is also evidence that Hanken was threatening to take adverse employment action against Greisen, action that could "ruin" Greisen's career.

Notwithstanding Hanken's orders to Greisen to stop commenting on matters outside of Police Department business, Greisen did not stop his questioning and making statements about matters of public concern. In the spring of 2013, Greisen spoke with Herr about the citywide practice of delaying payments to vendors until the next fiscal year. The actions taken by Hanken shortly thereafter, between July 17 and September 30, 2013, came sufficiently close in time to Greisen's conversation with Herr in the spring of 2013 to constitute sufficient circumstantial evidence that Hanken must have learned of those communications made in violation of Hanken's previous directions and that Hanken continued to disapprove of them. This is sufficient temporal proximity to satisfy the first *Keyser* plus factor. The second *Keyser* plus factor also is shown by Hanken's direct statements to Greisen, demonstrating that Hanken disapproved of Greisen commenting on City financial matters that were not on Greisen's "side of City Hall," *i.e.*, that did not strictly concern Police Department business.

Finally, Hanken admitted at trial during cross examination that when he provided the news media with a copy of the photograph of the cash that Greisen had been keeping in his office, along with Hanken's related statements, Hanken knew that this was not money that had just been found or discovered in Greisen's office. Hanken also admitted that he had known for some time about the Police Department's charitable fundraising activities, that the money being held by the Police Chief had not being going through the City's budgetary process, and that the practice of maintaining this money outside of the City's budgetary process had in fact been "authorized." Thus, as Hanken admitted at trial, he knowingly made false statements to the news media that the money in Greisen's desk was "unauthorized." Hanken also admitted during cross examination that Hanken's statements to and conduct with the news media violated City policy. and "wasn't inappropriate." Trial Transcript 476. This is evidence that the reasons given for the adverse employment actions, including the initiation of the third investigation, were false or pre-textual and is sufficient to satisfy the third *Keyser* plus factor.

Even though the Ninth Circuit in *Keyser* noted that a plaintiff need only show at least one of the three *Keyser* plus factors, Greisen at trial presented evidence of all three. Thus, Greisen presented sufficient evidence to show that Hanken acted with the requisite retaliatory motive.

### 3. Causation

Hanken argues that Greisen must prove that it was Hanken who took an adverse employment action against Greisen. Greisen does not dispute this point. Hanken then adds:

> The only adverse [ ] employment action Hanken took was issuing a two week suspension. Plaintiff did not even seek damages related to the two week suspension. The only adverse employment action for which plaintiff sought damages was his termination. Hanken did not terminate plaintiff, he was terminated by subsequent City Manager named Don Otterman. (Tr. Plt. 137:19-24 & Ex. 59) Plaintiff presented no evidence indicating that Hanken participated in the decision to terminate his employment or otherwise influenced Mr. Otterman's decision to terminate him.

ECF 120 at 24 (internal page 17). Hanken continues: "The record contains uncontroverted evidence that in fact Hanken played no part in the decision to terminate plaintiff." *Id*. From this, Hanken concludes that he "cannot be liable for the plaintiff's termination because plaintiff did not present any evidence that Hanken sufficiently influenced Mr. Otterman's later legitimate, independent decision to terminate plaintiff." *Id*. at 24-25 (internal pages 17-18). In support of this conclusion, Hanken cites *Lakeside-Scott v. Multnomah Cty.*, 556 F.3d 797 (9th Cir. 2009).

Before directly addressing Hanken's argument, the Court observes that Hanken is incorrect when he argues that the only adverse employment action that Hanken took was issuing a two-week suspension to Greisen. Initiating each of the three investigations against Greisen also are adverse employment actions. *See Ellins*, 710 F.3d at 1061 (holding that an adverse employment action includes all "actions taken by the defendants [that] were reasonably likely to deter [the public employee] from engaging in protected activity under the First Amendment. The government's act of retaliation need not be severe and it need not be of a certain kind." (quotation marks and citations omitted)). In addition, as will be discussed below, Hanken overstates his case when he asserts that "Hanken played no part in the decision to terminate plaintiff."

A person deprives another of a constitutional right "within the meaning of § 1983, if he does an affirmative act . . . that causes the deprivation of which complaint is made." *Preschooler II v. Clark Cty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007) (quotation marks and citations omitted). "The requisite causal connection may be established when an official *sets in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict constitutional harms*." *Id*. (emphasis added) (quotation marks and citation

omitted). This standard of causation "closely resembles the standard 'foreseeability' formulation of proximate cause." *Arnold v. Int'l Bus. Machs. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981).

These principles also apply in a § 1983 case alleging First Amendment retaliation. In *Austin v. Terhune*, 367 F.3d 1167 (9th Cir. 2004), the Ninth Circuit held that Austin, a state prisoner, sufficiently alleged a claim for First Amendment retaliation. Austin claimed that a guard, Williams, filed a false disciplinary complaint against Austin in retaliation for Austin reporting inappropriate conduct by Williams. As a result of the false disciplinary complaint filed by Williams, Austin was placed in administrative segregation for six weeks. The district court granted summary judgment in favor of Williams. The Ninth Circuit reversed, holding:

> a jury could find that the *administrative segregation was the natural and proximate result of [the guard's] filing a false report accusing an inmate of violating prison rules* . . . [and] could also infer that [the guard] intended that result, and acted only after Plaintiff said he planned to report the incident to prison officials. We conclude that a claim of retaliation for the filing of a First Amendment-protected grievance was sufficiently, though certainly not expertly, raised in the district court.

*Austin*, 367 F.2d at 1171 (emphasis added) (quotation marks omitted).

Further, in *McCollum v. Cal. Dep't. of Corr. & Rehab.*, 647 F.3d 870 (9th Cir. 2011), the Ninth Circuit considered a claim alleging First Amendment retaliation brought by McCollum, a volunteer prison chaplain, against a prison official, Sabrina Johnson. The chaplain alleged that Johnson retaliated against the chaplain for filing a lawsuit against the prison. Specifically, McCollum, the chaplain, alleged that Johnson falsely alleged that McCollum misrepresented himself as a "paid-chaplain" when he was in fact only a volunteer chaplain. This caused an investigation to be instituted that resulted in McCollum losing access to the prison facility for seven months. The district court granted summary judgment in favor of Johnson after finding

that Johnson was not involved in the decision to suspend McCollum's volunteer chaplain

privileges. Rejecting that analysis, albeit in *dicta*, the Ninth Circuit explained:

> This conclusion is inconsistent with our case law. *See Austin v. Terhune*, 367 F.3d 1167, 1171 (9th Cir. 2004) (a false accusation may constitute retaliation where deprivation of a benefit "was the natural and proximate result of" that accusation and one can infer based on the facts alleged that the accuser "intended that result"). We may, however, affirm on any ground supported by the record. *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1059 (9th Cir. 2007). We affirm because McCollum has failed to meet his burden to raise a genuine issue of material fact as to retaliatory motive.

*McCollum*, 647 F.3d at 882.

Thus, to prove causation in a First Amendment retaliation case, a plaintiff need not show

that the defendant personally made the decision that directly resulted in the damage to the

plaintiff. All that a plaintiff need prove to show causation is that the defendant, acting with

retaliatory motive based on the plaintiff's protected conduct, did something where the natural

and proximate result was to set in motion a series of acts by others that caused harm or injury to

the plaintiff and that the defendant intended to bring about that harm or injury. The facts in

*McCollum* are analogous to the fact in the present case.

The evidence presented at trial shows that Hanken, acting with retaliatory motive based

on Greisen's protected conduct, initiated three meritless investigations of Greisen in quick

successive order, gave knowingly false information and misleading photographic evidence to the

news media during an official investigation in violation of City policy, and expressly prohibited

Greisen from presenting to the news media his side of the story. These actions set in motion a

series of acts by others (including by the news media and later by interim City Manager

Otterman) that a reasonable jury could find naturally led to Hanken's economic and

non-economic damages. Further, based on Hanken's prior experience with local governments,

*see* Trial Transcript 397-400, it is a reasonable inference that Hanken was aware that these

damages to Greisen would be the natural and proximate result of Hanken's actions and that he intended these results. As in *McCollum*, the fact that someone other than Hanken, namely Otterman, made the decision to terminate Greisen's employment, does not relieve Hanken of responsibility for the natural and proximate consequences of his actions, just like the fact that someone other than Johnson made the decision to suspend McCollum's volunteer chaplain privileges.

Hanken argues that the Ninth Circuit's decision in *Lakeside-Scott* demonstrates an instance of an intervening cause that breaks the chain of proximate causation. In *Lakeside-Scott*, a discharged county employee (Scott) sued the county and a supervisor (Brown), alleging retaliatory discharge after Scott made certain comments about her co-workers and one of her other supervisors. Scott was directly supervised by Hogue, who reported to Gorton, who reported to Brown. Brown, in turn, reported to the department director Fuller. Scott complained to Hogue and Gorton about alleged misuse of the County's computers by co-workers and managers. Scott also filed a formal complaint with the Oregon Bureau of Labor and Industries ("BOLI"), alleging among other things that Brown gave preferential treatment to gays and lesbians in hiring and promotion. Brown learned about the BOLI complaint shortly thereafter. *Lakeside-Scott*, 556 F.3d at 800.

In an unrelated episode, Fuller ordered Brown to search the work emails of a different employee, Landis, as part of an investigation of still another employee who allegedly sent racially discriminatory emails at work. Brown directed another employee (Williams) to perform the search. As part of this search, Williams discovered a journal written by Scott and sent by Scott to Landis. After the discovery of Scott's journal, either Human Resources or Fuller instructed Brown to look for additional materials from Scott. *Id.* at 800.

In the meantime, either someone in Human Resources, or perhaps Williams, informed Brown about Scott's journal having been found. Brown read the journal, which included inappropriate remarks. Brown showed Scott's journal to Fuller, who placed Scott on administrative leave. Fuller then directed another employee, Turner, to conduct an internal inquiry into Scott's possible violations of County work rules or policies. Brown was not involved in this investigation. Ultimately, it was discovered by Fuller that Scott misused County property, conducted personal business on County time, inappropriately accessed emails and other documents of other employees, and engaged in prohibited workplace harassment. Fuller notified Scott of these charges. At the conclusion of Turner's investigation, Turner prepared a report for Fuller, concluding that the charges had been sustained. Although Scott's journal was the reason that Fuller decided to initiate the investigation of Scott, Fuller based her decision to fire Scott on the evidence that Turner uncovered. *Id*. at 801.

Scott sued, alleging among other claims retaliatory discharge based on Scott's filing of a BOLI complaint and her criticisms of Brown. A jury found in favor of Scott. *Id*. at 802. The Ninth Circuit reversed, holding that Scott was discharged after Fuller, the department director, made an independent decision to terminate Scott's employment. As explained by the Ninth Circuit:

> Here, it is not clear that Scott relies on Brown's role in bringing the journal to Fuller's attention or her participation in the administrative leave decision as alone sufficient to support the jury's verdict finding Brown liable for Scott's termination. Even if we consider those events, however, the evidence negates any inference that Fuller would not have taken any action against Scott but for Brown's retaliatory motivations. The journal surfaced in a workplace investigation of possible employee misconduct, and several DCJ employees became aware of its existence contemporaneously with Brown. Brown was engaged in activities typical and appropriate for her position when she became aware of the journal. The journal itself was accidentally discovered during

an investigation of another employee's conduct, and Scott did not allege that Brown targeted her for investigation or selectively reported her misconduct. Brown was at most a part of a process that included several other employees who were focused on disciplining violations of workplace rules and policies. Given the numerous potential rules violations revealed in the journal and the actions taken by the human resources department, it is unreasonable to conclude that Fuller—who had already initiated the inquiry into another employee's misuse of emails—would not have been informed of or reacted to the journal but for Brown's animus against Scott.

Given the evidence that Fuller made an independent, principled decision for her own reasons to investigate and eventually terminate Scott, there was by definition no "constitutional injury."

*Id*. at 805 (footnotes omitted). The Ninth Circuit held that "the neutrality of the decisionmaking process eliminated any 'causal' link to Brown's bias," *id*. at 806, and that "the record of Fuller's independent actions and judgments compels the conclusion that she was not influenced by any retaliatory motive on Brown's part." *Id*. at 807.

Hanken's reliance on *Lakeside-Scott* is not persuasive because the facts in that case are significantly distinguishable from the facts in the present case. Otterman testified that he made the decision to terminate Greisen under the "no cause" provision in Greisen's contract only after Otterman "reviewed the three reports that had been done—the report regarding the pursuit, the financial report, and the hostile work environment report—and after I reviewed those reports, I felt that it was the best for the City if he [Greisen] was to leave." Trial Transcript 291. Otterman, however, did not testify that he had made an independent decision that Greisen had engaged in misconduct sufficient to justify termination. This distinguishes the present case from *Lakeside-Scott*, where Fuller made an independent decision, not influenced by Brown's allegedly retaliatory motive, that Scott had engaged in substantial wrongful conduct that warranted termination of her employment, including misusing County property, conducting personal

business on County time, inappropriately accessing emails and other documents of other

employees, and engaging in prohibited workplace harassment

Otterman made no such finding about Greisen. As Otterman testified at trial, "There were

several articles about [Greisen] and about what was going on in the City. The city manager had

been fired. The police chief was on administrative leave. And that causes commotion or turmoil

in the organization and needs to be resolved as soon as possible." Trial Transcript 303-304. Thus,

Otterman terminated Greisen's contract based on the "commotion or turmoil" that Hanken,

acting with retaliatory motive, had set in motion.

In *Lakeside-Scott*, Fuller, who had no retaliatory motive, came across information that

resulted in Fuller's independent decision to fire Scott for reasons that had nothing to do with

anything done by Brown, who arguably did have a retaliatory motive. In contrast, Otterman, who

had no retaliatory motive, based his decision to terminate Greisen's employment solely on the

existence of a controversy created by Hanken. Thus, *Lakeside-Scott* is factually distinguishable,

and there is no intervening and independent cause that breaks the chain of causation.

Moreover, any other conclusion would be inconsistent with the direction from the Ninth

Circuit in *Austin* and *McCollum* that a claim of First Amendment retaliation may include

recovery for damages that are "the natural and proximate result of" actions taken by a defendant

with a retaliatory motive who intended to cause those damages. A reasonable jury could

conclude from the evidence presented at trial that Otterman's termination of Greisen's

employment based on the "commotion or turmoil" that Hanken had set in motion was the natural

and proximate result of Hanken's actions. *See also Gini v. Las Vegas Metro. Police Dep't.*, 40

F.3d 1041 (9th Cir. 1994) ("There is no question here that neither the LVMPD nor Mahony was

Gini's employer. Neither terminated her. However, we have recognized that '[t]he requisite

causal connection can be established not only by some kind of direct personal participation in the deprivation but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'") (citations omitted).

In addition, Hanken raises an entirely new argument in his reply brief, which he presented neither at trial nor in his opening post-trial memorandum. Hanken asserts that "[s]peech in response to speech is not an adverse employment action." ECF 135 at 28 (internal page 21). Hanken makes a similar point in his post-reply supplemental memorandum, which the Court allowed Hanken to file after allowing Greisen to file a supplemental memorandum. In Hanken's supplemental memorandum, he cites *Mulligan v. Nichols*, 835 F.3d 983, 990 (9th Cir. 2016), for the proposition, according to Hanken, that "speech in response to speech cannot support a First Amendment retaliation claim." ECF 140 at 7-8 n.4. In *Mulligan*, however, the Ninth Circuit simply observed that "plaintiffs alleging government retaliation that takes the form of speech [must] meet a high threshold." 835 F.3d at 990. In the present case, the challenged adverse employment actions taken by Hanken involve more than just speech, although Hanken's knowingly false and misleading statements to the news media about Greisen contributed to Hanken's economic and non-economic harm. The adverse employment actions taken by Hanken challenged by Greisen include initiating three meritless investigations against Greisen. This is more than just speech. For all of the reasons stated above, Greisen has presented sufficient evidence of causation to sustain the jury's verdict.

### 4. Qualified immunity

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v.*

*Callahan*, 555 U.S. 223, 231 (2009). The doctrine protects officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The privilege is an *immunity from suit* rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (quotation marks omitted) (emphasis in original). For this reason, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam). This Court has done so.

On December 29, 2015, the Court denied Hanken's motion for summary judgment based on qualified immunity. ECF 42 at 12-14. As previously discussed by the Court at summary judgment, the Supreme Court in *Saucier* outlined a two-step analysis for determining the applicability of the qualified immunity doctrine. 533 U.S. at 200. The first step is to determine "whether a constitutional right would have been violated on the facts alleged." *Id*. The second step is to determine "whether the right was clearly established." *Id*. When considering whether qualified immunity applies, the court must resolve all factual disputes in favor of the party asserting the injury. *Ellins*, 710 F.3d at 1064.

### a. Step one

At trial, Greisen presented substantial evidence that would permit a reasonable jury to conclude that he spoke as a private citizen on "a matter of public concern" and that his "protected speech was a substantial or motivating factor in the adverse employment action." *Ellins.* 710 F.3d at 1056 (quotation marks omitted). These points have already been discussed in connection with Hanken's first and second arguments in support of his renewed motion for judgment as a matter of law. Thus, Greisen has satisfied step one of the qualified immunity analysis.

### b. Step two

Regarding step two, "'[a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Hunt v. Cty. of Orange*, 672 F.3d 606, 615 (9th Cir. 2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "The 'clearly established' requirement 'operates to ensure that before they are subject to suit, [government officials] are on notice their conduct is unlawful.'" *Eng*, 552 F.3d at 1075 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)) (quotation marks omitted).

The First Amendment right of public employees to be free from retaliation for commenting on matters of public concern outside of their official duties was well established by 2012. *See Ellins*, 710 F.3d at 1065 (stating that the right was established in 1968 with the Supreme Court's opinion in *Pickering v. Board of Education*).

Greisen's First Amendment right to be free from retaliation for constitutionally protected speech was clearly established at the time of the alleged violation. Taking the facts in the light most favorable to the Plaintiff, a reasonable jury could have concluded that Hanken violated Greisen's clearly established constitutional right by taking action against Greisen in retaliation for Greisen's constitutionally protected speech. Accordingly, the Court denies Hanken's renewed motion for judgment as a matter of law.

## B. Motion for New Trial or Remittitur

Hanken also raises four arguments in support of his motion for new trial or remittitur. First, Hanken argues that the jury's award of both economic and non-economic damages was excessive. Second, Hanken argues that the weight of the evidence establishes that Greisen did not engage in protected speech. Third, Hanken argues that three of the Court's evidentiary

rulings were erroneous and substantially prejudiced him. Finally, Hanken argues that the Court's Jury Instruction No. 17 was erroneous.

## 1. Damages

### a. Economic damages

After the City of Scappoose terminated his employment in May 2014, Greisen unsuccessfully applied for more than 200 positions related to law enforcement across the country. Trial Transcript 108; Trial Exhibit 61. Greisen was approximately 50 years old at the trial his employment as Police Chief was terminated, and he testified that he "wasn't ready to leave Scappoose at that time. I wasn't ready to retire or anything," and that he was "going to work another 15 years easily." Trial Transcript 112-13. At trial, Greisen called the City Manager for the City of Sutherlin, Oregon, Garold Gillham. He also was a former City Manager for the City of Scappoose and is a member of the Oregon City/County Managers Association. Gillham testified that before a city manager would consider hiring someone to be a chief of police or a deputy chief, a background search would be conducted. According to Gillham, based on a Google search of Greisen's name, he is "unhirable." Gillham added, "everybody watches the chief of police, even more so than the city manager, and I -- I could not move to bring him on board." *Id.* at 232-33, 240-41.

Based on this foundation, Greisen called an expert witness on economic damages, Ronald Greisen. Although this expert witness was Plaintiff's brother, this witness was a certified public accountant, possessed a financial forensic certification from the American Institute of CPAs, and previously assisted clients regarding damages in both court cases and arbitrations. *Id.* at 254. Plaintiff's expert witness calculated Plaintiff's economic damages both up through trial and continuing into the future for seven years. He reduced Plaintiff's current economic damages by the amount that Plaintiff had earned working at other jobs since May 2014, and he discounted

Plaintiff's estimated future lost income to present value. *Id*. at 255-59. Although Hanken cross-examined Greisen's expert witness, Hanken did not offer his own expert witness or present any alternative calculations of economic damages. The jury's conclusion regarding Greisen's economic damages is not contrary to the clear weight of the evidence, grossly excessive or monstrous, or based only on speculation or guesswork. It is affirmed.

### b.    Non-economic damages

Hanken also challenges the jury's award of $3,000,000 in non-economic damages. At trial, Greisen presented ample evidence, both through his own testimony and with testimony from his wife, concerning the emotional damage that Greisen suffered as a result of Hanken's actions. Hanken's actions included instigating the three meritless investigations, giving an explicit order to Greisen (three times) that he not speak with anyone other than his family and his legal counsel about the underlying facts, and making the admittedly inappropriate and contrary-to-City-policy communications the news media, including providing a copy of the photographic cash spread relating to the third investigation. Moreover, Hanken offered no alternative damage figure for the jury to consider if it were to reach the question of damages.

Hanken also argues that "Plaintiff presented no evidence from a psychologist, psychiatrist or other mental health professional regarding his condition." ECF 120 at 29 (internal page 22). That is true, but Hanken provides no legal authority that any such testimony is required before a jury may award non-economic damages for emotional distress—and the Court is aware of no such authority.

Hanken also offers other cases for comparison purposes in which juries awarded much smaller amounts for emotional distress damages. In response, Greisen cites *Harper v. City of Los Angeles*, 533 F.3d 1010 (9th Cir. 2008), in which the Ninth Circuit affirmed non-economic

compensatory damage awards of $5,000,001 to each of the three former police officer plaintiffs for their § 1983 claims against the City. As the Ninth Circuit observed in that case,

> Compensable injuries under § 1983 include "impairment of reputation, personal humiliation, and mental anguish and suffering." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986); *see also Johnson v. Hale*, 13 F.3d 1351, 1353 (9th Cir. 1994) (discussing compensatory damages under 42 U.S.C. § 1982). The testimony of the plaintiff alone can substantiate a jury's award of emotional distress damages. *See Zhang [v. Am. Gen. Seafoods, Inc.]*, 339 F.3d [1020,] at 1040 (9th Cir. 2003); *see also Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 513 (9th Cir. 2000).

*Harper*, 533 F.3d at 1029. The facts of the cases cited by Hanken as well as the facts in *Harper* cited by Greisen are sufficiently distinct from the facts in the present case to offer relatively little guidance to the Court. Nevertheless, based on the principles stated by the Ninth Circuit in *Harper* and other cases, the Court concludes that the evidence presented at trial is sufficient to sustain the jury's non-economic damage award of $3,000,000.

Finally, Hanken argues:

> Additionally, plaintiff's counsel inappropriately urged the jury to "send a message" in rebuttal resulting in what amounted to an award of punitive damages against defendant disguised as an award for emotional distress. (Tr. Plt. Closing 567:17-568:9) Punitive damages were not recoverable against the individual defendant in this case. Dkt. 42 at 14 ("Greisen…conceded that his claim for punitive damages should be stricken.")

ECF 120 at 28 (internal page 21). Hanken is correct. The Court previously struck punitive damages, and it was improper for Greisen's counsel to argue to the jury that it should "send a message" in this case.

Hanken, however, fails to note two points. First, Hanken's counsel did not object to the statement of Greisen's counsel at closing argument. More significantly, the Court *sua sponte* issued a curative instruction. Plaintiff's counsel made his inappropriate "send a message"

comment in the closing seconds of rebuttal argument. Immediately thereafter, the Court told the jury:

> THE COURT: All right. Thank you, Mr. Ostrander. Although, I do want to clarify something for the jury. There's some talk about sending a message. I want to make sure you understand, as I say in the instructions, because that can mean different things to different people. In this civil case you may—if you decide that there's liability and if you decide to award damages, you may only award damages to compensate for injuries or for damages or for loss consistent with the instructions that I've given you. I just want to make sure that's clear.

Trial Transcript 568. Hanken's counsel did not ask for any further curative instruction. The jury's conclusion regarding Greisen's non-economic damages is not contrary to the clear weight of the evidence, grossly excessive or monstrous, or based only on speculation or guesswork. It is affirmed.

## 2.  Weight of the evidence regarding protected speech

Hanken argues that the weight of the evidence establishes that Greisen did not engage in protected speech. ECF 120 at 37-38 (internal pages 30-31). The Court has already sufficiently discussed this evidence at Section A(1), *supra*. The Court concludes that the weight of the evidence does not warrant a new trial.

## 3.  Evidentiary rulings

Defendant challenges three of the Court's evidentiary rulings at trial. They are discussed in turn.

### a.  Police department budget

Both Greisen and Hanken agree that Greisen's discussions with City Councilors and employees regarding the Police Department budget, including discussions concerning the delayed payments made by the City on vendor invoices for purchases for the Police Department, were not protected under the First Amendment. Greisen made those comments as part of his

official duties. Nevertheless, the Court allowed Greisen to testify about those discussions and the

Court received exhibits concerning those issues, over Hanken's timely objection, to provide the

jury with background and context to understand the issues and how Greisen came to learn about

the City's widespread practice in other departments of delaying payment on vendor invoices.

Hanken argues:

> Determining what is and what is not protected speech is
> complicated. The court's decision to admit speech which it had
> already ruled could not form the basis of the plaintiff's claim
> substantially prejudiced Hanken because it distracted the jury from
> a key, threshold issue in this case.

ECF 120 at 39 (internal page 32).

Hanken's argument is without merit. Before trial began, the Court denied Hanken's

eighth motion *in limine* (ECF 60 at 10-11) to exclude testimony relating to the Police

Department's budget. The Court stated:

> The Court previously has ruled that Plaintiff's statements made
> concerning the Police Department budget were made in his role as
> Police Chief and are not constitutionally protected. The jury will
> be so instructed. The evidence relating to the Police Department
> budget, however, including Plaintiff's statements about that
> budget, provide relevant background showing how Plaintiff came
> to learn about other budgetary issues involving Defendant that
> went beyond merely the Police Department budget.

ECF 92 at 7. Hanken did not request a limiting instruction at the time the evidence was received.

Instead, this instruction was given at the close of the case.

Immediately before closing arguments, the Court instructed the jury both orally and in

writing as follows:

> When the Plaintiff, who was the Chief of Police, spoke about his
> concerns over the Police Department's budget and finance issues,
> he was not speaking as a citizen; instead, those communications
> were made pursuant to his official duties. Those communications
> are not constitutionally protected free speech and may not serve as
> the basis for finding any liability by the Defendant. Those

statements were received in evidence only for the limited purpose
of providing background, and only to the extent that you may find
them to be helpful.

ECF 105 at 14-15 (Jury Instruction No. 16); Trial Transcript 524-25. Jurors are presumed follow

the Court's instructions. *Richardson v. Marsh*, 481 U.S. 200, 206 (1987).

Further, Plaintiff's counsel, in closing argument, reinforced this point, telling the jury:

Now, be clear, Exhibit—or Instruction 16 states that, you know,
questions about police budget, that portion of the budget, police
budget, are not protected, and we are not claiming that they are.
We showed you the evidence about the late payments for the over
four months payments for ammunition and the late—the problems
with batteries and the vendor material flow just so you would have
background and understand how this issue came up.

But, in contrast, questions to other departments about are you
not—are you—you know, about late payments to other
departments—the water, the sewer—that's not the police budget.

\*    \*    \*

Questions about other departments is not part of his job as police
chief. And, to that point, the evidence before you is that Doug
Greisen also talked to actual other department heads. It was Steve
Wabschall in Sewer and Terry Andrews in Public Works about
their experience.

\*    \*    \*

The overall budget, not within his job duties—airport, parks, pools.
Questions about audits are not within his job duties. Questions
about other department's late payments are not in his job duties.
Questions about—more general questions about, you know, "What
is Hanken's sudden increased protectiveness and what's going
on?" That's not—

Trial Transcript 531-33. There was no error and no substantial prejudice to Hanken in receiving

this evidence.

### b.  Mr. Bickmore

Hanken's ninth motion *in limine* sought to exclude evidence relating to Mr. Bickmore,

including his mugshots. ECF 60 at 11-12. Mr. Bickmore was the suspect in the hit-and-run

accident that was the subject of the PIT maneuver at issue in the first internal investigation of

Greisen initiated by Hanken. The Court denied the motion in limine, explaining "This evidence

provides relevant background concerning the PIT maneuver incident." ECF 92 at 7. The

evidence was received, including mug shots taken of Bickmore. Hanken argues that "allowing

the plaintiff to introduce this irrelevant, inflammatory evidence substantially prejudiced Hanken,

a City Manager with absolutely no expertise in PIT maneuvers, because it distracted the jury

from relevant issues and implied that they should find the investigation was retaliatory and that

plaintiff was justified in violating police department policy because he was protecting the public

from a person who looks 'scary' in a still photograph." ECF 120 at 40 (internal page 33).

The photographs of Mr. Bickmore were received in evidence as Trial Exhibits 27-30,

after sufficient foundation testimony was provided that "they represent the person that [Greisen]

stopped on February 4, 2013." Trial Transcript 83. Greisen explains the relevance of this

evidence as follows:

> Plaintiff presented evidence that Defendant's investigation of the
> Bickmore arrest, and the subsequent investigation, was retaliatory.
> Part of that evidence consisted of the facts demonstrating that
> neither Defendant, nor the investigator he hired (Mr. Stoelk),
> considered the circumstances of the arrest, including Bickmore's
> "deranged" demeanor. Tr. 472:10-13 (Hanken); Tr. 334:15-17,
> 336:5-22 (Stoelk). Plaintiff and Officers Miltich and Oxenrider all
> observed Bickmore in person. They all concluded that he was
> dangerous to the community and that a PIT maneuver was
> necessary and appropriate to stop him. Tr. 206:3-9, 207:1-11
> (Miltich); Tr. 80:17-81:4 (Plaintiff); Tr. 503:14-20, 504:16-505:11
> (Oxenrider). Each of these witnesses considered Bickmore's
> deranged demeanor in making their decision that the arrest of
> Bickmore required the use of potentially deadly force. It was
> established that the Bickmore photographs, Exhibits 27 through 30,
> accurately represented the person Plaintiff stopped on the night of
> February 4, 2013. Tr. 83:3-5. Defendant ignored the circumstances
> of this arrest and pretextually punished Plaintiff for the PIT
> maneuver he authorized that night. The Jury was entitled to
> understand the threat that Defendant willfully ignored.

ECF 128 at 53 (internal page 48). The Court agrees with Greisen. There was no error and no substantial prejudice to Hanken in receiving this evidence.

### c. News media reports

Hanken argues that it was prejudicial error for the Court to receive news media reports discussing Greisen, including the newspaper article the contained the photograph of the "cash spread" (Trial Exhibit 51) and the KOIN 6 television news report (Trial Exhibit 50). ECF 120 at 40-42 (internal pages 33-35). Hanken also makes a new argument, not raised at trial. Hanken correctly observes that the Court previously dismissed Greisen's defamation and false light claims. ECF 42 at 14-20. Hanken then adds: "By allowing plaintiff to impose liability on Hanken for exercising *his own rights* under the First Amendment, the court allowed plaintiff to use the Court to retaliate against Hanken. *See generally New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) (involving defamation claim by a public figure); *Time, Inc. v. Pape*, 401 U.S. 279 (1971) (involving defamation claim by a police chief). This substantially prejudiced defendant." ECF 120 at 40-41 (internal pages 33-34) (emphasis in original). Among other responses, Greisen argues that Hanken's official duties as City Manager included communicating with news media regarding the City and thus would not constitute speech protected under the First Amendment for § 1983 retaliation purposes.

In addition, the items of evidence about which Hanken complains are relevant to Greisen's damages and were received with limiting instructions. As the Ninth Circuit observed in *Harper*, "[c]ompensable injuries under § 1983 include 'impairment of reputation, personal humiliation, and mental anguish and suffering.'" *Harper*, 533 F.3d at 1029 (quoting *Stachura*, 477 U.S. at 307).

When the Court received Trial Exhibit 51, the Court instructed the jury that it was receiving that evidence for the limited purpose of providing context for Greisen's testimony about how it made him feel. The Court instructed the jury:

> THE COURT: Well, this is a copy of a newspaper article. You'll see it in a few moments. We all know times the newspaper stories don't get all their facts right. So I'm not letting this in evidence for the truth of anything that's asserted. You may not conclude, from anything that you read in here, ah, that's evidence of that thing really happened.
>
> However, there's not any – there's evidence that this article was published in the paper. We have now heard evidence that Mr. Greisen read it and saw it and to the extent that it had an effect on him and what that effect was and how it made him feel when he read about this. That is a legitimate purpose, and so I'm receiving this evidence for that purpose.

Trial Transcript 98. Greisen then told the jury how reading this and seeing the photographic money spread made him feel. *Id*. at 99.

During the direct examination of Plaintiff's wife, Mrs. Greisen, the Court allowed the jury to see the television news story contained in Trial Exhibit 50, which related primarily to the second investigation initiated by Hanken. Trial Transcript 177. Plaintiff's wife described the reaction of her husband when they watched this story together on television. *Id*. at 177-78. Hanken did not request a limiting instruction regarding this evidence. Plaintiff's wife also described Plaintiff's reaction when the newspaper story (Trial Exhibit 51) came out. Trial Transcript 178-80.

Finally, regarding the "cash spread" depicted in the photograph contained in Trial Exhibit 51, Hanken argues that "the photograph of the money—was true." ECF 120 at 28 (internal page 21); ECF 120 at 41 (internal page 34). Hanken cites to the following testimony from the cross examination of Greisen:

> Q.      So to the extent there's a photo of cash from a desk, that is an accurate photo, right, that there was cash in your desk?
>
> A. Yes.

Trial Transcript 152. This argument, however, glosses over the fact that the way in which the money was spread on the desk and then photographed makes it appear in Trial Exhibit 51 as if it came from a "drug bust," which was confirmed both by Lt. Miller and by Hanken. Trial Transcript 392 (Miller); Trial Transcript 492 (Hanken). As Hanken admitted on cross examination, what he did was contrary to City policy and "wasn't appropriate." Trial Transcript 467, 474-76. There was no error and no substantial prejudice to Hanken in receiving this evidence.

### 4.  Jury Instruction No. 17

Hanken argues that Jury Instruction No. 17 was an incorrect statement of the law. ECF 120 at 42-43 (internal pages 35-36). That instruction reads in full as follows:

**Instruction No. 17: Plaintiff's Claim for Damages**

It is the duty of the Court to instruct you about the measure of damages. By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

If you find for the Plaintiff, you must determine the Plaintiff's damages. The Plaintiff has the burden of proving damages by a preponderance of the evidence. Damages means the amount of money that will reasonably and fairly compensate the Plaintiff for any injury you find was caused by the Defendant.

You can award money only for those damages that arise naturally and necessarily from the violation of law that the Plaintiff has proven.

It is for you to determine what damages, if any, have been proved. Your award must be based upon evidence and not upon speculation, guesswork, or conjecture.

The basic purpose of § 1983 damages is to compensate persons for injuries that are caused by the deprivation of constitutional rights. Compensatory damages may include not only out-of-pocket loss

and other monetary harms (which are generally referred to as "economic" loss or damages), but also such injuries as impairment of reputation, personal humiliation, and mental anguish and suffering (which are generally referred to as "non economic" loss or damages).

In determining the measure of damages, you should consider:

1.      The loss of enjoyment of life experienced and which with reasonable probability will be experienced in the future and the mental or emotional pain and suffering experienced and that with reasonable probability will be experienced in the future (non economic loss, present and future);

2.      The reasonable value of wages, earnings, employment, and employment opportunities lost up to the present time (present economic loss); and

3.      The reasonable value of wages, earnings, employment, and employment opportunities that with reasonable probability will be lost in the future (future economic loss).

If you find that the Defendant wrongfully retaliated against the Plaintiff in violation of the Plaintiff's constitutional rights, and if you also find that it was reasonably foreseeable that such wrongful retaliatory conduct, if any, by the Defendant would render the Plaintiff unable to maintain either his position or his salary (either at the City of Scappoose or at another employer), then you may award the Plaintiff any non-speculative, foreseeable economic damages caused by the Defendant's wrongful retaliatory conduct.

Let me say a little more about the concept of "causation" or "cause" in the context of damages. The Plaintiff must prove that the claimed unlawful conduct "caused" his damages. The Plaintiff bears the burden to show that "but for" Defendant's wrongfully motivated retaliatory conduct, the damages he claims would not have occurred. You may not award damages to the Plaintiff that are not caused by Defendant's wrongfully motivated retaliatory conduct, if any.

ECF 105 at 15-17.

Hanken's first objection to this jury instruction is based on the Ninth Circuit's decision in

*Lakeside-Scott*. ECF 120 at 42 (internal page 35). For the reasons previously discussed,

*Lakeside-Scott* is factually distinguishable, and the Court's instruction is consistent with the Ninth Circuit cases of *Austin* and *McCollum*. *See* discussion at Section A(3), supra.

Hanken's second objection is that the Court's instruction "does not accurately capture the state of the law with respect to damages arising in employment claims alleging retaliation in violation of the First Amendment" and "does not properly recite the law with respect to assessing damages for various other types of section 1983 claims, which, like First Amendment retaliation claims derive from tort principles." ECF 120 at 43 (internal page 36). Hanken does not develop this argument in his memorandum and does not address it at all in his reply brief. Nevertheless, the Court has reviewed its Jury Instruction No. 17 and finds it consistent with the law of this circuit. *See Harper, Austin,* and *McCollum*, discussed *supra*. In addition, in this instruction the Court directed the jury that it may only award damages caused by Hanken that were reasonably foreseeable.

## CONCLUSION

Defendant Hanken's Renewed Motion for Judgment as a Matter of Law and Alternative Motions for New Trial and Remittitur (ECF 120) are denied.

**IT IS SO ORDERED**.

DATED this 12th day of May, 2017.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge